UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

UNITED STATES OF AMERICA,      )
                               )
  PLAINTIFF,                   )      CASE NO. 2:14-CR-127
                               )
        vs.                    )      APRIL 13, 2016
                               )
ROBERT B. LEDBETTER, ET AL.,   )      9:00 A.M.
                               )
  DEFENDANTS.                  )      VOLUME 7
_____)


**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
BEFORE THE HONORABLE ALGENON L. MARBLEY
UNITED STATES DISTRICT JUDGE, and a jury
COLUMBUS, OHIO


APPEARANCES:

FOR THE PLAINTIFF:

BENJAMIN C. GLASSMAN
United States Attorney
By:  DAVID M. DEVILLERS
     KEVIN W. KELLEY
     BRIAN J. MARTINEZ
Assistant United States Attorneys
303 Marconi Boulevard
Columbus, Ohio  43215


FOR THE DEFENDANT ROBERT B. LEDBETTER:

JEFFREY A. BERNDT, ESQ.
575 South High Street
Columbus, Ohio  43215

AARON G. DURDEN, ESQ.
10 West Monument Avenue
Dayton, Ohio  45402
                                    - - -


     Proceedings recorded by mechanical stenography,
transcript produced by computer.

APPEARANCES CONTINUED:


FOR THE DEFENDANT CHRISTOPHER A. HARRIS:

Carpenter, Lipps & Leland, LLP
By:  KORT W. GATTERDAM, ESQ.
280 North High Street
Columbus, Ohio  43215

KEVIN P. DURKIN, ESQ.
367 East Broad Street
Columbus, Ohio  43215


FOR THE DEFENDANT RASHAD A. LISTON:

ISABELLA DIXON, ESQ.
98 Hamilton Park
Columbus, Ohio  43203

Kegler, Brown, Hill & Ritter
By:  S. MICHAEL MILLER, ESQ.
65 East State Street
Columbus, Ohio  43215


FOR THE DEFENDANT DEOUNTE USSURY:

Office of the Ohio Public Defender
By:  GREGORY W. MEYERS, ESQ.
      KIRK A. MCVAY, ESQ.
250 East Broad Street
Columbus, Ohio  43215


FOR THE DEFENDANT CLIFFORD L. ROBINSON:

Scott & Nolder Law Firm
By:  STEVEN S. NOLDER, ESQ.
35 East Livingston Avenue
Columbus, Ohio  43215


- - -

TRIAL ONE – VOL. 7 – 468

WEDNESDAY MORNING SESSION

APRIL 13, 2016

– – –

(Thereupon, the following proceeding was held in open court with all counsel and defendants present.)

(Jury in at 8:59.)

THE COURT:  Good morning, ladies and gentlemen.  I hope everyone had a pleasant evening and a pleasant drive in.  I'm loath to say it, but I'll say it anyway.  I think we might have turned the corner.  It might be spring in fact.  Snow might be behind us.  Who knows.  We might get lucky this weekend.

Mr. Kelley, are you ready to continue with the government's case in chief?

MR. KELLEY:  We are, Your Honor.

THE COURT:  Please call your first witness.

MR. KELLEY:  Thank you, Your Honor.  We call Michael Robison.

(Witness sworn.)

THE COURT:  Officer, please bend the mic toward you as much as you can and speak clearly into it.  Thank you.  Mr. Kelley, please proceed.

TRIAL ONE – VOL. 7 –  469

1                              – – –

2                        MICHAEL ROBISON

3       Called as a witness on behalf of the Plaintiff,

4       being first duly sworn, testified as follows:

5                      DIRECT EXAMINATION

6       BY MR. KELLEY:

7       Q    Please state your name and spell your last name for us.

8       A    Michael N. Robison, R-O-B-I-S-O-N.

9       Q    Who do you work for?

10      A    Columbus Division of Police.

11      Q    How long have you been with the Columbus Division of

12      Police?

13      A    Just shy of 17 years.

14      Q    I want to take your attention back to the time frame

15      2006, 2007.  Tell the ladies and gentlemen of the jury where

16      you were working at that time.

17      A    I was working patrol assignment 4th Precinct which

18      covers the off-campus area and the Short North area.

19      Q    Give us a general idea what were your responsibilities?

20      A    As a patrol officer, you respond to calls for service

21      whether they be crimes in progress or taking reports from

22      individuals.

23      Q    And the area you described, you said the Short North,

24      that was part of the 4th Precinct?

25      A    Yes, sir.

TRIAL ONE – VOL. 7 –   470

1   Q    Can you describe what you believe the boundaries of the

2   Short North to be?

3   A    Currently, Short North probably would stretch down to

4   south to First or Second Avenue, up until about Seventh or

5   Eighth Avenue; probably reach to High to about Grant.

6   Q    Okay.  I want to ask you about a couple of specific

7   incidents.  I want to draw your attention to February 23rd of

8   2006.  Were you involved in an incident involving a Mechie

9   Harris?

10   A    Yes, sir.

11   Q    First off, who is Mechie Harris?  Do you know his given

12   name?

13   A    Demetrius Harris.

14   Q    What was this incident?  How were you involved?

15   A    A fellow officer assigned to the precinct aired that he

16   was -- he stopped a car, and the driver fled from the car.  He

17   said he was not pursuing the individual; he was just going to

18   stay and impound the car, but if anyone saw Mechie -- that was

19   the person that ran from him -- pick him up if possible and

20   bring him back to him.

21   Q    At that point, were you already familiar with this

22   Mechie Harris?

23   A    Yes, sir.

24   Q    Explain to the jury how.

25   A    Just from being assigned to that area from the time I've

TRIAL ONE - VOL. 7 - 471

1   been out there.  It was frequent to come across him.

2       Q    What happens, then, for you, that afternoon?

3       A    I responded to the area that Officer Haley had described

4   where Mechie had fled to or fled from.  I came from -- I think

5   I was west of High Street.  I came across Eighth from Summit to

6   Fourth.  And as I came to the stop sign at eastbound on Eighth

7   to Fourth, I saw who I was pretty sure was Mechie.  At that

8   point in time I had a hard time from discriminating Mechie from

9   Chris.  They're brothers.  They look fairly similar.  I knew it

10  was one of the two.  I pulled across the street, got out with

11  him, and was surprised he didn't run seeing how he ran from

12  another officer.

13          MR. GATTERDAM:  Objection.  Speculation.

14          THE COURT:  Overruled.

15          THE WITNESS:  I said, Are you Chris or Mechie?

16      He said, I'm Mechie.

17      I'm like, Hop in.  I got another officer who wants to

18  talk to you.

19      He complied completely, got in the back seat.  I took

20  him to Officer Haley where he took custody of him and put him

21  in the back of his cruiser.

22      BY MR. KELLEY:

23      Q    What did you do at that point?

24      A    I stood by and kind of watched his prisoner Mechie while

25  he completed paperwork to impound the vehicle that he had run

TRIAL ONE – VOL. 7 –  472

1    from.

2    Q    You also mentioned you were familiar with a brother

3    Chris.  Can you tell us about that?

4    A    Yes; similar, very frequent run-ins, or just would see

5    him out and about on the streets as we're doing our daily

6    patrol duties.

7    Q    Ultimately, who was responsible for the handling of

8    Mechie Harris and his arrest?

9    A    Primarily Officer Haley.

10   Q    Okay.  What happened, then, next that was significant?

11   A    Officer Haley communicated to me that he wanted to get

12   Mechie out of the car to search him further because he felt he

13   was trying to either conceal or remove something that was

14   concealed in the back of his -- while he was in the back of the

15   car.

16        So we got him out of the cruiser.  And Jim -- I'm sorry.

17   Officer Haley could feel something in his coat, and so we

18   decided the best course of action was to take the coat off of

19   him.  But in doing so, we have to release at least one hand

20   from the handcuffs so you can remove the coat.  As we did that,

21   Mechie spun and tried to flee from us, which ended up being a

22   bit of a wrestling match on the ground beside the cruiser.

23   Q    You say a bit of a wrestling match.  Explain to us what

24   happened.

25   A    He spun from us, got partially beside the cruiser where

TRIAL ONE – VOL. 7 – 473

1   we took him down to the ground and he still was not complying

2   with -- and still trying to get away and flee.  He was maced at

3   least once or twice before we were able to get him under

4   control again and get him back in the car.

5       Q    What was your responsibility once that had happened?

6       A    After a short point where -- it was standard procedure

7   to have a medic come out and do what we can to help ease the

8   effects of the mace once a person is under control.

9            He continued to complain that he couldn't see.  So at

10  that point, it was determined that the medics should take him

11  to the hospital.  And I rode in the medic with him to the

12  hospital while Jim stayed and processed the car -- Officer

13  Haley stayed and processed the car.

14      Q    Did you ever return to the scene yet that same day?

15      A    If I did, it would have been to collect my cruiser that

16  I was assigned since I went with the medic.

17      Q    What you described is basically the extent of your

18  involvement?

19      A    Yes, sir.

20      Q    Okay.  There's another incident January 11th of 2007

21  involving a vehicle of Ms. Delores Turner.  Do you recall that

22  incident?

23      A    Yes, sir.

24      Q    Tell us how you became involved in that.

25      A    Again, assigned to the area, I was dispatched to take a

TRIAL ONE - VOL. 7 -  474

1   report on a vehicle that had been struck with gunfire.  As I

2   got there, I was primarily speaking with Ms. Turner's daughter,

3   India Hawk.  She communicated to me that --

4           MR. GATTERDAM:  Objection.  Hearsay.

5           THE COURT:  Sustained.

6           MR. KELLEY:  If I may, Your Honor.

7   BY MR. KELLEY:

8   Q    You talked to Ms. Hawk.  Had you interacted with

9   Ms. Hawk previously?

10  A    If I had, it was on a minor level.  That house I had

11  been to a lot.  I can't recall specific incidents with her, but

12  that house in general we were at frequently.

13  Q    And did you develop any information as to what had

14  happened that night?

15  A    Yes.  It was probably more towards the afternoon, early

16  evening.  She told me that --

17          MR. GATTERDAM:  Objection.

18          THE COURT:  Sustained.

19  BY MR. KELLEY:

20  Q    What did you do in response to what she told you?

21  A    I went to the vehicle which was parked on the side --

22  their house is on the corner of North Fifth and East Ninth

23  facing Fifth.  The car was actually parked on Ninth, so it was

24  right beside their house.  They took me out there and showed me

25  the vehicle that was struck numerous times by gunfire.  I

TRIAL ONE - VOL. 7 - 475

1  collected up any evidence I could find being shell casings and

2  found spent projectiles, bullets, inside the car.

3  Q    For our jury, can you explain what the car looked like

4  when you checked it out?

5  A    It was -- had multiple holes in it.  It was completely

6  shot up.  I collected over 20 spent casings and probably five

7  to ten projectiles from the car.

8  Q    For our jury, can you explain what are casings?

9  A    Casings are what are left over after the bullet has been

10  fired.  And then, in a semiautomatic weapon, it will eject the

11  spent casings after the actual projectile, bullet, has been

12  fired out.

13  Q    Projectile being what?

14  A    Lead bullets, or commonly lead.

15      MR. KELLEY:  If I may have a moment, Your Honor?

16      THE COURT:  Yes, you may, Mr. Kelley.

17  BY MR. KELLEY:

18  Q    Once you had collected those items, what did you do?

19  A    I completed an offense report, which is typical,

20  basically listing all the information that was told to me at

21  the scene, and took the evidence, being the spent casings and

22  projectiles, to our property room.

23  Q    Just so we have some feel, did the number of casings and

24  number of projectiles seem to match up exactly with the number

25  of holes in the car?

TRIAL ONE – VOL. 7 –   476

1    A    No.  There were a lot more spent casings than actual

2   bullets I found from the car.  But the way the car was shot up,

3   it was hard to tell exactly how many holes I should have found

4   in the car to match up with the amount of casings.

5           MR. KELLEY:  If I may approach the witness, Your

6   Honor?

7           THE COURT:  Yes, you may, Mr. Kelley.

8    BY MR. KELLEY:

9    Q    Handing you Government's Exhibit 36-3.  I apologize.

10  We're doing this the old-fashioned way.  Can you first identify

11  what that item is?

12   A    It is the evidence bag that contains spent projectiles

13  and bullet casings.

14   Q    Can you tell us what incident that's from?

15   A    It does not say the actual report number, but it does

16  have my signature on it.

17   Q    Is there a property number on that as well?

18   A    Yes, there is.

19   Q    And what property number is there?

20   A    07-931.

21          MR. KELLEY:  If we could, Your Honor, if I could call

22  up Government's Exhibit 36-2?

23          THE COURT:  You may.

24   BY MR. KELLEY:

25   Q    In the meantime, if you could explain to the jury just

TRIAL ONE - VOL. 7 -   477

1    so they know —— you're our first officer - an evidence bag,

2    what is it and how is it prepared?

3    A    Basically, at a scene of anything, any sort of crime or

4    offense, if there are items of evidentiary value, we are to

5    collect them and submit them to the property room so they could

6    be held in the event someone is identified to hold responsible

7    for the crime.  Also at the property room, it will be taken for

8    any sort of forensic examinations, if that would apply, be it

9    fingerprints or anything like that.

10   Q    How do you recognize that bag?  What's on that bag that

11   makes it unique?

12   A    My signature, my badge number.

13   Q    In terms of the items inside, do you designate what

14   items have been placed inside?

15   A    Yes.  On the front of this, it's either done —— a lot of

16   times this is actually done by the property clerk as we're

17   turning it over to them, because they're verifying what we are

18   saying is here is actually there, and they annotate that on

19   there.  We seal it up, and they have us sign and initial with

20   our badge number.

21   Q    If you look on the screen in front of you, Government

22   Exhibit 36-2, do you recognize this form?

23   A    Yes.  That would be an evidence request, a request for

24   examination of evidence that is found.

25   Q    To be clear, what portion of the form are you

1    responsible for?

2    A    I am responsible for the top part.

3    Q    Do you recognize this one as being from the incident you

4    were talking about?

5    A    Yes, sir.

6    Q    And the date of that incident?

7    A    January 11th of 2007.

8    Q    Is there a property number on that form as well?

9    A    Yes.  The property number is on the upper left corner.

10   It's 07-9, I think it says 31.

11   Q    And does that number match, then, what is also on the

12   bag as the property number?

13   A    Yes, it does.

14   Q    And ultimately, what is it that you submitted?  What are

15   the actual items?  You mentioned casings and projectiles.  How

16   many of each?

17   A    You're going to have to excuse me.  It's a little small

18   for me.  Sixteen 9-millimeter casings, and I think it says 26

19   .40 Smith and Wesson casings.

20   Q    If we look just above there, do you indicate number of

21   casings, number of bullets?

22   A    Yes.  It says 21 spent casings and 6 spent bullets.

23   Q    Does that 21 and 6 match what's on the evidence bag that

24   you're holding?

25   A    Yes.

TRIAL ONE – VOL. 7 –  479

1          MR. KELLEY:  If I may have a moment, Your Honor?

2          THE COURT:  Yes, you may.

3          MR. KELLEY:  Your Honor, if I may retrieve the

4    exhibit?

5          THE COURT:  Yes, you may.

6          MR. KELLEY:  Your Honor, if we could formally move

7    Government Exhibit 36-3 into evidence.

8          THE COURT:  Any objection?

9          MR. BERNDT:  No, Your Honor.

10          MR. GATTERDAM:  No, Your Honor.

11          MR. MILLER:  No, Your Honor.

12          MR. MCVAY:  No, Your Honor.

13          MR. NOLDER:  No, sir.

14          THE COURT:  36-3, Mr. Kelley, will be received and you

15    may publish it.

16          MR. KELLEY:  Thank you, Your Honor.  I don't know that

17    we'll publish it at this time, but thank you.

18          THE COURT:  All right.

19     BY MR. KELLEY:

20     Q    In regards to the incident with Mechie Harris, are you

21    aware if anything was retrieved from his pockets or his person?

22     A    I believe there were narcotics.  As to exactly what type

23    and how much, I do not recall.

24          MR. KELLEY:  I have nothing further, Your Honor.

25    Thank you.

TRIAL ONE – VOL. 7 –  480

1          THE COURT:  Mr. Durden?

2          MR. DURDEN:  No questions of the officer.

3          THE COURT:  Okay.  Mr. Gatterdam?

4          MR. GATTERDAM:  Yes, Your Honor.

5      May I proceed, Your Honor?

6          THE COURT:  Yes.

7                        –  –  –

8                   CROSS-EXAMINATION

9   BY MR. GATTERDAM:

10   Q    Good morning, Officer.

11   A    Good morning.

12   Q    Let's go back to the first incident Mr. Kelley went over

13   with you, okay?

14   A    All right.

15   Q    So you indicated that at the time you saw the person

16   near this scene where Officer Haley was, you didn't know

17   whether it was Chris Harris or Mechie Harris, correct?

18   A    Correct.

19   Q    And obviously you found out it was Mechie Harris,

20   correct?

21   A    Correct.

22   Q    During all this time you talked about that evening, you

23   never saw Chris Harris, did you?

24   A    No, I don't believe I did.

25   Q    And let me ask you this.  For that first incident,

TRIAL ONE - VOL. 7 - 481

1    2/23/06, did you ever do a written report about that?

2      A    I don't believe I did, no.

3      Q    So your testimony today ten years later is based on

4    what: memory, or looking at somebody else's report?

5      A    Mostly memory.

6      Q    How many arrests have you had in the last ten years?

7      A    I'm not sure.  It would be --

8      Q    Thousands?

9      A    Not thousands, no.

10     Q    How many encounters with individuals have you had over

11   the last ten years?

12     A    Encounters with individuals would probably be thousands,

13   multiple every day.

14     Q    And you testified at that point in time what your

15   territory was where you patrolled, correct?

16     A    Yes.

17     Q    So Christopher Harris, my client, you've seen him

18   before, correct?

19     A    Yes.

20     Q    Talked to him before?

21     A    Probably, yes.

22     Q    At that point in time as of 2/23/06, you had never

23   arrested him before, had you?

24     A    Probably not.

25     Q    How many police vehicles do we have in the area?  We

TRIAL ONE - VOL. 7 - 482

1    have your vehicle and Officer Haley's vehicle, correct?

2    A    At the moment of this incident, yes.  I don't recall if

3    anybody else was in the area at the time, no.

4    Q    And I know we're going back ten years.  When you

5    actually -- did you actually arrest Mechie by yourself?

6    A    No.  What I did was I detained him, I guess was a

7    better -- I don't believe I even handcuffed him.  I just

8    approached him, pulled up next to him, got out of my car, said,

9    Hey, are you Chris Harris or Mechie?

10        He said, I'm Mechie.

11        Officer Haley wants to talk to you.  Why don't you hop

12   in and we will go over there.

13        When I brought him to Officer Haley, he then handcuffed

14   him and put him in the back of his car.

15   Q    When you asked if he was Mechie or Chris, you didn't

16   know them well enough to be able to tell the difference,

17   correct?

18   A    I knew -- if I saw them together, I would be able to

19   figure out -- or I would be able to tell which one is which.

20   But if I just saw one, I know that's either Chris or Mechie.

21   At that point, I wasn't as familiar as I became with them.

22   Q    All right.  And when you detained him and put him in the

23   back of your cruiser, did you handcuff him?

24   A    I don't believe I did.  I may have, but I don't believe

25   I did.

TRIAL ONE - VOL. 7 -   483

1    Q    Did you pat him down?

2    A    Probably not.

3    Q    How long did it take you to get from where you found

4    Mechie to where Officer Haley was?

5    A    Probably less than two minutes.  It was within a block

6    and a half.  So it was a very short ride.

7    Q    When you arrived to where Officer Haley is, is it just

8    your two cars, yours and Haley's car?

9    A    I believe so, yes.

10   Q    And are either of those cars back then equipped with

11   video?

12   A    I don't believe they were at that point.

13   Q    So suffice to say, I assume before coming into court

14   today, you checked to see if there was any video of this

15   incident?

16   A    I did not check, no.

17   Q    And during the entire period of time that you're back at

18   Officer Haley's car, you don't see Chris Harris, correct?

19   A    No.

20   Q    And you end up -- do you ride in the -- does Mechie go

21   to the hospital in your car or in a medic?

22   A    In a medic.

23   Q    And you're indicating that when Mechie pulled away from

24   you and Officer Haley, is it just the three of you in that

25   area, or are there others around?

TRIAL ONE - VOL. 7 -   484

1    A     Just the three of us in the immediate area, yes; no

2    other officers in the area.

3    Q     Any civilians that you saw?

4    A     I remember seeing some at some point in all that, yes.

5    Q     And were they saying anything to you or anybody else, if

6    you recall?

7    A     Nothing distinguishable.

8    Q     And so then you said that -- I think you described it as

9    a wrestling match, correct?

10   A     Correct.

11   Q     Were any punches thrown by you or Officer Haley?

12   A     None that I recall.  I know I didn't.

13   Q     And did you or Officer Haley end up throwing Mechie to

14   the ground?

15   A     That could have happened.  It was -- obviously, when

16   someone's trying to get away, it's a pretty fast moving and

17   fluid situation.  We wound up on the ground at some point,

18   whether it be attack or a throw to the ground in an attempt to

19   gain control.  I honestly couldn't tell you exactly how it

20   happened at this point.

21   Q     Okay.  Partially because this happened ten years ago?

22   A     Partially, yes.

23   Q     When he hit the ground, are we talking sidewalk or grass

24   or street or --

25   A     I believe the car was in an alley.  So in having -- just

TRIAL ONE - VOL. 7 -   485

1   because knowing the area as I do, it would have been grass

2   and/or gravel.

3   Q    Was it well lit?  Or if you say alley, I'm assuming

4   dark, correct?

5   A    When it started it was daylight.  At this point, it was

6   probably getting at least dusk.

7   Q    Okay.  So your memory is it was -- and this is February,

8   so it gets dark pretty early, correct?

9   A    Correct.

10  Q    Had Officer Haley by the time this is occurring, had he

11  patted down Mechie?

12  A    I would assume, but I don't know for sure.

13  Q    You indicated later that there was -- there was drugs

14  found on Mechie, correct?

15  A    Correct.

16  Q    Okay.  And you don't know whether those drugs were found

17  before or after this, quote, wrestling match?

18  A    They were after.  Part of the reason why we brought him

19  out of the car was Officer Haley communicated to me that he

20  thought he was trying to retrieve something out of his shoe, I

21  believe.  And so he wanted to make sure that it was nothing

22  dangerous, or whatever it was was not lost.  So that's why we

23  got him out of the car.

24  Q    During the time that you're there at the scene, the

25  medics come, is there anybody else that comes to the scene?

TRIAL ONE – VOL. 7 –   486

1    A    I can't say for certain.  I would tend to imagine that

2    there probably were because things like that tend to draw a bit

3    of attention.  So someone would probably have come out to see

4    what was going on, if they weren't there already.  But I don't

5    remember anything specific happening with bystanders or

6    anything like that.

7    Q    You don't remember anybody coming up to you and

8    approaching you and asking you about Mechie's condition?

9    A    I don't remember it.  It could have happened, but I

10   don't remember it.

11   Q    So then what hospital does he end up going to?

12   A    I believe he went to Grant.

13   Q    And again, you accompany him there?

14   A    Yes, either in the medic or I followed directly behind

15   with my cruiser.  I'm not entirely sure which one it was.

16   Either one is -- happens at times, but it could have easily

17   been either way.  But I followed directly behind if I was in my

18   cruiser.

19   Q    And he's still handcuffed?

20   A    Yes.

21   Q    And you observe whatever takes place there at the

22   hospital or --

23   A    Yes.

24   Q    I mean, do you stay there while he's being treated?

25   A    Correct.

TRIAL ONE - VOL. 7 - 487

1    Q    So that you can then take him and book him in?

2    A    Or until I'm relieved, yes.  As it eventually happened,

3    it got late enough that I would be going off shift, and I

4    believe someone came and actually relieved me there.  He was in

5    the company of an officer the whole time, yes.

6    Q    Did you observe any injuries to Mechie other than the

7    mace in his eyes?

8    A    Not that I recall.  That was the primary complaint he

9    had, was his ability to see because of the mace.

10   Q    And how long was it that you stayed there until you were

11   relieved of your duties?

12   A    I would be hazarding to guess, but probably no more than

13   two hours just based on time frame of when this happened as to

14   when I would have been getting off shift.  I would be getting

15   off at ten.  They would do what they could to get me relief so

16   I would not be late.

17   Q    So you wouldn't go back to the area where Officer Haley

18   was, correct?

19   A    No, not given that situation with the time of day and

20   everything.

21   Q    And during the time that you're at the hospital, do you

22   have any -- do you ever see Chris Harris?

23   A    No.

24   Q    Did you see any other members of Mechie's family?

25   A    Not that I recall.

TRIAL ONE - VOL. 7 -   488

1   Q    And then who takes over on the case in terms of Mechie,

2   the drugs found?  Is that something you take over, or do you

3   turn that over to somebody?

4   A    It would depend on the level of the offense.  If it was

5   a misdemeanor offense, the arresting officer would handle it.

6   If it was going to be a felony amount of drugs, it would be

7   handed over to our narcotics division.

8   Q    Do you recall which it was in this case?

9   A    I don't.  That was mostly handled by Officer Haley.

10  Q    Suffice to say, after you leave the hospital, your role

11  in anything related to Mechie is over?

12  A    Correct.

13  Q    And until you had to come in here today to testify as to

14  this or any other incident involving Mechie or Chris Harris,

15  you haven't heard any -- you haven't been asked to go to state

16  court on Mechie or Chris, have you?

17  A    No.

18  Q    Now, turning to the January 11th, 2007 incident, do you

19  recall what time of day that was?

20  A    It was probably late afternoon, early evening.  I

21  believe it was still daylight when I initially responded out

22  there.

23  Q    And you respond alone?

24  A    Yes.

25  Q    And the people you -- did you talk to both Delores

TRIAL ONE – VOL. 7 –  489

1   Turner and India Hawk, or just India Hawk?

2      A    Both.

3      Q    And at the time you were there, you never saw Chris

4   Harris there, did you?

5      A    No.

6      Q    And at the time you're there, does anybody else -- do

7   any other officers come to the scene, or is it simply you?

8      A    I believe there were other officers out there that

9   helped me collect evidence, or at least stand guard over things

10  until we were out of position where we could gather it.

11     Q    So the evidence that you discussed on direct, you're not

12  sure whether those casings and bullets were all collected by

13  you or somebody else or both?

14     A    Well, I physically took possession of them and took them

15  to the property room.  And I know all the stuff -- all of the

16  projectiles that I recovered from inside the car, I did.  In a

17  situation like this when obviously there's multiple shell

18  casings laying around in a street, sometimes other eyes help

19  you distinguish where they are.  You don't see everything.

20         But they were all collected at the same time, whether I

21  did some or other officers did some.  They were all collected

22  at the same time and all taken to the property room together.

23     Q    And you can't say for certain whether those shell

24  casings were all shot at the same time, can you?

25     A    No.

TRIAL ONE - VOL. 7 - 490

1    Q    Same with the bullets:  You can't tell whether they were

2    shot then either?

3    A    Correct.

4    Q    And fair to say you responded to more than a couple of

5    shootings in the Short North in your time there?

6    A    That's correct.

7    Q    Officer, I have a question because you were testifying

8    about Government's Exhibit 36-2.  I, like you, am having

9    trouble seeing it.  It's terrible getting old.

10        Thanks, Eric.

11        I'm a little confused because it says type of evidence,

12   and it says 21 spent casings and 6 spent bullets.  Do you see

13   that?

14   A    Yes.

15   Q    Okay.  And then below it it says 9-millimeter Luger and

16   .40 Smith and Wesson, correct?

17   A    Correct.

18   Q    In parentheses does it say 16 and 20?

19   A    The top one definitely says 16.  The bottom one being

20   carbon, I'm not sure if it says 20 or exactly what it says.

21   It's a 20, maybe 26.

22   Q    Okay.  I can't read my own writing either, so I'm okay

23   with that.  Let's say conservatively that would total 36

24   casings, correct?

25   A    I think that's a total of -- well, that -- yes, that

TRIAL ONE - VOL. 7 - 491

1    should be casings.

2    Q    Why does that number 36 not match the number above, 21?

3    A    I'm not sure.

4    Q    All you can really say is this Exhibit 36-3 is what you

5    turned in to the property room?

6    A    Correct.

7    Q    And did you, before coming in today, count how many

8    casings were in here?

9    A    No.

10   Q    How did you physically collect these, just pick them up?

11   A    Yes, with a gloved hand or sometimes you use a pen or

12   another object that you can put inside so you're not physically

13   touching it.

14   Q    Did you observe anybody else who was helping you

15   collect, how they were doing it?

16   A    No, but our practice is all the same.

17   Q    As a result of this incident, did you ever personally

18   file charges against anybody for this?

19   A    No, because that type of crime is followed up by a zone

20   investigator of our Strategic Response Bureau.  I believe at

21   the time of the report, Ms. Turner indicated that she would

22   like to pursue criminal charges against who did this, if we

23   could determine who that was.  And I explained to her the

24   process, how it would get transferred to someone else to do the

25   investigation portion of it.  And I believe when he tried to

TRIAL ONE - VOL. 7 -  492

1   contact them, it was -- in a subsequent report kind of an

2   addendum to my report, he was listed -- he notated he was

3   unable to get ahold of her; she would not return calls or

4   whatever.

5       Q    Suffice to say, other than coming in here today -- and

6   this would be a state charge normally, correct?  It would be

7   filed over in state court?

8       A    It would probably depend on the level of damage because,

9   at this point, it was a criminal damaging report.

10      Q    Right.

11      A    The same as breaking out a window with a baseball bat,

12  as far as how we would classify reports.  It's basically based

13  on the dollar amount of the damage to the vehicle.

14      Q    Okay.  So you never had to go into court and testify any

15  further about this incident after the date in question?

16      A    No.

17      Q    Okay.

18      A    After about a week or ten days after the incident, I

19  never heard of it again until probably less than six months

20  ago.

21      Q    And as to these casings that you picked up or the

22  bullets you picked up, whether they would ever be fingerprinted

23  or have DNA taken off them, that's past -- that's not something

24  you would order to be done.  A detective would order that?

25      A    Well, at least the ballistics aspect, that's done

TRIAL ONE – VOL. 7 –  493

1    regardless on any sort of firearm, you know, projectile

2    casings.  They do those examinations regardless.  That's half

3    of what -- in conjunction with this property slip and also a

4    request for laboratory examination.  Actually, that's more of

5    what this is, specifically for firearm-type examinations.  So

6    that's what this was, was a request for examination.

7       Q    Okay.  So it's a ballistics exam.  But my question was

8    more towards fingerprinting or DNA.

9       A    No, sir.  No.

10      Q    And you turned these casings and bullets in on that

11   specific day and you haven't seen them since?

12      A    Not until today, correct.

13      Q    Okay.

14           MR. GATTERDAM:  May I have a moment, Your Honor?

15           THE COURT:  Yes, you may.

16           MR. GATTERDAM:  Judge, nothing further.

17           THE COURT:  Thank you, Mr. Gatterdam.

18        Mr. Miller, any questions?

19           MR. MILLER:  Not of this witness, Your Honor.  Thank

20   you.

21           THE COURT:  Anything, Mr. McVay?

22      MR. MCVAY:  No, Your Honor.

23           THE COURT:  Mr. Nolder?

24           MR. NOLDER:  No questions, Your Honor.

25           THE COURT:  Mr. Kelley, any redirect?

1        MR. KELLEY:  Briefly, Your Honor.

2        THE COURT:  All right.

3                        - - -

4               REDIRECT EXAMINATION

5    BY MR. KELLEY:

6    Q    Regarding 36-2, that's that report that's in front of

7    you.

8        MR. KELLEY:  If I may publish that for the jury, Your

9    Honor.  We are not seeking to admit it into evidence, but it

10   was referenced, and so the jurors can follow along.

11       THE COURT:  Mr. Gatterdam, any objection?

12       MR. GATTERDAM:  May we approach?

13       THE COURT:  Yes.

14                        - - -

15    Thereupon, the following proceeding was held at side-bar

16   out of hearing of open court:

17       MR. GATTERDAM:  My concern with publishing and/or

18   admission is he's testified that there's -- he doesn't know why

19   there's one notation for a certain number of casings and then

20   another notation, and then there's lab results that were down

21   below that he has nothing to do with.

22       THE COURT:  As a threshold matter, before we even get

23   to that, I wanted to have this side-bar to divine the basis on

24   which I will publish an exhibit that was not a demonstrative,

25   that had not been admitted.  So we've got to cross that hurdle

TRIAL ONE - VOL. 7 -  495

1    first, then we'll get to the secondary consideration.  Go

2    ahead.

3           MR. KELLEY:  First of all, we're not seeking to admit

4    it, and we're not seeking to show the part that has the

5    results, which is at the bottom.  Mr. Gatterdam had asked about

6    the notations in the upper part.  I simply want to ask the

7    officer to explain the notations.  And the jury can follow

8    along as he's explaining the notations.  He's referring to the

9    document, as Mr. Gatterdam brought up, and I was just going to

10   let the jury follow along.

11          MR. GATTERDAM:  I don't have a problem with that, if

12   that's all.  I thought it was an admission question.

13          MR. KELLEY:  No.  I specifically said I'm not seeking

14   to admit.

15          THE COURT:  Well, look, if the parties agree to it,

16   I'll allow it.  But it's novel because I'm basically showing

17   the jury an exhibit that's neither a demonstrative exhibit nor

18   an exhibit admitted into evidence.  Typically, we don't do

19   that.  But if you all want to do it for the purpose of

20   illustrating this point, I'm going to treat this as a

21   quasi-demonstrative exhibit so that we will have some basis on

22   which the jury has seen this; and then we have all discharged

23   our functions:  You as stipulators, me as a gatekeeper.

24          Mr. Kelley, you're going to --

25          MR. KELLEY:  Just this upper part.

1          THE COURT:  Just the upper part?

2          MR. KELLEY:  Right.

3       (Back in open court.)

4          THE COURT:  Mr. Kelley, please proceed.

5          MR. KELLEY:  Thank you, Your Honor.  If we could

6   publish the highlighted portion for the jury.

7    BY MR. KELLEY:

8    Q    Officer, Mr. Gatterdam asked you about some notations

9    here.  Basically, in the middle of our screen, you see where we

10   have the number 16 and the number 20 in parentheses?

11   A    Yes, sir.

12   Q    What is to the right of that in terms of numerics in

13   parentheses?

14   A    One of eight and one of thirteen.

15   Q    And eight plus thirteen is how much?

16   A    Twenty-one.

17   Q    And 21 matches what?

18   A    The number of spent casings listed above that.

19   Q    All right.  Mr. Gatterdam also asked you how you can

20   remember this incident from ten years ago.  Was there something

21   significant related to the arrest of Mechie that causes you to

22   remember this?

23   A    Yes.  It may seem hard to believe that spending as much

24   time as I have out there, I haven't had a lot of physical

25   confrontation with suspects for whatever reason.  And so having

TRIAL ONE - VOL. 7 - 497

1    a wrestling match beside a cruiser with someone sticks out in

2    my mind.

3    Q    Was there anything that happened after his arrest that

4    was significant as well?

5    A    Yes.   There were shots fired that were -- seem to be

6    directed at Officer Haley.

7            MR. GATTERDAM:   Objection.   Speculation.   Outside the

8    scope.

9            THE COURT:   Sustained.

10   BY MR. KELLEY:

11   Q    You were asked how you could remember this incident ten

12   years later.   Was there something additionally significant that

13   happened that evening that causes you to remember?

14   A    While I was at the hospital guarding Mechie, obviously I

15   still had my radio on and I hear officers --

16           MR. GATTERDAM:   Objection.   Hearsay.

17           THE COURT:   I'm going to overrule it.   Officer, if you

18   can finish your answer without telling us what was said, but

19   you can tell us the fact that you heard officers talking but

20   without -- can you complete your answer - this portion of the

21   answer at least - without telling us what was said and allow

22   Mr. Kelley to ask his next question?   Is it possible that you

23   can do that?   If not, you can --

24           THE WITNESS:   I don't know exactly if I can -- I'm not

25   sure what he's expecting me to say that he doesn't want to

TRIAL ONE – VOL. 7 –  498

1  hear, and I don't know if I cannot say that and accurately

2  answer the question.

3       THE COURT:  Because it may be hearsay what the other

4  officers told you.  And so --

5       THE WITNESS:  I actually heard what I was going to say

6  over my police radio that was attached to me.

7       THE COURT:  Would part of your answer be that you

8  heard officers talking over your radio?

9       THE WITNESS:  Yes.

10       THE COURT:  All right.  Leave it at that, then.  And

11  then Mr. Kelley may ask the next question.

12       MR. KELLEY:  I actually have no further questions,

13  Your Honor.  We're good.

14       THE COURT:  Side-bar.

15                              –  –  –

16    Thereupon, the following proceeding was held at side-bar

17  out of hearing of open court with Mr. Kelley and Mr. Gatterdam

18  only:

19       THE COURT:  My position is that if he's going to

20  testify as to what he heard and then he took certain steps as a

21  result of what he heard, I don't think that would be hearsay.

22  That was my concern.

23       MR. KELLEY:  Your Honor, I would suggest it's not

24  offered for the truth.  He was asking why he remembers it ten

25  years later.  But he could say what was said because it's not

TRIAL ONE - VOL. 7 -   499

1    offered for the truth, if he can remember.

2            THE COURT:  That's my point.  If that's what he's

3    going to say and then if he testified he took certain steps as

4    a result of it, then that --

5            MR. KELLEY:  He did not take any additional steps.

6    And the very next witness handles all of it.  And my thought

7    was to keep it clean, and just move it in with the next

8    witness.

9            THE COURT:  All right.  Good enough.

10        (Back in open court.)

11            THE COURT:  Anything further, Mr. Kelley?

12            MR. KELLEY:  No, Your Honor.  Thank you.

13            THE COURT:  Any recross, Mr. Gatterdam?

14            MR. GATTERDAM:  Yes, Your Honor.

15                           - - -

16                    CROSS-EXAMINATION

17     BY MR. GATTERDAM:

18     Q    Mr. Kelley asked you about Exhibit 36-2 still up on your

19     screen.

20     A    Yes, sir.

21     Q    Do you know what is in parentheses where it says make 16

22     and then 20 below it.  Do you know what that indicates?

23     A    No.  That section is actually filled out by the property

24     room clerk.

25     Q    So it's some notation that that's not your writing?

TRIAL ONE – VOL. 7 – 500

1    A    No.  That's what I'm looking at.  That does not look to

2   be my writing.

3           MR. GATTERDAM:  Thank you.  Nothing further.

4           THE COURT:  Thank you.  I take it there's nothing

5   further from any other defense counsel?

6           MR. DURDEN:  No, Your Honor.

7           MR. MILLER:  No, Your Honor.

8           MR. MCVAY:  No.

9           MR. NOLDER:  No, Your Honor.

10          THE COURT:  Thank you very much, Officer.  You may be

11  excused.  Mr. Kelley, your next witness.

12          MR. KELLEY:  James Haley.

13      (Witness sworn.)

14          THE COURT:  Officer, would you bend the microphone

15  toward you and speak clearly into it.  Thank you.

16        Please proceed, Mr. Kelley.

17          MR. KELLEY:  Thank you, Your Honor.

18                            – – –

19                        JAMES HALEY

20    Called as a witness on behalf of the Plaintiff, being first

21  duly sworn, testified as follows:

22                      DIRECT EXAMINATION

23    BY MR. KELLEY:

24    Q    Please state your name and spell your last name for the

25  jury.

TRIAL ONE – VOL. 7 – 501

1    A    James Haley, H-A-L-E-Y.

2    Q    Who do you work for?

3    A    Columbus Division of Police.

4    Q    What position do you currently hold?

5    A    Sergeant for the police department.

6    Q    Draw your attention back to the early 2000 time frame.

7    What position did you hold at that time?

8    A    I was a police officer.

9    Q    And how long had you been a police officer?

10   A    What year did you state?

11   Q    I was talking early 2000s.

12   A    I was sworn in in 1996, so for six years.

13   Q    If we go to the early 2000 time frame, where were you

14   working at that time?

15   A    I was assigned to 4th Precinct, second shift on patrol.

16   Q    Can you describe for the jury what is 4th Precinct?

17   What areas does it include?

18   A    Fourth Precinct's boundaries would have been Seventh

19   Avenue at the time on the south, west was Olentangy River,

20   north was East Hudson Street, and east would have been I-71.

21   Q    Does that include an area known as the Short North?

22   A    It does.

23   Q    Can you describe generally what were your duties back in

24   that time frame?

25   A    I was a normal patrol officer.  I would take dispatch

TRIAL ONE – VOL. 7 – 502

1   runs, work in the area, just regular police duties.

2       Q    And you're one of our first police officers, so I'm

3   going to ask you, just give the jury a feel for day-to-day in

4   that area, what kind of responsibilities and things do you do?

5       A    Day-to-day normal in that area the majority of the time

6   was spent in the Weinland Park area.  And the Weinland Park

7   area consisted essentially from Fifth Avenue on the south end,

8   to Chittenden to the north, Indianola to the west, and to the

9   railroad tracks, or 71, to the east.

10          The reason we were there is because that was typically

11  where the most calls for service were, and that's where the

12  most dispatched runs were dispatched, and that's where the

13  higher crime area was.

14      Q    What other landmarks are in that area that you got used

15  to dealing with?

16      A    You had Weinland Park Elementary.  You had several

17  carryouts.  The D&J Carryout was at North Fourth Street, East

18  Eighth Avenue.  You had Kelly's Carryout which was at North

19  Fourth Street and Eleventh Avenue.  You had the Godman Guild

20  Center.  At that time it was called something different.  The

21  university was obviously west of that precinct.

22      Q    You mentioned the D&J Carryout.  What was the

23  significance of it?

24      A    The D&J Carryout was the carryout that was centered

25  right in the middle of the Weinland Park area.  And it became

TRIAL ONE – VOL. 7 –   503

1   the main hub or the main area where the majority of the people

2   from that area would loiter or hang out.

3           MR. KELLEY:  If we could have Government's

4   Exhibit 1-2-036, Your Honor.

5           THE COURT:  Yes.

6           MR. KELLEY:  I believe it was already published for

7   the jury.  If we may publish it again.  It has been admitted

8   into evidence.

9           THE COURT:  Yes, you may.

10   BY MR. KELLEY:

11   Q    It should be up on your screen, Sergeant.  What is that?

12   A    That is the D&J Carryout located at Fourth and Eighth.

13   Q    It's a picture of the D&J Carryout?

14   A    Correct.

15   Q    You were describing a lot of activity around there.

16   What did you do in response to some of this activity?

17   A    From the time I was down there, that was the central

18   location where many of the people would shop or hang out,

19   loiter.  There was narcotics sold from the street.

20           There used to be a building on the northwest corner just

21   north of this location.  There was a three-story apartment

22   building on the third floor.  We had access to a vacant

23   apartment, and we would spend hours in the vacant apartment

24   doing surveillance from that spot.  You could see not only that

25   location, but you could see up Fourth Street, east on Eighth

1    Avenue and west on Eighth Avenue.  There used to be an

2    apartment complex just west of there, 228 East Eighth Avenue,

3    which was also a three-story apartment complex that had a lot

4    of issues with it.

5    Q    When you describe people out on the street, give us more

6    detail.  What kind of numbers are we talking about?

7    A    On a normal, nice day there would be -- not uncommon to

8    see anywhere from 20 and 40 people loitering between Fifth

9    Avenue up to Eleventh Avenue between the business, the front

10   stoops of the apartment complexes, and even the eastern side

11   where the residential areas would be.

12   Q    Not to nitpick, but you say loitering.  What do you mean

13   by loitering?

14   A    Just a group of people hanging out.  For example, they

15   would hang out in front of the D&J Carryout.  They would go in

16   and buy a bag of chips, but they would stay in front of the

17   place 20, 30, 40 minutes just to loiter.  People come in and

18   out, greet one another, drugs were sold in front of it.  It was

19   just -- no sense of just being there.

20   Q    Did you also do special duty during this time frame?

21   A    I did.

22   Q    Can you explain for the jury what is meant by special

23   duty, and what did you do?

24   A    Special duty is extra assignments that you pick up.

25   You're paid by different employers that pay for extra patrol

TRIAL ONE – VOL. 7 –  505

1   within the area.  And in this area, I worked -- at the time it

2   was called CPO or Broad Street Management is what it used to be

3   called, and they owned several apartment complexes within the

4   area.  We worked in extra shifts, three hours, four hours, five

5   hours at a time patrolling those apartment complexes.

6        The reason we did it was because the calls for services

7   were so great.  On third shift, oftentimes they didn't have

8   enough resources to have regular patrol officers to respond, so

9   they supplemented by paying special duty officers or extra

10   officers to patrol those areas.

11   Q    During the time you were working this, did you become

12   familiar with Chris Harris?

13   A    I did.

14   Q    How?

15   A    Just day-to-day contacts.  I also knew his brothers.  I

16   worked down there long enough where I had a relationship with

17   many of the people that lived down there.  I knew them by name,

18   knew them by face.

19   Q    To be fair, was that unusual with people that hung out

20   in the Short North?

21   A    No.  I knew the majority of the people that lived down

22   there, that worked down there.  I knew mothers of children.  I

23   knew their mothers, where they lived.  I mean, it was not

24   uncommon.

25   Q    Do you know if Chris Harris was living in the Short

TRIAL ONE – VOL. 7 – 506

1   North at that time?

2     A    I believe at the time that I was out there, I knew he

3   had an address down on Bucher Drive or Bucher Street on the

4   south end.  But I don't know for a fact.

5     Q    Which would or would not be part of the Short North?

6     A    That would not be part of the Short North.

7     Q    Did you become familiar with gang activity during the

8   time you worked patrol there?

9     A    I did.

10    Q    What kind of things were you seeing that suggested gang

11  activity?

12            MR. GATTERDAM:  Objection.  Foundation.

13            THE COURT:  Overruled.

14            THE WITNESS:  Typical things were graffiti, the colors

15  being worn of blue.  The Short North Posse was a Crip gang, so

16  a lot of blue would be worn.  There were some people that

17  actually was self-admitted that I knew of, and just

18  associations with crime and other things.

19            MR. KELLEY:  If we could have Government's

20  Exhibit 1-2-026.

21            THE COURT:  Yes.

22    BY MR. KELLEY:

23    Q    First off, do you recognize what this is?

24    A    Yeah.  It's graffiti from the area of the Short North.

25    Q    And do you know what area of the Short North that is

TRIAL ONE – VOL. 7 –   507

1    from?

2    A     The area of Fourth and Eighth.

3    Q     Is that something that you saw while you were working

4    down there?

5    A     I did.

6    Q     Does that accurately depict it as you saw it at that

7    time?

8    A     It does.

9    Q     And again, you said it's a building in the Short North?

10   A     Yeah.  I believe that's the side of the building that

11   was in the alley just east of North Fourth Street, just south

12   of East Eighth Avenue.

13   Q     And then 1-2-027.  Do you see this item?

14   A     Yeah.  That's more graffiti.

15   Q     And is that -- in terms of location, where is that?

16   A     That's on -- that's the front of the house on East

17   Eighth Avenue just east of North Fourth Street.

18        MR. KELLEY:  And if we can go back, then, to publish

19   for the jury, Your Honor, we would ask to move these into

20   evidence, 26 and 27.

21        THE COURT:  Any objection?

22        MR. DURDEN:  No objection, Your Honor.

23        MR. GATTERDAM:  No objection.

24        MR. MILLER:  No, Your Honor.

25        MR. MCVAY:  No objection.

TRIAL ONE – VOL. 7 – 508

1          MR. NOLDER:  None, Your Honor.

2          THE COURT:  They will be admitted, Mr. Kelley, and you

3    may publish them.

4          MR. KELLEY:  We can start with 027 which is already

5    up.  If we can publish this for the jury.

6    BY MR. KELLEY:

7    Q      You indicated this was the front side of the house?

8    A      Correct.

9    Q      And then 026, talking about the same house for this

10   photograph?

11   A      Yeah.  It appears that was the same house that is the

12   side of the house that was on the alley.

13   Q      And again, this graffiti was on, and you saw this

14   graffiti and recognized it as something?

15   A      Yeah.  It appears to be gang graffiti.

16   Q      If we go to Government's Exhibit 1-2-028 just for the

17   officer.  Do you recognize this?

18   A      Yeah.  That's the front of the same house east of North

19   Fourth Street on the south side of the street.

20   Q      And that's something that you saw at the time while you

21   were working patrol?

22   A      Correct.

23   Q      Does that accurately depict it as it was when you saw it

24   back then?

25   A      It does.

1    Q    Then 1-2-029.  What is this?

2    A    This appears to be the same house, but I believe that's

3    the back of the house.

4    Q    And then finally 1-2-030.  What is this?

5    A    Same house, again.  I believe it's the rear of the

6    house.

7    Q    So this series of photographs, same house, and in

8    substantially -- this photograph is substantially the same as

9    it was at that time when you saw it?

10    A    I believe so, yes.

11         MR. KELLEY:  Okay.  If we could then move those into

12    evidence, Your Honor, and publish them for the jury?

13         THE COURT:  Any objection?

14         MR. DURDEN:  No objection, Your Honor.

15         MR. GATTERDAM:  No objection.

16         MR. MILLER:  No objection, Your Honor.

17         MR. MCVAY:  No objection.

18         MR. NOLDER:  No, Your Honor.

19         THE COURT:  They will be received, Mr. Kelley, and you

20    may publish them.

21         MR. KELLEY:  Thank you, Your Honor.  We're starting

22    with 030 which is already up.  If we could publish that for the

23    jury.

24    BY MR. KELLEY:

25    Q    On this particular one about the middle we see a word

TRIAL ONE – VOL. 7 – 510

1   B-L-A-C-C.  Are you familiar with that?  What is that?

2   A    That's Lando Reynolds' street name, Blacc.

3   Q    Lando Reynolds -- let me stick with B-L-A-C-C.  Why is

4   it spelled that way?  Do you know?

5   A    Because C-K would be Crip killer.

6   Q    Now 029, please.  Do you know what the writing on this

7   one refers to?  And this is published for the jury.

8   A    Obviously RIP is rest in peace, Frank.

9   Q    Do you know who Frank is?

10  A    Not a hundred percent.

11  Q    Okay.  And then 1-2-028.  Is any of this writing

12  significant to you?

13  A    The N-Hood was something that they would often refer to.

14  Q    In referring to what?

15  A    Just N-Hood.

16  Q    An area of town, as far as you knew?

17  A    I mean, just in their hood, like a location is the way I

18  took it as.

19  Q    If we could now have Government's Exhibit 1-2-031.  What

20  is this?

21  A    This is Cut Throat graffiti that's on the north side of

22  the building.  And the building itself sat on the southeast

23  corner of North Fourth Street and East Eighth Avenue.

24  Q    Is that photograph an accurate depiction of how you saw

25  that graffiti at that time?

TRIAL ONE – VOL. 7 –  511

1    A    It is.

2         MR. KELLEY:  If we may move that into evidence and

3    publish it for the jury?

4         THE COURT:  Any objection?

5         MR. DURDEN:  No objection.

6         MR. GATTERDAM:  I guess my question is "at that time."

7    That's my only question.

8         THE COURT:  Mr. Miller, any objection?

9         MR. MILLER:  No objection, Your Honor.

10        MR. MCVAY:  No objection.

11        MR. NOLDER:  No, sir.

12        THE COURT:  Mr. Kelley, give us a time period.

13   Subject to that, the exhibit will come into evidence.

14   BY MR. KELLEY:

15   Q    Sergeant, can you pin down for us a time frame that you

16   would have seen this particular graffiti on this building?

17        THE COURT:  Mr. Kelley, I'm sorry.  I was just advised

18   that this exhibit has already been admitted.  So you may

19   publish it.

20        MR. KELLEY:  Thank you, Your Honor.

21   BY MR. KELLEY:

22   Q    And the Cut Throat graffiti is what you referred to here

23   on this building?

24   A    Correct.

25   Q    If we could go to Government's Exhibit 1-2-056.  And I

TRIAL ONE – VOL. 7 –   512

1    believe that has already been admitted into evidence.

2            THE COURT:  Yes.

3            MR. KELLEY:  I want to publish that for the jury,

4    please.

5    BY MR. KELLEY:

6    Q    What does this photograph show?

7    A    Again, more graffiti.

8    Q    Can you tell us about the location for the jury, please?

9    A    Yeah, it's the wall -- it's between actually two

10   apartment complexes, the apartment complexes south of East

11   Eighth Avenue.  And the wall actually sits in the alley east of

12   North Fourth Street.

13   Q    Is there any great significance to this wall in terms of

14   what you saw and dealt with on patrol?

15   A    This wall was routine art change.  This was an area that

16   most graffiti was actually put, and it was constantly changing

17   or at least added to.

18   Q    If I could also then show you 1-2-057 which again I

19   believe has already been admitted.

20           MR. KELLEY:  I'd like to publish for the jury.

21           THE COURT:  Yes, you may.  You may publish it.

22   BY MR. KELLEY:

23   Q    Can you describe this in relation to the other photo we

24   just saw?

25   A    Again, wall east of North Fourth Street, south of East

TRIAL ONE – VOL. 7 –  513

1   Eighth Avenue.

2          MR. KELLEY:  Government's Exhibit 1-2-080 only for the

3   witness.  I believe this one has been admitted.  If I can

4   confirm.

5          THE COURT:  That one has been admitted.

6          MR. KELLEY:  If we can publish that for the jury.

7          THE COURT:  You may.

8   BY MR. KELLEY:

9   Q    Sergeant, what does this photograph show us?

10  A    It's a picture of a deceased individual, Elijah

11  Ledbetter.

12  Q    How are you familiar with Elijah Ledbetter?

13  A    He used to associate with the Short North.  He was a

14  regular person that used to be on the street that I would come

15  in contact with on a daily basis.

16  Q    Do you know what happened to him at some point?

17  A    He was killed.

18  Q    And did you do anything shortly thereafter, any

19  particular incident related to him and his death?

20  A    I ended up doing a small special assignment with our

21  Criminal Information Unit.

22  Q    And what was that?

23  A    It was a temporary unit with a temporary assignment with

24  our gang unit over a summertime period.  They had a memorial

25  for Mr. Ledbetter in Weinland Park.  And at that memorial, this

TRIAL ONE - VOL. 7 - 514

1    car was actually there and that's where I first saw it.

2    Q    And can you describe what was going on in Weinland Park

3    during this memorial?

4    A    It was a memorial for Mr. Ledbetter.  And people from

5    the community came out along with members -- people that he

6    used to associate with, people that I knew to be gang members.

7         It was in Weinland Park at the Weinland Park Elementary

8    school.  In the grassy area, they had a cookout.  I was in the

9    assignment at the time with a gang unit, so we went to the park

10   and just walked through to see who was there.

11   Q    How were people dressed at this gathering?

12   A    Either black, a lot of them had rest-in-peace shirts,

13   some had pictures like handmade spray-painted-type shirts.

14   Q    And do you remember who was driving this particular

15   vehicle that day?

16   A    On that day, I don't remember who was driving.  But

17   it -- from the conversation I had, it seemed as though Ricco

18   Maye was claiming possession of the car.

19   Q    Did you see other people driving the car at various

20   times?

21   A    I had seen other people drive the car.

22   Q    Okay.

23        MR. KELLEY:  If I may approach the witness, Your

24   Honor.

25        THE COURT:  Yes, you may.

TRIAL ONE – VOL. 7 –   515

1    BY MR. KELLEY:

2    Q     Handing you what's been marked as Government's

3    Exhibit 1-3-076, I believe.  Is that the number in the lower

4    right?

5    A     1-3-076, correct.

6    Q     Do you recognize what this is?

7    A     I do.

8    Q     Can you describe it for the jury?

9    A     It's a trash dumpster that was in the alley east of

10   North Fourth Street, south of East Eighth Avenue.  On that

11   trash dumpster, it had graffiti sprayed on it.

12   Q     Is this photograph an accurate depiction of that

13   dumpster as you saw it?

14   A     It is.

15   Q     Can you give us an approximate time frame this would

16   have occurred?

17   A     Mid 2000s.  2003, 2008, somewhere in there.

18   Q     While you were working patrol in that area?

19   A     I was still on patrol in that area, yes.

20         MR. KELLEY:  Your Honor, I would move that into

21   evidence and also publish it to the jury.

22         THE COURT:  Any objection?

23         MR. DURDEN:  No objection.

24         MR. GATTERDAM:  No objection.

25         MR. MILLER:  No objection.

TRIAL ONE – VOL. 7 –   516

1          MR. MCVAY:  No objection.

2          MR. NOLDER:  No, Your Honor.

3          THE COURT:  It may be admitted and you may publish it.

4          MR. KELLEY:  I'm doing this the old-fashioned way as

5   well, Your Honor.

6          THE COURT:  That will be fine.

7      BY MR. KELLEY:

8      Q    If you could for the jury, tell us what is written on

9   this dumpster.

10     A    Fuck Haley, car 40.

11     Q    How is the word fuck spelled?

12     A    F-U-C-C.

13     Q    What was the significance of car 40?

14     A    That was the cruiser I was assigned to for three or four

15   years.

16     Q    There is a small picture to the lower right?

17     A    Of a police cruiser.

18     Q    What was your reaction after seeing this graffiti?

19     A    I was contacted by another officer who saw it.  And then

20   we actually called the graffiti team for the city and had it

21   immediately painted over.

22     Q    I want to draw your attention to an incident that

23   happened February 23, 2006.  It involved Mechie Harris.  Are

24   you familiar with that incident?

25     A    I am.

TRIAL ONE - VOL. 7 -  517

1  Q    What work were you doing at that time?

2  A    I was in patrol.  I was working a cruiser, actually car

3  40.

4  Q    And what happens involving Mechie Harris?

5  A    I knew Demetrius not to have a driver's license, and he

6  had driven past.  I tried to catch up to him.  He sped up and

7  ended up bailing out of a car, a Cutlass-type car, in the alley

8  east of North Fourth Street north of East Sixth Avenue.  When

9  he fled, he was already out.  I didn't go chase.  He was

10  already gone.  But I aired on the radio who it was and if

11  anybody would see him to pick him up for me.  I knew he didn't

12  have a driver's license, and I was going to meet him to give

13  appropriate tickets to him.

14  Q    What then happened?

15  A    Officer Mike Robison actually responded to the area.  He

16  saw Mr. Harris in the area of Fourth and Eighth, picked him up

17  and brought him back actually to my cruiser.  When he brought

18  him back to me, I secured him in handcuffs, put him in the back

19  of the car after doing a pat down, and began doing paperwork in

20  the front seat of the car.

21  Q    What is he doing while he's in the back seat of the car?

22  A    Mr. Harris is -- I could feel him kicking underneath my

23  seat.  He's sitting behind me.  I could smell the odor of

24  marijuana coming about.  I actually asked Mr. Harris, Are you

25  dumping marijuana in my car? to which he did not reply.  So I

TRIAL ONE – VOL. 7 –  518

1   get out of my cruiser, open the door.  And the shoes -- his

2   actual shoe was kicked off and there was a bag of weed that's

3   visible that's on the floor kind of jammed between the cage in

4   the back of a police cruiser and underneath my seat.

5   Q    What do you do then?

6   A    Got Mr. Harris out of the car to retrieve the marijuana

7   and then do another pat down on him, which I could feel

8   something hard in his pocket.  I had to get the winter jacket

9   off that he was wearing to get the other narcotics -- what I

10  believe at the time -- off of him.  And when I un-handcuffed

11  him, he attempted to get away and try to run.

12  Q    What did you do in response?

13  A    I grabbed Mr. Harris.  I was actually within the

14  doorjamb of the car and the back seat where he was at.  He

15  tried to run past.  I grabbed him, had to physically take him

16  down to the ground.  A small scuffle ensued.  I had to use mace

17  on him.  He was arrested.  And we were able to get the jacket

18  off of him at that time and placed him back in the car.

19  Q    Was anything ultimately found in the jacket?

20  A    There was a large amount of crack cocaine also.

21  Q    While this is going on, are there other people around?

22  A    Shortly after the scuffle had ceased, and Mechie had

23  complained of head pain so protocol is we requested a squad to

24  respond.  He had been maced.  Squad came.  At the time that the

25  squad was there, family members began to show up and people

TRIAL ONE – VOL. 7 – 519

1   from the neighborhood showed up.

2   Q    You say family members.  How do you know them to be

3   family members?

4   A    Because I worked out there.  I knew that they were his

5   brothers.

6   Q    And do you know the brothers by name?

7   A    Alandice Harris was there, Brandon Harris was there.  I

8   believe either Mr. Harris's mom or aunt was also there with

9   some other people I didn't recognize.

10  Q    Was Chris Harris there?

11  A    I did not see Chris.

12  Q    And you're familiar with Chris Harris?

13  A    I am.

14  Q    Did you see him at all at the time of this incident?

15  A    I didn't.

16  Q    What are you then doing with Mechie Harris, Demetrius

17  Harris?

18  A    Demetrius got transported because he was complaining of

19  head pain.  So he got transported to Grant hospital.  Officer

20  Mike Robison actually either went in the squad or drove behind

21  the squad with him; I don't recall.

22       The car was still there.  In the process of impounding

23  the vehicle, Officer Tim McClellan showed up shortly thereafter

24  during the response when we were asking for other officers to

25  respond because he was fighting.  So he was there assisting

TRIAL ONE - VOL. 7 -  520

1    with the impound of the car.

2    Q    Was there much interaction with the family during this

3    time?

4    A    There were -- there was normal shouting, just screaming,

5    you know, I hurt him.  They were upset obviously because he was

6    being transported in the squad.  I tried to explain to them

7    what had happened.  They weren't listening to me, and they

8    ended up leaving on their own.

9    Q    Meanwhile you're waiting for a tow truck?

10   A    I am.

11   Q    What happens next?

12   A    While we're waiting on the tow truck, I'm outside of the

13   cruiser.  Tim McClellan, the officer with me, is there.  If you

14   look up the alley 50, 60 yards, I guess - I'm not a hundred

15   percent sure - there was a dumpster.  And in that dumpster you

16   could see the silhouette of somebody walk by the dumpster.

17   After they walked by the dumpster, they reappeared again.  It

18   seemed odd because they weren't coming down the alley.  We just

19   had people leave.

20        I actually looked to Officer McClellan, I said, hey,

21   something is up, be careful.  Right after I said that, five,

22   six, seven gunshots were fired towards our direction.

23   Q    No question in your mind they were gunshots?

24   A    There's no question.

25   Q    What do you do in response?

1    A    I ducked behind the car, aired for other officers to

2   respond, that shots had been fired, directed them to the area

3   of Seventh and the alley east of North Fourth Street where I

4   saw the person.  And I believe the helicopter also responded.

5    Q    Fair to say a whole series of officers responded to the

6   scene?

7    A    Yeah.

8    Q    Were you involved in collecting casings or projectiles

9   or anything at the scene?

10   A    No.

11   Q    And did you do anything else as it relates to this

12  particular scene at that time?

13   A    I just follow up at the hospital to finish the arrest

14  paperwork for Demetrius Harris, and he ended up being slated or

15  put in jail that night.

16        MR. KELLEY:  If I may have a moment, Your Honor?

17        THE COURT:  Yes, you may, Mr. Kelley.

18  BY MR. KELLEY:

19   Q    Sergeant, you mentioned Ricco Maye you believe was

20  driving the vehicle with Elijah Ledbetter on the hood?

21   A    Correct.

22   Q    Would you recognize Ricco Maye if you saw him?

23   A    If he hasn't changed much in the last six or eight

24  years, yes.

25   Q    I want to ask you to look at a photograph, Government's

TRIAL ONE – VOL. 7 –  522

1    Exhibit 154-1-33.  Do you recognize that photograph?

2     A     That is Ricco Maye.

3          MR. KELLEY:  Okay.  Your Honor, if we may then move

4    that into evidence and publish it for the jury.

5          THE COURT:  Any objection, Mr. Durden?

6          MR. DURDEN:  No objection, Your Honor.

7          MR. GATTERDAM:  No, Your Honor.

8          MR. MILLER:  No, Your Honor.

9          THE COURT:  Mr. McVay?

10         MR. MCVAY:  No, Your Honor.

11         MR. NOLDER:  No, Your Honor.

12         THE COURT:  Exhibit 154-1-33 will be received.  You

13   may publish it.

14         MR. KELLEY:  Thank you, Your Honor.  I have no further

15   questions for Sergeant Haley.

16         THE COURT:  Mr. Durden, any questions?

17         MR. DURDEN:  No questions.

18         THE COURT:  Mr. Gatterdam?

19         MR. GATTERDAM:  May I proceed, Your Honor?

20         THE COURT:  Yes, you may.

21                             - - -

22                      CROSS-EXAMINATION

23    BY MR. GATTERDAM:

24    Q    Good morning, Sergeant.

25    A    Good morning.

TRIAL ONE – VOL. 7 – 523

1    Q    I want to go back to the questions that Mr. Kelley was

2    asking you first about your patrol duties in the Short North,

3    okay?  Is it against the law to stand out in front of the D&J

4    Carryout?

5    A    No.

6    Q    Because you talked about loitering.  And I presume if

7    you are on patrol and you saw somebody doing something illegal,

8    you would take some action, correct?

9    A    Correct.

10   Q    And you talked about some of the things that you

11   observed as you patrolled.  This graffiti that you were talking

12   about, did you ever contemporaneously do a report indicating

13   that you would notice something in the Short North, graffiti or

14   something tagged?

15   A    There would be times that I would forward stuff, whether

16   it's phone call -- by phone call, by letter, by e-mail.  But

17   it's -- it was well documented not only by me but by actually

18   the people that I would forward it to who also were patrolling

19   the area.

20   Q    Did you provide any reports that you documented of

21   graffiti to the prosecutors in this case?

22   A    The dumpster.

23   Q    That one -- the dumpster that supposedly has your name

24   on it?  That's the dumpster you're speaking of?

25   A    That has my name on it, yeah.

TRIAL ONE – VOL. 7 –  524

1   Q    It has a name Haley on it, correct?

2   A    Correct.

3   Q    And it's not spelled the way you spell your name,

4   correct?

5   A    No.

6   Q    Now, the graffiti that you spoke about, you didn't

7   actually see the person putting it up there, correct?

8   A    Correct.

9   Q    And I think you were asked about three or four different

10  pieces of graffiti.  And if I had it correct, it was all the

11  same house, correct?

12  A    It appeared to be, correct.

13  Q    And do you know -- you were shown those photographs.  Do

14  you know specifically when that graffiti was placed there?

15  A    The exact date, no.

16  Q    Do you even know a year?

17  A    During the time I was on patrol out there.

18  Q    Which was?

19  A    It could have been -- it was later.  It was between

20  2000, 2006.

21  Q    Okay.  So anywhere in that time frame, that graffiti

22  could have gone up there?

23  A    That's fair to say.

24  Q    Did it ever change -- that house you were shown three or

25  four pictures of, did that graffiti stay there during that time

TRIAL ONE - VOL. 7 -  525

1   period or did it change to something else?

2   A   That graffiti was there for a while, but there were

3   other things that had been added.  The house is no longer

4   there.  It's torn down.

5   Q   So during the time period that you patrolled, that house

6   or that area always had graffiti on it?

7   A   That house and other houses, yes.

8   Q   And the one where you were asked about the wall, did

9   that always have some graffiti on it?

10  A   There was something on it usually, typically.

11  Q   Did you ever arrest anybody ever for putting graffiti

12  up?

13  A   Me, no.

14  Q   And same thing with that 1-2-031 where it said Cut

15  Throat.  2000 to 2006, is that as best you can narrow down when

16  that was put up?

17  A   Yeah.  I don't know exactly the date, no.

18  Q   Now, the one that you testified to that you did see that

19  had the Haley car 40, do I have it correct that you believe

20  that was put up between 2003 and 2008?

21  A   That would be fair to say, I guess.

22  Q   And nobody was ever caught putting it up, correct?

23  A   Correct.

24  Q   Now, you spoke about the incident 2/23/06, and you also

25  talked about being on patrol.  So you had been in the Short

TRIAL ONE - VOL. 7 -   526

1  North how many years before that incident?

2    A    I believe I began in the Short North in 1998, 1999,

3  somewhere in there.

4    Q    So five, six years roughly?

5    A    Correct.

6    Q    Six, seven years.  And you indicated you knew the people

7  there and you knew my client, Chris Harris, right?

8    A    I knew Chris.

9    Q    Had run-ins with Chris before, had to have talks with

10  Chris before?

11    A    Yeah.

12    Q    Did you get along with Chris okay?

13    A    I got along with all the guys out there.

14    Q    And in fact, in the time you were out there, you had a

15  number of conversations with Chris, correct?

16    A    I did.

17    Q    Now, what time of day was it that this incident you saw

18  Mechie driving, and how did you know it was Mechie?

19    A    I had firsthand knowledge of Mechie from just day-to-day

20  interactions.  It would have been -- it was -- without looking

21  at the actual paperwork, I don't know for sure.  I know when

22  the shots happened, it was at nighttime.  I can't recall if the

23  incident was during the daytime or not, when it began.

24    Q    Okay.  And ultimately, he's brought back to the scene.

25  You said you didn't give chase because he -- you didn't chase

TRIAL ONE - VOL. 7 -  527

1   after his vehicle, correct?

2   A    I followed the vehicle, but he was driving too fast for

3   me to catch up.  By the time I got to his vehicle, he was

4   already gone.

5   Q    He was out of the vehicle on foot?

6   A    I didn't see him leave.  I saw him driving, and the dust

7   was still settling when I pulled up.

8   Q    Did you recognize the car, too, or the driver?

9   A    I recognized both.

10  Q    Okay.  So you were staying with the car because by the

11  time you got there, there was no Mechie?

12  A    Correct.

13  Q    When Officer Robison brings him back, do you conduct

14  that initial pat down?

15  A    I did.

16  Q    And fair to say, on the initial pat down, you didn't

17  discover there was any crack cocaine?

18  A    Huh-uh.

19  Q    And you didn't discover there was any marijuana,

20  correct?

21  A    No.

22  Q    So you put him in the cruiser.  And at that point in

23  time, you were going to write a ticket for no operator's

24  license, correct?

25  A    He probably would have just got a ticket and released,

TRIAL ONE – VOL. 7 –  528

1    correct.

2    Q    And then you described the incident where he -- you

3    took -- did you take a cuff off of him to do the --

4    A    I had to take one cuff off of him.  One at a time

5    typically is how you do it.  He had a bulky winter jacket on.

6    We had to get the jacket off, and the cuffs were already on

7    him.  When you take a jacket off, you remove one arm sleeve at

8    a time.  Once we removed the one arm sleeve, he twisted and

9    was -- attempted to get out.

10   Q    Just you and Officer Robison at the time?

11   A    I believe so.

12   Q    Do you know if other people had gathered at that point

13   in time or not till later?

14   A    It was just us at that time.

15   Q    How well lit is the area?

16   A    I don't recall.

17   Q    Is it on a street or is it in an alley?

18   A    It's in an alley.  I mean, it was dark.  Our headlights

19   would have been there; back porch lights, if they were on.  I

20   don't think it has alley lights except at the intersections.

21   But I don't recall for sure.

22   Q    So looking in the direction you ultimately end up

23   looking later when shots were fired, would that also be dark

24   going 50, 60 yards, I think you said?

25   A    Well, with the illumination of our headlights, you were

TRIAL ONE - VOL. 7 -  529

1   able to see north, or in that direction, better than behind the

2   lights.

3      Q    Did you have your flashing lights on?

4      A    I don't recall.

5      Q    Did Officer Robison have his flashing lights on?

6      A    I don't recall.

7      Q    Did either of you have cars equipped with video?

8      A    Then we did not.

9      Q    And I assume no belt mics?

10     A    Correct.

11     Q    So when Mechie pulls from you, what happens?  In other

12  words, do you end up taking him down to the ground?

13     A    I take him down to the ground, correct.

14     Q    You and Officer Robison?

15     A    He was there.  I know I had control of him.  I know I

16  did.

17     Q    Did -- was one cuff still on him at all times?

18     A    I believe so.

19     Q    And when you were on the -- were you on the ground with

20  Mechie?

21     A    Yes.

22     Q    And when you were on the ground with Mechie, were any

23  punches thrown?

24     A    There was force used.  Without the report, I can't

25  remember if I actually punched him.  I know I maced him.  I

TRIAL ONE – VOL. 7 –  530

1    know I had to hold him down on the ground, but I don't recall

2    what force was used.

3        Q    Where did he go to the ground?  Was it on the grass?

4    Was it on the concrete?

5        A    The alley is -- was at the time like a chip sealed

6    paved -- chip sealed alley.

7        Q    So that's --

8        A    Tar and stone.

9        Q    So you would have been doing it right outside of your

10   cruiser, so on the road portion?

11       A    I believe so.

12       Q    And how long were you on the ground with Mechie?

13       A    I couldn't tell you an exact time.  It seemed like

14   forever.

15       Q    Okay.  And then once you and Officer Robison get control

16   of him, do you place him back in your vehicle or his?

17       A    I believe he was put back in my vehicle.

18       Q    And how long after that before medics get there?

19       A    We immediately requested the medic.

20       Q    I understand you requested.  Did they come right away or

21   take awhile?

22       A    Average response.  Three to five minutes, probably.

23       Q    How long after this incident before members of his

24   family arrived?

25       A    About the same amount of time.

TRIAL ONE - VOL. 7 -   531

1    Q    And you indicated, I think, at this point in time that

2    Chris was not living in the Short North, correct?

3    A    At that time, I don't know where he was living.  I knew

4    he had an address on Bucher, Bucher Street, Bucher Drive.  It

5    was on the south end.  Whether he was living there or not, I

6    don't know.

7    Q    I think you indicated that Alandice and Brandon,

8    Mechie's brothers and Chris's brothers, they showed up,

9    correct?

10   A    They were there.

11   Q    And his mother Pam showed up?

12   A    It was either Pam or their aunt.  I don't remember

13   specifically which one.

14   Q    Could it have been both?

15   A    Maybe.

16   Q    If your report indicates that, is that indicative that

17   perhaps both were there?

18   A    If I have a report that says that, then they probably

19   both were there.

20   Q    And fair to say that I think you said words were

21   exchanged between the family and you?

22   A    No.  They were accusing me of police brutality and

23   beating Mechie up and doing it for no reason, for no good.

24   Q    All right.

25   A    I had a relationship with the majority of the people in

TRIAL ONE - VOL. 7 -  532

1   the neighborhood.  So the one thing I did do almost always was

2   explain to them why we did what we did.  And I had a rapport

3   with most of the people in the community, that they actually

4   would ask for me specifically to explain why we did -- people

5   were doing what they did.  So I was trying to explain that.

6   They didn't want to hear it.

7   Q    And when you say they didn't want to hear, were there

8   more than one person in the family that was speaking to you?

9   A    There was a group.  I was trying to generally speak to

10  the group of people.

11  Q    Did they say they were going to file charges against you

12  for police brutality?

13  A    I don't remember specifically if they said that.

14  Q    Did they indicate that you were always messing with

15  them?

16  A    I'm sure that was said.

17  Q    And you talk about rapport.  Had you ever had

18  conversations with Chris Harris's mother Pam before?

19  A    I've talked to her before.  But I don't know before then

20  or after then, but I've talked to his mom before, yeah.

21  Q    She didn't say anything to you on that day that would

22  cause you to arrest her, correct?

23  A    Not -- no, not that I remember.

24  Q    Is it fair to say that your greatest concern with the

25  people that were talking there was with his brother Alandice,

TRIAL ONE – VOL. 7 –   533

1    correct, the way he was looking at you?

2    A    Yeah.

3    Q    And after how many minutes did that group end up

4    dispersing, Chris's brother and his mother, maybe aunt?

5    A    Ten, 15 minutes, maybe.

6    Q    And did they leave in a car?  Did they walk away?  Or

7    how did they go?

8    A    I believe they walked up, and I believe they left on

9    foot, too.  I can't be for sure.

10    Q    Which direction did they go?

11    A    North.  Northwest.

12    Q    Is that the direction you ended up seeing the shots

13    coming from?

14    A    It is.

15    Q    And they walked away, and you didn't place any of them

16    under arrest, correct?  The situation cooled and they left?

17    A    Yeah.  The only person that was under arrest was

18    Demetrius Harris.

19    Q    And did you say how much time elapsed after they left

20    before you observed the person in the alley and the shots were

21    fired?

22    A    I don't recall.  It was -- there was some time frame

23    that elapsed waiting on the tow truck to get there.  I don't

24    recall how long that time was.

25    Q    And was -- in terms of police officers, it was just you

TRIAL ONE – VOL. 7 –  534

1    and Officer McClellan when the shots were fired?

2    A    That I remember, correct.

3    Q    And you said that you observed -- maybe 50 to 60 yards

4    up, you observed a silhouette, correct?

5    A    You could see someone walking, correct.

6    Q    How many seconds after seeing before the shots?  I think

7    you said something to the other officer?

8    A    Thirty seconds, maybe.

9    Q    And could you tell if it was the same silhouette that

10   actually was firing the shots?

11   A    No, I couldn't.

12   Q    But what you saw was one person, correct?

13   A    I saw a silhouette, and then I saw another silhouette,

14   and then the shots happened.  But I don't know if there were

15   two people or if it was one person.

16   Q    And how many shots do you believe you heard?

17   A    Five to seven, maybe more.

18   Q    Did you end up, after the shots -- I know you aired for

19   help.  Did you end up going and trying to find who did this?

20   A    No.  We asked for assistance, and within seconds there

21   were numerous officers there.

22   Q    So you weren't involved in further investigation of this

23   matter?

24   A    I didn't want to leave the car.  It had the property in

25   it.

TRIAL ONE - VOL. 7 -   535

1    Q    Who is Orlando Harris?

2    A    I'm not a hundred percent sure now.

3    Q    Or Olando Harris?

4    A    I don't know.

5    Q    Do you agree that he became the suspect in this

6    shooting?

7    A    I don't know.

8    Q    Did you ever review a report by Officer Shepherd that

9    named him as the suspect?

10   A    I may have.  I don't recall doing it.

11   Q    Would it help to refresh your recollection to review

12   that report?

13   A    I can review it.

14        MR. GATTERDAM:  Your Honor, may I approach the

15   witness?

16        THE COURT:  Yes, you may.

17        MR. GATTERDAM:  May I stay here to ask him questions?

18        THE COURT:  No.  You can put it on the ELMO and then

19   you can both share it.

20        MR. GATTERDAM:  All right.

21   BY MR. GATTERDAM:

22   Q    Officer, can you see -- Sergeant, can you see this

23   report from Robert Shepherd?

24   A    Yeah.

25   Q    And would you agree that this report discusses the

TRIAL ONE - VOL. 7 - 536

1   incident that you've been testifying to here today?

2   A    It does.

3   Q    All right.  I'm going to flip a few pages to the back of

4   it.  Would you agree that at the back of the report it says the

5   possible suspect is Olando Harris?

6   A    I see that.

7   Q    And I'm going to show you a picture of an individual

8   named Orlando Lamont Harris.  Are you familiar with this

9   individual?

10  A    No.

11  Q    Never saw him in the neighborhood before in your time

12  patrolling?

13  A    His face doesn't look familiar now, no.

14  Q    But you were familiar with Alandice Harris, Chris

15  Harris's brother, correct?

16  A    I was.

17  Q    Now, as a result of this incident, were there ever, to

18  your knowledge, any charges filed in state court for what

19  happened?

20  A    I don't believe so.

21  Q    You never had to testify in any proceedings about this

22  over in state court?

23  A    The shooting or the --

24  Q    The shooting.

25  A    No.

TRIAL ONE - VOL. 7 - 537

1   Q    So until you came to court here today, you haven't had

2   to testify about this specific incident?

3   A    Correct.

4        MR. GATTERDAM:  May I have a moment, Your Honor?

5        THE COURT:  Yes, you may.

6   BY MR. GATTERDAM:

7   Q    Officer, you did a report in this matter, correct?

8   A    The arrest -- the actual arrest?

9   Q    About the shooting.

10  A    That's what you just showed me.

11  Q    That was Officer Shepherd's report.  Did you also do a

12  letter of information, or a report, as a result of this?

13  A    I don't recall doing it.

14  Q    Would it help to refresh your recollection if I showed

15  you a report?

16  A    Sure.

17  Q    Officer, I'm going to show you what appears to be

18  dated -- well, on February 23rd, 2006, and it goes into the

19  stop.  Is that your name, badge number and car number at the

20  bottom?

21  A    That is.

22  Q    Does that refresh your recollection that you perhaps did

23  a report on this incident?

24  A    Yes.

25  Q    Okay.  And does it also say at the very bottom of the

TRIAL ONE - VOL. 7 - 538

1  report, encloses the photos of the subject arrested, which

2  would be Mechie, correct?

3     A    If that's who -- yeah.

4     Q    And the two brothers that were at the scene and another

5  brother that is usually with him?

6     A    Okay.

7     Q    So you provided to whoever was investigating this the

8  two brothers that came out to the scene and the picture of

9  Chris Harris also?

10    A    If that's in there, yes.

11    Q    Okay.  Would that be something you would have done?

12    A    Probably.

13    Q    And during this entire incident, you never saw Chris

14 Harris once, correct?

15    A    I did not.

16            MR. GATTERDAM:  Nothing further.

17            THE COURT:  Mr. Miller, anything?

18            MR. MILLER:  No, Your Honor.

19            THE COURT:  Mr. McVay, anything?

20            MR. MCVAY:  No, Your Honor.

21            THE COURT:  Mr. Nolder, anything?

22            MR. NOLDER:  No questions.

23            THE COURT:  Mr. Kelley, any redirect?

24

25

TRIAL ONE - VOL. 7 - 539

1              - - -

2          REDIRECT EXAMINATION

3  BY MR. KELLEY:

4      Q    Sergeant, any other officers Haley spelled H-A-L-I-E-Y

5  that you're aware of?

6      A    Not that I know.

7      Q    What about Car No. 40?  Any others driving that car?

8      A    In the 19 years I've been on it, I don't remember

9  anybody with the last name Haley other than me driving that

10 car.

11         MR. KELLEY:  Thank you.  No further questions.

12         MR. GATTERDAM:  No, Your Honor.

13         THE COURT:  Officer Haley, thank you very much, sir.

14 You may be excused.

15     Ladies and gentlemen, it's 10:35.  We'll take our

16 morning recess now.  We'll stand in recess until 10:50.

17 Remember the Court's admonition.

18     (Recess taken from 10:35 a.m. to 10:50 a.m.)

19     (Thereupon, the following proceeding was held in open court

20 with all defendants and counsel present.)

21     (Jury in at 10:50 a.m.)

22         THE COURT:  Mr. Kelley, Mr. Devillers, Mr. Martinez,

23 who is your next witness?

24         MR. DEVILLERS:  Officer Magaw, Your Honor.

25         THE COURT:  All right.

TRIAL ONE – VOL. 7 –   540

1          Mr. Kelley.

2              COURTROOM DEPUTY CLERK:  Sir, come forward to be

3    sworn, please.

4        (Witness sworn.)

5              COURTROOM DEPUTY CLERK:  Please be seated, sir.

6              THE COURT:  Mr. Devillers.

7          Officer, please bend that toward you.  Speak clearly

8    into it.

9              THE WITNESS:  Yes, sir.

10             THE COURT:  Mr. Devillers, please proceed.

11             MR. DEVILLERS:  Thank you.

12                            – – –

13                         STEVEN MAGAW

14      Called as a witness on behalf of the Plaintiff, being first

15    duly sworn, testified as follows:

16                            – – –

17                      DIRECT EXAMINATION

18     BY MR. DEVILLERS:

19     Q.   Good morning, Officer.

20     A.   Good morning.

21     Q.   Are you comfortable?

22     A.   Yes, sir.

23     Q.   They make those chairs perfectly so police officers can

24    fit in them just very comfortably.

25     A.   Not the heavy ones, but --

TRIAL ONE - VOL. 7 - 541

1    Q.    Could you please state your name?  And spell your last
2    name for us.
3    A.    It's Steven Magaw.  It's M-A-G-A-W.
4    Q.    And who do you work for?
5    A.    Columbus Division of Police.
6    Q.    How long have you worked for the Columbus Division of
7    Police?
8    A.    Twenty-six years.
9    Q.    I want to take you back to 2006.  What were your duties
10   in 2006?
11   A.    I was working patrol.
12   Q.    Was there an area of town you were working?
13   A.    Worked the near east side.
14   Q.    What's special duty?
15   A.    Special duty is, when we're off our regular work duty
16   with the City, we can pick up security jobs for different
17   businesses.
18   Q.    And were you doing that in 2006?
19   A.    Yes, I was.
20   Q.    In what area of town were you working special duty?
21   A.    The same area, the near east side.
22   Q.    I want to direct your attention specifically to February
23   3rd of 2006.  On that particular date, do you recall hearing
24   some shots being fired at one point?
25   A.    Yes, I do.

TRIAL ONE - VOL. 7 - 542

1  Q.   All right.  Tell us what you remember.

2  A.   I was working special at 1234 East Broad Street.

3  Outside the building, they have a security house.  And I was

4  standing inside that in the parking lot.  And around 2:15, I

5  heard, like, a barrage of gunshots.

6  Q.   Two fifteen a.m. or p.m.?

7  A.   P.m.  I'm sorry.

8  Q.   Okay.

9  A.   I'm looking around, trying to find out where it's coming

10 from.  And then I hear a vehicle that was on the alley south of

11 Broad Street, just east of Sherman.  The vehicle comes

12 screaming out of the alley, northbound on Sherman.

13      I started walking out towards, so I can get a better

14 look at it.  The driver then goes east on Broad and north on

15 Winner.

16      When the shots were fired, I could actually hear them

17 skipping off the pavement.  So, this business had another

18 building just east of where I was.  So I went to check the

19 front of it to make sure no bullets went inside the front

20 office area.  And then I walked across the street to the area

21 where I saw the vehicle leave to see if I could -- if there was

22 a body or anything there.

23 Q.   Was there?

24 A.   No.

25 Q.   Did you continue looking around?

TRIAL ONE – VOL. 7 – 543

1    A.    Continued looking.  I had also advised radio of the

2    gunshots, the vehicle I saw leaving the area.  And then I

3    started walking through the alley, looking for shell casings

4    or, like I said, any other evidence, body parts, or, I mean, a

5    body or clothing or anything like that.

6    Q.    How many cars did -- This is 2:30 in the afternoon.  Do

7    you see a lot of cars there?  Or how many cars did you see in

8    the area?

9    A.    Cruisers or just --

10   Q.    Just regular cars after -- around the time you heard the

11   shots.

12   A.    It's right on Broad Street.  So, it's a very busy area

13   of town.  There's quite a few cars.

14   Q.    Did you see, actually see, anybody shooting out of a

15   car?

16   A.    No, I did not.

17   Q.    This is the area, I think you said, of East Broad and --

18   What's the nearest intersection?

19   A.    It was -- Well, the intersection where it happened is

20   Sherman, but it's between Champion Avenue and Winner Avenue.

21   Q.    And as far as the -- You're familiar with where the

22   Short North is?

23   A.    Yes, sir.

24   Q.    Is this in the Short North?

25   A.    No, it's not.

TRIAL ONE – VOL. 7 –  544

1    Q.   About what direction would it be from the Short North?

2    A.   Be southeast.

3    Q.   You had indicated you went looking for a body or some

4    shell casings?

5    A.   Correct.

6    Q.   Did you find any shell casings?

7    A.   Yes, I did.  I found, I believe, 12 shell casings in the

8    alley.

9         MR. DEVILLERS:  May I approach the witness, Your

10   Honor?

11        THE COURT:  Yes, you may.

12   BY MR. DEVILLERS:

13   Q.   I'm going to hand you what's been marked as Government's

14   Exhibit 128-2.  Would you take a look at that?  Can you tell me

15   what that is?

16   A.   It's the shell casings I recovered from the alley and

17   turned in to the property room.

18   Q.   And is your name written on that?

19   A.   Yes, sir, it is.  We sign it -- When we seal it, we all

20   put our initials, badge number, and the date that it was done

21   on it.

22   Q.   Was there a suspected projectile recovered as well?

23   A.   Yes, there was.

24   Q.   What's a projectile?

25   A.   It's the actual bullet itself.

TRIAL ONE – VOL. 7 –  545

1    Q.   All right.  And how many -- Were different types of

2    shell casings recovered?

3    A.   Yes.

4    Q.   Okay.  What was recovered?

5    A.   It looks like a .45 and 9-millimeter.

6    Q.   Is it written on the bag anywhere, the number and types

7    of shell casings?

8    A.   No, I don't -- yes, it is.  There's eight 9-millimeter

9    and four .45-caliber casings --

10   Q.   Okay.  And then the one projectile?

11   A.   -- and one spent bullet.  Yes.

12        MR. DEVILLERS:  Okay.

13        May I have a moment, Your Honor?

14        THE COURT:  Yes.

15     (Whereupon, there was a brief interruption.)

16        MR. DEVILLERS:  Your Honor, I would move to admit

17   Exhibit 128-2 into evidence.

18        MR. BERNDT:  Your Honor, I don't think I'll have an

19   objection, but I would like to see it before I --

20        THE COURT:  All right.  That's fair enough.

21        MR. DEVILLERS:  May I approach?

22        THE COURT:  Yes, you may.

23        (Thereupon, Mr. DeVillers shows the exhibit to Mr.

24   Berndt.)

25        THE COURT:  That's fine.

TRIAL ONE - VOL. 7 - 546

1      MR. BERNDT:  No objection, Your Honor.

2      THE COURT:  Any objection, Mr. Durkin?

3      MR. DURKIN:  No, Your Honor.  Thank you.

4      THE COURT:  Mr. Miller.

5      MR. MILLER:  No, Your Honor.

6      THE COURT:  Mr. McVay?

7      MR. McVAY:  No, Your Honor.

8      THE COURT:  Mr. Nolder?

9      MR. NOLDER:  No, Your Honor.

10      THE COURT:  128-2 will be received.

11      MR. DEVILLERS:  No further questions, Your Honor.

12      THE COURT:  All right.

13      Did you wish to publish them or pass -- circulate them

14  among the jury, Mr. Devillers?

15      MR. DEVILLERS:  That would be great, Your Honor.

16      (Thereupon, the exhibit was examined by the jurors.)

17      MR. DEVILLERS:  Your Honor, I could sit, and defense

18  could cross while they're --

19      THE COURT:  Well, I don't want them to be distracted

20  during either your or the defense's examination.  So they can

21  inspect it and pass it around as part of their fact-finding

22  responsibility, but you could sit if you'd like.

23      MR. DEVILLERS:  I'm fine, Your Honor.  Thank you for

24  your concern.

25      THE COURT:  All right.

TRIAL ONE – VOL. 7 –  547

1      MR. DEVILLERS:  May I retrieve the exhibit?

2      THE COURT:  Yes, you may.  Thank you, Mr. Devillers.

3      Mr. Durkin -- I'm sorry.  Mr. Berndt?

4      MR. BERNDT:  Thank you, Your Honor.  No questions of

5  Officer Magaw.  Thank you.

6      THE COURT:  Okay.  Thank you.  I'm sorry.

7      Mr. Durkin?

8      MR. DURKIN:  Thank you, Your Honor.

9                        - - -

10                  CROSS-EXAMINATION

11  BY MR. DURKIN:

12  Q.   Good morning, Officer.

13  A.   Good morning.

14  Q.   How are you?

15  A.   Fine, thank you.

16  Q.   Hard to believe it's been ten years, right?

17  A.   Yes, it has.

18  Q.   All right.  That area has changed.  Some of the

19  buildings have changed, and some of the names have changed.

20  I'm assuming -- Were you working at, like, the Columbus

21  Foundation?  Is that where you worked?

22  A.   That's correct, sir.

23  Q.   All right.  And, so, after you -- the shots were coming

24  from the other side of Broad Street?

25  A.   Yes, sir, south of Broad.

TRIAL ONE – VOL. 7 –  548

1    Q.   So you had to cross Broad to recover these items?

2    A.   Yes, sir.

3    Q.   Now, we had just a short tutorial on shell-casing

4    recovery this morning.  What's your preference:  Gloves or

5    using a pen?

6    A.   I usually use a pen and pick it up and put it in a

7    baggie.

8    Q.   All right.

9         THE COURT:  Just one second.  Just so that I get my

10   bearings straight, so would it be on the same side of Broad

11   Street as is Franklin Park or on the side of Broad Street as

12   the hospital?

13        THE WITNESS:  Franklin Park, sir.  But it would be

14   much farther west.

15        THE COURT:  Okay.  All right.

16      I'm sorry.  Go ahead.

17        MR. DURKIN:  Quite all right.

18   BY MR. DURKIN:

19   Q.   And this is before you get to -- Back ten years ago, was

20   that the CNA Building, on that side of East Broad Street?

21   Would that have been the CNA Building at that time, now the

22   Hammond Building?  I'm trying to think of just in terms of on

23   East Broad Street.

24   A.   That's Broad and Ohio.  This is farther east.

25   Q.   Right.  Okay.  And beyond -- You retrieved the casings,

TRIAL ONE – VOL. 7 –  549

1   you put it in a bag, you signed off on 128-2, and off it went;

2   you didn't prepare any other reports?

3     A.   No.  You just do a lab request when you turn it in, but

4   that's it.

5     Q.   All right.  And after that, that's -- for a long time,

6   that's the last you saw of it?

7     A.   Yes.  The patrol officers who responded said they would

8   take care of --

9     Q.   Well --

10    A.   Okay.

11    Q.   We'll ask them, obviously.

12    A.   Okay.

13    Q.   But you turned it over, and that started the chain of

14   evidence?

15    A.   Correct.  Yes, sir.

16          MR. DURKIN:  All right.  Thank you, Your Honor.

17          THE COURT:  All right.

18        Mr. Miller, any questions?

19          MR. MILLER:  No, Your Honor.

20          THE COURT:  Mr. McVay, any questions?

21          MR. McVAY:  No questions.

22          THE COURT:  Mr. Nolder, any questions?

23          MR. NOLDER:  No.

24          THE COURT:  Mr. Devillers, any redirect?

25          MR. DEVILLERS:  No, Your Honor.

TRIAL ONE - VOL. 7 -   550

1    THE COURT:  Officer Magaw, thank you very much, sir.

2  You may be excused.

3    THE WITNESS:  Thank you, sir.

4    MR. DEVILLERS:  Your Honor, the government's next

5  witness will be Officer Ken Linscott.

6    THE COURT:  All right.

7    Officer, please come forward and be sworn.

8    COURTROOM DEPUTY CLERK:  Sir, would you raise your

9  right hand, please?

10   (Witness sworn.)

11    COURTROOM DEPUTY CLERK:  Please be seated, sir.

12    THE COURT:  Officer, would you bend the microphone

13  toward you and speak clearly into it, please?

14                        - - -

15                    KEN LINSCOTT

16   Called as a witness on behalf of the Plaintiff,

17    being first duly sworn, testified as follows:

18                        - - -

19                  DIRECT EXAMINATION

20   BY MR. DEVILLERS:

21   Q.   Good morning, sir.  Can you please state your full name?

22  And spell your last name.

23   A.   First name is Ken.  Last name is Linscott,

24  L-I-N-S-C-O-T-T.

25   Q.   What do you do for a living, sir?

1    A.    I'm a Columbus police officer.

2    Q.    What are your duties today?

3    A.    Today, I work in the narcotics bureau.

4    Q.    Back in two thousand -- the spring of 2006, what did you

5    do?

6    A.    I was in patrol.

7    Q.    What area of town did you patrol?

8    A.    The Linden area.

9    Q.    And in relation to the Short North, where would the

10    Linden area be?

11    A.    It would be east of the Short North.

12    Q.    What's an O. R. report?

13    A.    It's a report taken for incidents that happen that we

14    take in patrol.

15    Q.    Is that opposed to what a detective would do,

16    necessarily?

17    A.    No.  It's more of an everyday report.

18    Q.    So would a detective do something a little bit more

19    substantive?

20    A.    Probably.  More in depth, yes.

21    Q.    Okay.  I'm going to direct your attention to March 9,

22    2006.  Do you recall being dispatched to a location of East

23    Twenty-Second Avenue?

24    A.    I -- I don't recall.  It's --

25    Q.    If I showed an you an O. R. report, would that help

TRIAL ONE – VOL. 7 –   552

1   refresh your recollection?

2     A.    Most likely, yes.

3           MR. DEVILLERS:  Your Honor, I would like to show

4   Government's Exhibit 130-1.

5           COURTROOM DEPUTY CLERK:  130-what?

6           MR. DEVILLERS:  Yes.

7           COURTROOM DEPUTY CLERK:  No.  What.

8           THE COURT:  You may.  130-1.

9           COURTROOM DEPUTY CLERK:  Thank you.

10    BY MR. DEVILLERS:

11    Q.    And it's Detective now; is that right?

12    A.    Yes, sir.

13    Q.    Detective, what is this?

14    A.    That's an O. R. report.

15    Q.    And, again, an O. R. report is what?

16    A.    It's a report taken by patrol of an incident that

17   happened.

18    Q.    And did you fill out this report?

19    A.    Yes.

20    Q.    And does it indicate where this incident took place?

21    A.    1171 East Twenty-Second Avenue.

22    Q.    And about where is that?

23    A.    That's -- Those numbers would probably run between

24   Cleveland Avenue and, say, Ontario.

25    Q.    Is that in the Linden area?

TRIAL ONE – VOL. 7 –   553

1    A.    Yes.

2    Q.    And do you recall why you went to that location?

3    A.    It looks like there was a shooting into a dwelling.

4    Q.    I want to --

5         MR. DEVILLERS:  May I approach the witness, Your

6    Honor?

7         THE COURT:  Yes, you may.

8    BY MR. DEVILLERS:

9    Q.    I'm going to hand you what's been marked as Government's

10   Exhibit 130-2.  If you'd take a look at this.

11   A.    Shell casings and one spent round.

12   Q.    And is your name on that, or badge initials and badge on

13   there anywhere?

14   A.    Yeah, on the evidence form.  Yeah.

15   Q.    Okay.  And does that indicate that you collected those

16   shell casings?

17   A.    That's correct.

18   Q.    Okay.  After those shell casings would have been

19   collected, what would you have done with them?

20   A.    After I collected them myself, I would have taken them

21   straight to the property room.

22   Q.    Is there a property number on that form?

23   A.    Yes.

24   Q.    What's that property number?

25   A.    065983.

TRIAL ONE – VOL. 7 – 554

1      MR. DEVILLERS:  May I have a moment, Your Honor?

2      THE COURT:  Yes.

3    (Whereupon, there was a brief interruption.)

4      MR. DEVILLERS:  No further questions, Your Honor.

5    May I retrieve the exhibit?

6      THE COURT:  Yes, you may.

7    Mr. Berndt, any cross?

8      MR. BERNDT:  No questions, Your Honor.  Thank you very

9 much.

10      THE COURT:  Mr. Durkin, any cross?

11      MR. DURKIN:  Yes, Your Honor.  Thank you.

12      MR. DEVILLERS:  Mr. Berndt, may I interrupt you for a

13 second?

14      MR. DURKIN:  Of course.

15      MR. DEVILLERS:  Your Honor, I would just move to admit

16 this into evidence.

17      THE COURT:  Any objection?

18      MR. DURKIN:  No objection, Your Honor.

19      MR. MILLER:  No, Your Honor.

20      MR. DURDEN:  No objection.

21      MR. McVAY:  No objection.

22      MR. NOLDER:  No, sir.

23      THE COURT:  All right.  It will be received.

24    Do you wish to publish it?

25      MR. DEVILLERS:  No, Your Honor.

TRIAL ONE – VOL. 7 –   555

1          THE COURT:  All right.

2       Go ahead, Mr. Durkin.

3          MR. DURKIN:  Thank you, Your Honor.

4                         -  -  -

5                      CROSS-EXAMINATION

6    BY MR. DURKIN:

7    Q.   Officer, we're still early in this case, so we may not

8    understand some of the mechanics of when you refer to things

9    like O. R. reports.  And Mr. Devillers was showing you an O. R.

10   report.  And I was -- It says it's entered by Sam Foster.  Does

11   that mean that somebody else mechanically puts your report in?

12   A.   No.  It does look like Sam did take the report, from

13   C Company.

14   Q.   All right.  Do you recall if you made a report?

15   A.   Uhm, no, I don't.  I thought this was my report.  But,

16   you're correct, it does say "Sam Foster."

17   Q.   Okay.  And in terms of anything that happened -- you

18   were there after -- you didn't hear any gunfire yourself?

19   A.   Correct.

20          MR. DURKIN:  All right.

21       Your Honor, just a moment.

22          THE COURT:  All right.

23          MR. DURKIN:  Thank you, Your Honor.

24          THE COURT:  Mr. Miller, anything?

25          MR. MILLER:  No questions, Your Honor.

TRIAL ONE – VOL. 7 –   556

1          THE COURT:  Mr. McVay, any questions?

2          MR. McVAY:  No, Your Honor.

3          THE COURT:  And, Mr. Nolder, any questions?

4          MR. NOLDER:  No, sir.

5          THE COURT:  Any redirect?

6          MR. DEVILLERS:  None, Your Honor.

7          THE COURT:  Officer Linscott, thank you very much,

8   sir.  You may be excused.

9          THE WITNESS:  Thank you.

10          MR. DEVILLERS:  The next witness would be Detective

11   Higgins.

12          THE COURT:  Okay.  Did you say "Higgins"?

13          MR. DEVILLERS:  Higgins, yes, Your Honor.

14          COURTROOM DEPUTY CLERK:  Sir, come forward to be

15   sworn, please.  And would you raise your right hand, please?

16     (Witness sworn.)

17          COURTROOM DEPUTY CLERK:  Please be seated, sir.

18          THE COURT:  You may proceed.

19                         – – –

20                      MICHAEL P. HIGGINS

21     Called as a witness on behalf of the Plaintiff, being first

22   duly sworn, testified as follows:

23                         – – –

24                      DIRECT EXAMINATION

25     BY MR. DEVILLERS:

TRIAL ONE – VOL. 7 –   557

1    Q.   Good morning, Detective.

2    A.   Good morning.

3    Q.   Could you please state your full name?  And spell your

4    last name.

5    A.   Michael P. Higgins, H-I-G-G-I-N-S.

6    Q.   And what do you do for a living, sir?

7    A.   I am a Columbus police detective.

8    Q.   In what capacity are you a detective?

9    A.   Currently, I am assigned to the FBI Joint Terrorism Task

10   Force.

11   Q.   Before that -- Well, strike that.

12        In 2006, were you a detective?

13   A.   Yes, I was.

14   Q.   And what area were you a detective in?

15   A.   I was assigned to the Columbus Police assault squad.

16   Q.   And what sort of -- what sort of investigations did you

17   handle?

18   A.   I, in general, worked aggravated assaults, nonlethal,

19   shootings, stabbings, beatings, things of that nature.

20   Q.   Do you recall getting a call in regards to a shooting

21   that took place on March 15th of 2006?

22   A.   I do.

23   Q.   What do you recall about that?

24   A.   I recall it was a shooting with no known suspects.  And

25   I believe there was, you know, uncooperative victims.

TRIAL ONE – VOL. 7 – 558

1    Q.   Do you recall the victims' names?

2    A.   I do not.

3    Q.   Would something refresh your recollection as to the

4    victims' names?

5    A.   My case file probably would.

6    Q.   What's an O. R. report?

7    A.   An offense report.

8    Q.   Would that help?

9    A.   Yes, it would.

10   Q.   All right.

11        MR. DEVILLERS:  Your Honor, I would like to show the

12   witness Government's Exhibit 131-1.

13        THE COURT:  You may.

14   BY MR. DEVILLERS:

15   Q.   Okay.  Detective, is your name on this O. R. report?

16   A.   I would imagine it is.  I --

17   Q.   It's hard to see?

18   A.   Yes.  Yes, I see it now.

19   Q.   We're going to blow it up for you a little bit.

20   Detective.

21        Okay.  And does it say "Detective Notified"?

22   A.   Yes.

23   Q.   And is that your name?

24   A.   It is.

25   Q.   Okay.  And in this O. R. report, does it indicate where

TRIAL ONE - VOL. 7 - 559

1   the offense took place?

2   A.   Yes, it does.

3   Q.   Where is that?

4   A.   Ontario Street, at East Twenty-Second Avenue.

5   Q.   And would it indicate who the victim was in this case?

6   A.   It --

7          MR. DURKIN:  Your Honor, I would object to the extent

8   that the fact of what the report indicates is not germane to

9   this witness' testimony.

10         THE COURT:  Overruled.

11         You may answer, Officer.

12         THE WITNESS:  Could you restate the question, please?

13  BY MR. DEVILLERS:

14  Q.   Would this help refresh your recollection -- Would any

15  part of this form tell you who the victim was?

16  A.   Yes.

17  Q.   Where would that be?

18  A.   It would be under the victim data section.

19  Q.   And would that be the next page?

20  A.   I believe so.

21         MR. DEVILLERS:  Could you please show the next page,

22  131-1-1, I think, or -2?

23         THE WITNESS:  Yes.  I can see Victim 1 is identified

24  as Julius Carson.

25         MR. MEYERS:  Your Honor, objection.  May we approach?

TRIAL ONE – VOL. 7 –  560

1            THE COURT:  Yes.

2                           –  –  –

3       (Thereupon, the following proceeding was held at side-bar.)

4            THE COURT:  Go ahead, Mr. Meyers.

5            MR. MEYERS:  Your Honor, I would object on a couple of

6   bases.  This is not a proper foundation for prior recollection

7   refreshed.  He didn't go through those steps.  To that extent,

8   under 803.8, the government cannot be the proponent of a

9   government record from a police department or law enforcement

10  agency.

11           THE COURT:  Well, he certainly can't move for its

12  admission under 803.8.  That much is true.  The witness can

13  refresh with anything, although there was some disconnect

14  between what he said would refresh his recollection and what

15  Mr. Devillers gave him to refresh his recollection, unless I

16  misunderstood the nomenclature, because he said -- I thought he

17  said the case file would refresh his recollection.

18           MR. MEYERS:  Yes, he did.

19           THE COURT:  And Mr. Devillers, if I recall correctly,

20  gave him the O. R.  So -- and they may be the same thing.

21           MR. MEYERS:  And they may be.  But above and beyond

22  just predicate bargain-basement prior-recollection refreshed,

23  there's a world of difference between a witness having a

24  refreshed recollection but, rather, reading off the page --

25           THE COURT:  I agree.

TRIAL ONE - VOL. 7 - 561

1            MR. MEYERS:  -- which is the gravamen of this

2      objection.

3            MR. DURKIN:  If I could speak, briefly, to it?

4            MR. DEVILLERS:  Can I do one at a time, Your Honor?

5            THE COURT:  Yes.  But I'm going to let Mr. Durkin

6      speak briefly to it so you can answer them both in a plenary

7      response.

8            MR. DURKIN:  I thought that the O. R. report he's

9      looking at was prepared by someone else, so then the matter was

10     referred to him, to this witness.

11           THE COURT:  It may have been.  I'm just saying that

12     that was my recollection of the testimony.

13           Mr. Devillers, I'm sure, can clear all this up.

14           MR. DEVILLERS:  Yes, Your Honor.  I actually asked him

15     if an O. R. report would refresh his recollection.  He said

16     yes.  I'm showing him the O. R. report.  I did not ask him,

17     quite yet, who the victim was.  I asked him if there would be a

18     victim on the report.

19           My next question is for him to read it and see if that

20     refreshes his recollection.

21           THE COURT:  Let me go back a moment.  What was the

22     question that sparked the failure of recollection -- that

23     manifested the failure of recollection in the first place?

24           MR. DEVILLERS:  I asked him if he recalled who the

25     victim was.

TRIAL ONE – VOL. 7 –   562

1       THE COURT:  Now, let me find out why is the identity

2   of the victim relevant here.  Well, who do you -- what do you

3   expect the answer to be?  Who was the victim?

4       MR. DEVILLERS:  Julius Carson.

5       THE COURT:  Okay.  That's one of the overt acts?

6       MR. DEVILLERS:  Yes, Your Honor.

7       THE COURT:  Okay.  All right.

8   Didn't you object to the relevancy?

9       MR. DURKIN:  No.  I said it wasn't -- that the

10  information he was relating wasn't from him.  It was from what

11  someone else had prepared for his benefit.

12      THE COURT:  Okay.  Now, this sounds kind of layered.

13  Is it a normal business practice in the police department for

14  someone to prepare for him a report, as was done in this case,

15  Mr. Devillers?

16      MR. DEVILLERS:  In this case, yes, Your Honor, because

17  it's an O. R. report.  And it didn't get any farther than the

18  O. R. report, because the person was uncooperative.

19      THE COURT:  Okay.  All right.  So, I think you've

20  responded to Mr. Durkin.

21  Do you want to respond to Mr. Meyers?

22      MR. DEVILLERS:  Your Honor, I can rephrase the

23  question and see if -- I'm going to ask him if this refreshes

24  his recollection.  And then I will go ahead and ask him, if it

25  does, who the victim is.  If not, then --

1          THE COURT:  Okay.  Now, if it does refresh his

2     recollection, then, technically, as you all know, he would

3     testify independent of the report because the theory of the

4     report jars something in his mind, not that he reads from the

5     report.

6          MR. DEVILLERS:  Understood.

7          THE COURT:  So I'm going to sustain your objection,

8     Mr. Meyers, because that is correct.

9          And you may go ahead and question.

10          MR. DEVILLERS:  Thank you, Your Honor.

11      (The following proceedings were had in open court.)

12          THE COURT:  Mr. Devillers, please continue.

13          MR. DEVILLERS:  Okay.

14     BY MR. DEVILLERS:

15     Q.   From reading this O. R. report, did that refresh your

16     recollection as to who the victim was?

17     A.   Yes.

18     Q.   Okay.  And who was the victim?

19     A.   The victim's identified as Julius Carson.

20     Q.   Do you recall what you did in relation to this case?

21     A.   Vaguely.  I recall attempting to do some interviews.  I

22     also recall collecting some expended shell casings.

23          MR. DEVILLERS:  May I approach the witness, Your

24     Honor?

25          THE COURT:  Yes, you may.

TRIAL ONE – VOL. 7 – 564

1    BY MR. DEVILLERS:

2    Q.   Do you recall where you collected these shell casings?

3    A.   They were at the scene of the shooting.

4         MR. DEVILLERS:  May I approach the witness, Your

5    Honor?

6         THE COURT:  Yes.

7    BY MR. DEVILLERS:

8    Q.   I'm going to show you what's been marked as Government's

9    Exhibit 131-3.  Can you tell me what that is, Detective?

10   A.   It is an evidence bag containing shell casings, and

11   looks like an expended round, as well.

12   Q.   And does it -- is your name or initials on that

13   anywhere?

14   A.   Yes, they are.

15   Q.   And is there a property number on that exhibit?

16   A.   Yes, there is.

17   Q.   What's the property number?

18   A.   It is 06008627.

19   Q.   From looking at that exhibit, does that refresh your

20   recollection as to what was collected?

21   A.   Yes.

22   Q.   And did you collect those shell casings from the scene

23   of the -- that you've already described?

24   A.   Yes, I did.

25   Q.   As a detective, normally what would you do after a

TRIAL ONE – VOL. 7 –   565

1   shooting where there is a victim?

2   A.    A number of things.  In reference to the evidence, it

3   would be collected, transported to the Columbus Police property

4   room, sealed.  You know, it's got my name and the date of seal

5   on the evidence tag.  Submit it for later ballistic testing.

6   Q.    What is the date of that bag being sealed?

7   A.    April 11th, 2006.

8   Q.    What -- What would you have done in relations to after

9   that?  Would you interview witnesses?

10  A.    Yes.

11  Q.    Do you recall attempting to interview any witnesses or

12  victims in this case?

13  A.    Yes, I do.

14  Q.    Okay.  And how did that attempt go?

15  A.    It was unsuccessful.  It's -- It appeared that they did

16  not want police involvement and pretty much, you know, limited

17  the scope of the investigation at that point.

18          MR. DEVILLERS:  May I have a moment, Your Honor?

19          THE COURT:  Yes, you may.

20      (Whereupon, there was a brief interruption.)

21          MR. DEVILLERS:  Your Honor, I would move to admit

22  Government's Exhibit 131-3 into evidence.

23          THE COURT:  Any objection, Mr. Berndt?

24          MR. BERNDT:  No, Your Honor.

25          THE COURT:  Mr. Durkin?

                                          TRIAL ONE - VOL. 7 -   566

1          MR. DURKIN:  No, Your Honor.

2          THE COURT:  Mr. Miller?

3          MR. MILLER:  No, Your Honor.

4          THE COURT:  Mr. Meyers?

5          MR. MEYERS:  No, Your Honor.

6          THE COURT:  Mr. Nolder?

7          MR. NOLDER:  No, Your Honor.

8          THE COURT:  131-3 will be received, Mr. Devillers.

9          MR. DEVILLERS:  Thank you, Your Honor.

10      May I collect the evidence?

11         THE COURT:  Yes, you may.

12         MR. DEVILLERS:  No further questions, Your Honor.

13         THE COURT:  All right.

14      Mr. Berndt, any cross?

15         MR. BERNDT:  No questions, Your Honor.  Thank you.

16         THE COURT:  Mr. Durkin?

17         MR. DURKIN:  Thank you, Your Honor.

18                          - - -

19                     CROSS-EXAMINATION

20   BY MR. DURKIN:

21   Q.   Good morning, Detective.  How are you?

22   A.   I'm fine.  How are you, sir?

23   Q.   Doing great.

24        Just so that I understand, are there really -- are there

25   two different O. R. reports involved here?

1    A.    I'm unaware.

2    Q.    Well, the one that refreshed your recollection, was that

3    done -- was that one that you prepared?

4    A.    I don't believe I prepared it.  I believe the patrol

5    officer prepared it.  I was just the responding detective.

6    Q.    Okay.  And then, a couple of weeks later, did you

7    prepare a report?

8    A.    I may have amended the report with, you know, the status

9    of the investigation.

10   Q.    Okay.  And that's a common practice?

11   A.    Yes.

12   Q.    Okay.  And then -- and that report would have then

13   reflected what work you had done in between the March 15th

14   incident and when the report was done?

15   A.    Correct.  It might not have been completed in its

16   entirety.  We have a separate investigative case file.  This

17   is -- the offense report is the official electronic copy

18   documenting the incident.

19   Q.    All right.  And, then, did you have a conversation the

20   day after the shooting with the victim, Mr. Carson?

21   A.    I want to say yes, but I -- I can't -- ten years ago --

22   I can't remember when, exactly, I spoke with him.

23   Q.    It has been.  Yeah, it's been ten years.

24         Would seeing your report refresh your recollection as to

25   any exchange, or any -- anything -- You've indicated that your

TRIAL ONE - VOL. 7 -  568

1   recollection is the victim wasn't cooperative?

2    A.   Yeah.  He provided limited information and --

3    Q.   All right.  Would seeing your report from that time help

4   refresh your recollection as to why he wasn't cooperative?

5    A.   It -- it may.  I'd have to review it.

6    Q.   All right.

7         MR. DURKIN:  Your Honor, rather than plugging this

8   computer into the source code here, could I approach him with

9   the report?

10        THE COURT:  Or you could just put it on the Elmo.

11   That would be the simplest of all.

12        MR. DURKIN:  Sure.

13        THE COURT:  Ms. Clark will show you how we can get

14   that done.  And then he can see it, you can see it, and all

15   counsel can see it.

16        MR. DURKIN:  Sure.

17        THE COURT:  Betty.

18        MR. DURKIN:  Detective, bear with us.  Everybody has

19   to do this the first time --

20        THE WITNESS:  Sure.

21        MR. DURKIN:  -- even though we practiced this ahead of

22   time.

23      (Whereupon, there was a brief interruption.)

24        MR. DURKIN:  Let me turn to the right page.

25        MR. DEVILLERS:  Mr. Durkin, we might be able to help

TRIAL ONE - VOL. 7 -   569

1   you out with that.  Can you come here, Kevin?

2          MR. DURKIN:  Sure.  Why don't we start with the page

3   before, so we can --

4          COURTROOM DEPUTY CLERK:  Are you pulling it up?

5          MR. DEVILLERS:  Yes.

6          MR. DURKIN:  Thank you, Dave.

7       Thank you, Agent.

8          THE COURT:  It went blank.  Oh, there it is.

9    BY MR. DURKIN:

10   Q.   Detective, does this look like, maybe, the report you

11  did in April of 2006 regarding this incident?  Would it help to

12  blow this up --

13   A.   Yes.

14   Q.   -- to see it?

15   A.   It would, sir.

16   Q.   All right.  I know that helps my eyes.  How about yours,

17  Detective?

18   A.   Yes, it does.

19   Q.   All right.  And this would have been the followup

20  report?

21   A.   Yes.  It is a dash two.  Yes.

22   Q.   All right.  And, then, if we could go to the second

23  page -- I'll give you just a moment to see this highlighted

24  portion -- see if that helps refresh your recollection of the

25  circumstances.

TRIAL ONE – VOL. 7 – 570

1    A.    Okay.

2    Q.    Detective, I think we're going to require everybody to

3    bring their reading glasses with them after this.

4          So, actually, the victim called you the next day after

5    the shooting, Mr. Carson?

6    A.    Yes.

7    Q.    And he asked for his money back; is that right?

8    A.    Correct.

9    Q.    And you had some bad news for him?

10   A.    I did.

11   Q.    And that was what?

12   A.    That he would not be receiving his money.

13   Q.    There was even -- even worse news?

14   A.    Yeah, because it was going to be used, pending an

15   indictment against him.

16   Q.    For just not having money, but --

17   A.    Yeah, the weapon and narcotics.

18   Q.    All right.  And after that news, would it be fair to say

19   he became uncooperative in the investigation?

20   A.    That would be a very good approximation of his attitude,

21   yes.

22         MR. DURKIN:  Very good.

23         Your Honor, may I have a moment to consult with counsel?

24         THE COURT:  Yes, you may.

25         MR. DURKIN:  Your Honor, thank you.

1          THE COURT:  Okay.

2          MR. DURKIN:  Thank you, Agent.

3          THE COURT:  Mr. Miller, any cross?

4          MR. MILLER:  No, Your Honor.

5          THE COURT:  Mr. McVay, any cross?

6      Or Mr. Meyers?  I'm sorry.

7          MR. MEYERS:  No, Your Honor.

8          THE COURT:  All right.

9      And Mr. Nolder?

10          MR. NOLDER:  I'm sorry.  No, sir.

11          THE COURT:  All right.

12      Any redirect, Mr. Devillers?

13          MR. DEVILLERS:  Just briefly, Your Honor.

14          THE COURT:  All right.

15                          – – –

16                  REDIRECT EXAMINATION

17   BY MR. DEVILLERS:

18   Q.   It would appear from the evidence that the victim of

19   this shooting was a drug dealer?

20          MR. DURKIN:  Well, Your Honor, I would object to that.

21          THE COURT:  I'm going to sustain the objection.

22   BY MR. DEVILLERS:

23   Q.   Were there drugs found in the vehicle of the victim?

24   A.   Yes.

25          MR. DEVILLERS:  No further questions, Your Honor.

TRIAL ONE – VOL. 7 –   572

1          THE COURT:  Officer, thank you very much.  You may be

2     excused.

3          THE WITNESS:  Thank you, Your Honor.

4          THE COURT:  Your next witness, Mr. Devillers?

5          MR. DEVILLERS:  Detective Garrison, Your Honor.

6          THE COURT:  Detective Garrison, please come forward

7     and be sworn.

8          COURTROOM DEPUTY CLERK:  Please come forward to be

9     sworn, please.

10         (Witness sworn.)

11         COURTROOM DEPUTY CLERK:  Please be seated, sir.

12         THE COURT:  Detective, I'm going to ask you to bend

13    the microphone towards you and speak clearly into it.

14         Thank you very much, sir.

15         Mr. Devillers, please proceed.

16                         – – –

17                   ANTHONY J. GARRISON

18     Called as a witness on behalf of the Plaintiff,

19     being first duly sworn, testified as follows:

20                         – – –

21                   DIRECT EXAMINATION

22     BY MR. DEVILLERS:

23     Q.   Detective, please state your full name and spell your

24     last name.

25     A.   Anthony J. Garrison, G-A-R-R-I-S-O-N.

TRIAL ONE – VOL. 7 – 573

1    Q.    And who do you work for?

2    A.    Columbus Division of Police.

3    Q.    What do you do for the Columbus Division of Police?

4    A.    I work in the HIDTA drug task force.

5    Q.    What's HIDTA?

6    A.    High Intensity Drug Trafficking Area.

7    Q.    Back in 2006, March of 2006, what did you do?

8    A.    I worked for the narcotics bureau in the INTAC unit.

9    Q.    What was the INTAC unit?

10   A.    It's the narcotics, like, SWAT team.

11   Q.    Is there still an INTAC unit?

12   A.    Yes.

13   Q.    What were the duties, in 2006, at least, of the INTAC

14   unit?

15   A.    Basically, the INTAC unit answers citizen complaints for

16   crack houses in people's neighborhoods.  If a crack house pops

17   up next to a relative and you call in on the narcotics line,

18   we're the people that look into it.

19   Q.    And what do you do to look into it?

20   A.    Usually the first thing we'll do is, we'll go out and

21   try to make a buy with a confidential informant.  If we do get

22   a buy out of the crack house or drug house, we apply for a

23   search warrant, get a search warrant up.  Then we'll attempt to

24   get another pre-buy.  After that pre-buy, we'll execute a

25   search warrant on the residence.

TRIAL ONE – VOL. 7 –  574

1    Q.    Okay.  So, you said there's an initial buy using a

2  confidential informant?

3    A.    Yes, sir.

4    Q.    What's a confidential informant?

5    A.    A person that's paid to work for the police department.

6    Q.    And is this a person -- what can this person do that a

7  regular police officer couldn't necessarily do?

8    A.    Well, I mean, usually it's a person that's in with the

9  drug people, that hangs out on the streets, that knows, you

10  know, the lingo.  And a police officer could probably do it.

11  It would probably be a lot more dangerous.

12    Q.    Okay.  Could a police officer, known police officer, buy

13  drugs from a drug dealer traditionally?

14    A.    Yes, but it's -- it's hard.

15    Q.    In a uniform?

16    A.    No.

17    Q.    Okay.

18    A.    I'm sorry.

19    Q.    Can an undercover officer buy drugs from a drug dealer?

20    A.    Yes.

21    Q.    Okay.  And is it common to use a confidential informant

22  for particular reasons?

23    A.    Yes.

24    Q.    All right.  You talked about a search warrant.  What's a

25  search warrant?

TRIAL ONE – VOL. 7 –   575

1    A.   A search warrant is -- it's a warrant to enter a

2  premises, like Fourth Amendment, you know, to go ahead, and

3  gives you permission to enter the premise, search the premise,

4  to take evidence from their premises.

5    Q.   Have you ever applied for a search warrant before?

6    A.   Yes.

7    Q.   How many times do you think you've applied for a search

8  warrant?

9    A.   Thousands.

10   Q.   Is there an affidavit to a search warrant?

11   A.   Yes.

12   Q.   And what's the affidavit?

13   A.   The affidavit, I mean -- I'm sorry.

14   Q.   What's an affidavit?

15   A.   It's the statement of facts that you say what went on,

16  why you want the warrant for the residence.

17   Q.   Okay.  And is the affidavit supposed to establish

18  something?

19   A.   The probable cause to hit the, or, to obtain the search

20  warrant.

21   Q.   Okay.  And once you get that affidavit, does it justify

22  the probable cause?

23   A.   Yes.

24   Q.   Who do you take that affidavit to?

25   A.   Municipal court judge.

TRIAL ONE - VOL. 7 - 576

1    Q.    And what does that municipal court judge do?

2    A.    He reviews it, looks at your probable cause.  Sometimes

3    they ask you questions about it.  And then, ultimately, he

4    either okays it by signing it or he tells you, no, there is not

5    enough probable cause and they don't sign it.

6    Q.    Traditionally, what's the purpose of sending a

7    confidential informant to a house to purchase drugs in INTAC's

8    world?

9    A.    In INTAC's world, it's easier.  There's less -- I mean,

10   it sounds kind of cruel, but a police officer -- you know, it's

11   more dangerous for a police officer to go up there 'cause

12   you're clean-cut, where confidential informants are usually

13   drug guys that these people know anyways that are -- they call

14   them snitches.

15   Q.    Okay.  Is it dangerous to be a confidential informant?

16   A.    Very dangerous.

17   Q.    Does -- Once a confidential informant goes to a drug

18   house and buys drugs, do you write that in your affidavit?

19   A.    Yes.

20   Q.    How long does it take to get from the time that you at

21   least believe you've established probable cause and you write

22   your affidavit to getting a judge to sign it?  How long does

23   that usually take?

24   A.    In the INTAC world, you would go out and make your buys

25   on Monday night.  You would go ahead and put in for your --

TRIAL ONE – VOL. 7 –  577

1    fill out your search warrant.  Then you would come in the next

2    day, take your search warrants down and go down to the judge,

3    have him review them and sign them.  So, 24 hours.

4    Q.    How long after the judge signs the search warrant do you

5    have, usually, to search a house, to actually go in?

6    A.    Seventy-two hours.

7    Q.    In INTAC's world back in 2006, about how many houses did

8    INTAC search in a given year?

9    A.    Over 400.

10   Q.    So this was -- would it be a daily thing that you would

11   search a house?

12   A.    Yeah.  Well, usually, it would be Tuesday through

13   Friday, typically.  But we would do them on Mondays.

14   Q.    Would you ever do more than one house on a day?

15   A.    Yes.

16   Q.    Okay.  You indicated there was a post-buy as well.

17   After the search warrant, there is another buy?

18   A.    We call it a pre-buy.

19   Q.    Okay.

20   A.    Just before, prior to executing the search warrant, we

21   try to get another buy out of the location.  That way, it gives

22   you some intelligence, you know, if there is guns, dogs, kids,

23   how many suspects are in the house, where they're located in

24   the house, who sold.  We'll get a description -- I'm sorry -- a

25   description of the suspect, what's going on in the

TRIAL ONE – VOL. 7 –  578

1  neighborhood.

2    Q.    I want to take you to March 15th of 2006.  And do you

3  recall being part of just what you described, an INTAC raid?

4    A.    Yes.

5    Q.    All right.  Do you remember where that was?

6    A.    Yes.  Could I --

7    Q.    I mean -- You have something in your hand.  What is

8  that?

9    A.    It's the investigative reports for the raid at 1338

10  North Fifth Street.

11    Q.    Okay.  Could you put that down?

12    A.    Sure.

13    Q.    I'll get in trouble if you read it.

14    A.    I'm sorry.

15    Q.    Did I hand you that earlier today?

16    A.    Yes.

17    Q.    And did we meet a few weeks ago?

18    A.    Yes.

19    Q.    And did you use that to refresh your recollection as to

20  what happened on that day?

21    A.    Correct.

22    Q.    Without looking at the report right now -- Turn it over.

23  Okay.  All right.  Do you recall -- do you recall the incident

24  as far as what happened after -- now that you know

25  the -- remember the address?  Did you do a pre-buy?

TRIAL ONE – VOL. 7 – 579

1    A.   Yes, a pre-buy was made.

2    Q.   Okay.

3         THE COURT:  I'm sorry.  Did who?

4         MR. DEVILLERS:  I'm sorry.  I'll repeat the question.

5         THE COURT:  Okay.

6    BY MR. DEVILLERS:

7    Q.   Did you do a pre-buy?

8    A.   I, specifically, did not do the pre-buy, but a pre-buy

9    was done.

10   Q.   And was it -- who was it done by?

11   A.   I believe --

12   Q.   Not the name, but was it done by a police officer, or

13   was it done by a confidential informant?

14   A.   Confidential informant.

15   Q.   All right.  And was that a paid confidential informant?

16   A.   Yes.

17   Q.   Once that was done, what happened?

18   A.   We got the green light to execute the search warrant.

19   Then the entry team briefs the location.

20   Q.   What's that mean?

21   A.   All locations, because only two detectives have been

22   there that made the initial buys to get the warrant up, the

23   rest of the 20-guy team, they've never been there.  So what we

24   do is, we -- we do what's called a scout.  We send detectives

25   out.  They take pictures.  They draw a map of the place that

1  we're going to execute.  They take pictures of the front and

2  the back, door swings, windows.

3       When we do -- After that scout, before we hit it, the

4  two detectives that do the scouts stand up and tell everybody,

5  you know, does it have security screen doors, which way is the

6  door swings, are they metal doors, are they wood doors, how

7  many houses -- because we have to drive up there and you don't

8  want to hit the wrong one, we do a map.  And the map is put up

9  on the wall so that everyone can see which house, where their

10  position is, and what they're going to do.

11  Q.   What is an INTAC, the team itself?  Describe the team.

12  A.   It's twenty detectives, two sergeants.

13  Q.   And I think earlier you said it's like narcotics' SWAT

14  team.

15  A.   Correct.

16  Q.   All right.  Is there particular weapons or equipment

17  they use?

18  A.   Yeah.  There is individual jobs in the team.  You have

19  the breachers, which is two guys.  The breachers usually,

20  primarily, have a handgun.  Then they have the breaching tools:

21  The ram, the Halligan tool.

22  Q.   What's a Halligan tool?

23  A.   A Halligan tool is a metal fire tool that you use to,

24  like, pry open doors or windows or -- you know, you can rake

25  out a window if you have to.  It's like a metal -- long.  It's

TRIAL ONE – VOL. 7 – 581

1  got a hook on the end.

2  Q.  A pry bar?  A crowbar?

3  A.  It's like a pry bar, crowbar.  It's a multi-purpose

4  tool.

5  Q.  Let's go back a little bit.  You talked a little bit

6  about maps and photographs and some surveillance photos and

7  things of that nature.

8  A.  Correct.

9  Q.  After the -- After the raid is done, is that kept in a

10  file?

11  A.  Yes.

12  Q.  All right.  And where is that file kept?

13  A.  In the INTAC office.  It's called the mission folder.

14  Q.  Okay.  Does that -- Is that mission folder purged after

15  a number of years?

16  A.  Yes.

17  Q.  Okay.  And did I ask you to go back and check if that

18  mission folder still existed?

19  A.  Correct.

20  Q.  Did it?

21  A.  No.

22  Q.  The report that you have in front of you, does that

23  still exist?

24  A.  Yes.

25  Q.  That's not the mission folder?

1    A.    No.

2    Q.    Okay.  Once you -- In this particular case, was the

3    residence breached?

4    A.    Yes.

5    Q.    Okay.  And what happened -- Did you go in as well?

6    A.    Correct.

7    Q.    Once you got in the house, what did you do?

8    A.    I was the collection officer.  My partner was the

9    affiant on the search warrant.  So I did all evidence

10   collection.

11        Let me explain that.  I don't walk around and pick it up

12   and take it.  I go to a central location.  The evidence is

13   collected by a detective.  He brings it over to me.  I

14   inventory it on an inventory sheet.  And then I take custody of

15   it.  And then I go, my partner and myself, down to the property

16   room.  And we turn it in.

17   Q.    Traditionally, in any case, once you breach a house,

18   what's the first thing you do?

19   A.    Secure it.  Secure the individuals inside.

20   Q.    And did you do that in this case?

21   A.    Yes.

22   Q.    Was there any resistance, if you can recall?

23   A.    I'm sorry.  I don't recall.

24   Q.    Was anyone shot?

25   A.    No.

TRIAL ONE – VOL. 7 –  583

1    Q.    On either side?

2    A.    No.

3    Q.    When you talk about securing the people in the

4    residence, what do you mean?  What do you do to secure them?

5    A.    We flex cuff them.  We take them to a central location.

6    They're tagged:  Their names, date of birth.  Socials are put

7    on a tag, put on their back.  Then they're individually

8    searched.  And all of the items that are on them are collected

9    and put into a bag, unless it's money, dope.  Then that's

10   collected and taken to the inventory officer, or weapons.

11   Q.    I'm going to show you and I'm going to show you on the

12   screen what's been marked as Government's Exhibit 19-1-006.

13   Can you tell me what that is?

14   A.    Yeah.  That's a narcotics bureau evidence inventory

15   sheet.

16   Q.    And is that your handwriting?

17   A.    Yes, sir.

18   Q.    And is there a date on that?

19   A.    Yes, 3-15 of '06.

20   Q.    And did you fill this out?

21   A.    Yes, I did.

22   Q.    All right.  And is this the inventory sheet subject to

23   what you've testified to so far, the house you hit, you raided?

24   A.    Yes, sir.

25        MR. DEVILLERS:  All right.

TRIAL ONE – VOL. 7 – 584

1          Your Honor, may I publish this to the jury?

2             THE COURT:  Yes, you --

3          Any objection?

4             MR. BERNDT:  No objection, Your Honor.

5             MR. DURKIN:  No, Your Honor.

6             MR. McVAY:  No, Your Honor.

7             MR. DURDEN:  No, Your Honor.

8             MR. NOLDER:  No objection.

9             THE COURT:  It will be received.  And you may publish

10    it.

11     BY MR. DEVILLERS:

12     Q.    There appears to be, to the right of the top, something

13    that says "Property Number."  What's that?

14     A.    When the evidence is turned into our property room, it's

15    issued its own number.  And it will keep that number forever.

16    That way, that's how they store it, and they can retrieve it.

17     Q.    And what's the property number to this case?

18     A.    It says 06-006500.

19     Q.    Okay.  And do you recall what time that the breach was

20    made of this residence?

21     A.    7:35.

22     Q.    The 33 -- Sorry.  The 1338 North Fifth Street, what area

23    of town is that in?

24     A.    It's in the campus area, like the Short North area

25    there.

TRIAL ONE – VOL. 7 – 585

1  Q.  Okay.  It appears like this form has columns.  Is that

2  accurate?

3  A.  Yes.

4  Q.  And the left column, the top column, what's that say?

5  A.  "Item Number."

6  Q.  What's an item?

7  A.  That's a piece of evidence.

8  Q.  Okay.  And do you designate numbers for each piece of

9  evidence that you collect?

10  A.  Yes.

11  Q.  All right.  And the next column?

12  A.  "Property Description."

13  Q.  Okay.

14      MR. DEVILLERS:  Thank you, Agent Lauber.

15  BY MR. DEVILLERS:

16  Q.  And the next column?

17  A.  "Location Found."

18  Q.  Okay.  And the next column?

19  A.  "Found By."

20  Q.  All right.  And there seems to be a few other columns

21  that indicate what?

22  A.  "Photo Numbers."  "Sealed Weight."  If it was sent to

23  the laboratory.  And it says "Latent Prints," if we did prints.

24  Q.  What are latent prints?

25  A.  They take fingerprints off of, like, firearms.  They try

TRIAL ONE – VOL. 7 – 586

1   to get them off of bags of narcotics that are found that aren't

2   found on an individual.

3       Q.   Okay.  Do you do that?  Do you actually try to lift the

4   prints?

5       A.   No.

6       Q.   Who does that?

7       A.   It's sent to the lab.  In our crime laboratory, they do

8   it, technicians, down there.

9       Q.   And what is a latent lift, do you know?

10      A.   No, not really.

11      Q.   Not your thing?

12      A.   Not my thing.

13      Q.   All right.  Okay.  So you indicated before, once you get

14   into the house, at least in this time, you were the person that

15   was -- your responsibilities were what?

16      A.   I am an inventory officer.

17      Q.   And what's an inventory officer do?

18      A.   I get to a central location in the house.  The officers,

19   which would be the "found by" guys, they pick up the item

20   numbers.  They bring it over to me.  I check it in on the

21   evidence inventory, and then I take custody of it.

22      Q.   Okay.  This exhibit, Exhibit 19-1-006, this is the --

23   how you log in the physical evidence?

24      A.   Correct.

25      Q.   All right.  What I'd like to do now, Detective, is show

TRIAL ONE - VOL. 7 -  587

1  you some evidence to see if that's the evidence that you

2  collected at the scene that day.

3    A.   Okay.

4    Q.   Fair enough?

5    A.   Uh-huh.

6    Q.   All right.  Once you collect the evidence from the

7  scene, where do you bring it to?

8    A.   Columbus Police property room.

9    Q.   And what do they do with it?

10   A.   They store it.

11   Q.   Okay.  Do they put it in boxes?

12   A.   Sometimes they put it in boxes.  Sometimes it's in bags.

13  They store it until the lab comes and gets it and takes custody

14  of it.

15   Q.   Could you go to the full -- Okay.  You indicated there

16  are particular item numbers; is that correct?

17   A.   That is correct.

18   Q.   All right.  I'm going to show you what's been marked as

19  Government's Exhibit 19-8.  Do you see that?

20   A.   Yes.

21   Q.   What am I showing you?

22   A.   A Smith and Wesson pistol.

23   Q.   Okay.  Is there a property number on that?

24   A.   Yes.

25   Q.   And what's the property number?

TRIAL ONE – VOL. 7 – 588

1    A.   06-006500.

2         MR. DEVILLERS:  Your Honor, with the Court's

3    permission, since I'm going to be showing this on the opaque,

4    if I could have him refer to 19-1-006 in his packet that he has

5    in front of him if I go through the items?

6         THE COURT:  You mean the --

7         MR. DEVILLERS:  Inventory list.

8         THE COURT:  -- log?

9         MR. DEVILLERS:  Yes.

10        THE COURT:  Yes, sure.  You may.

11   BY MR. DEVILLERS:

12   Q.   Detective, would you find the log in that -- in your

13   packet?  Do you have the log in front of you?  Is it a typed

14   version of the log?

15   A.   I have the typed version.  I don't have the other one.

16   Q.   Is that typed version similar to the one that I showed

17   you in 19 -- same as 19-1-006 as far as who collected what from

18   where?

19   A.   Yes.

20   Q.   All right.  Is there an Item 22 on that?

21   A.   Yes.

22   Q.   What's Item 22 indicated to be?

23   A.   Smith and Wesson .45-caliber pistol, Serial Number Tom

24   Boston Lincoln 8630, found by Detective Claud Roush, Badge

25   Number 1334, in the yard.  Someone threw it out of the west

TRIAL ONE - VOL. 7 - 589

1   bedroom.

2          MR. DURKIN:  Your Honor, I'm going to object.

3   BY MR. DEVILLERS:

4   Q.   Where was it found?

5   A.   In the yard.

6          THE COURT:  The objection is sustained.

7          You may proceed, Mr. Devillers.

8          MR. DURKIN:  Thank you, Your Honor.

9          MR. DEVILLERS:  Okay.

10         THE COURT:  Go ahead.

11  BY MR. DEVILLERS:

12  Q.   Did you see anybody throw a weapon out of the house that

13  night?

14  A.   No, I did not.

15  Q.   Okay.  Was a weapon found outside the house that night?

16  A.   Yes.

17  Q.   Is this that weapon, Government's Exhibit 19-8?

18  A.   Yes.

19  Q.   Okay.  Let's look at, if you would -- I'm going to zoom

20  in, because I have this cool technology.  And at the top, there

21  seems to be some sort of document on the plastic bag with that

22  exhibit.  What's that?

23  A.   It's the inventory sheet that goes on the bag when we

24  collect it.  We transfer the information of the item onto that.

25  And then it gets sealed in that bag until it goes to the lab.

1  Q.  And on the top, there appears to be a number over the

2  property number.  Do you see what that is?

3  A.  Yeah.  That's the item number.

4  Q.  Okay.  And this is Item Number --

5  A.  -- 22.

6  Q.  Now, this is in a -- in a plastic bag, Government's

7  Exhibit 19-8.  Is that how it was recovered?

8  A.  No.

9  Q.  Is this bag what was -- what you put it in after it was

10  recovered?

11  A.  Yes.

12  Q.  Okay.  I'm now going to show you what's been marked as

13  Government's Exhibit 19-4.  Can you tell me what that is?

14  A.  It's a Ruger handgun.

15  Q.  All right.  And can you see the item number to that?

16  A.  Yes.

17  Q.  And what item number is that?

18  A.  20.

19  Q.  Do you know where that was recovered?

20  A.  Yes.

21  Q.  Where was that?

22  A.  In the bathroom.

23  Q.  And by whom?

24  A.  Detective Howard Brenner, Badge Number 1352.

25  Q.  And are all these men you mentioned so far a part of

TRIAL ONE - VOL. 7 - 591

1  your INTAC team?

2    A.    They were at the time.  They're -- Some of them are no

3  longer here.

4    Q.    Okay.

5         MR. DEVILLERS:  Your Honor, just so I keep myself

6  honest here, we'd move on admit Government's Exhibit 19-8 into

7  evidence.

8              THE COURT:  Any objection?

9              MR. BERNDT:  No objection, Your Honor.

10             MR. DURKIN:  Yes, Your Honor.

11             THE COURT:  Legal basis?

12             MR. DURKIN:  No foundation basis.

13         Can we approach side-bar?

14             THE COURT:  Yes.

15                           - - -

16     (Thereupon, the following proceeding was held at side-bar.)

17             THE COURT:  Go ahead, Mr. Durkin.

18             MR. DURKIN:  Your Honor, I may have missed it; and, if

19  I did, I apologize.  I think I'm still missing the link between

20  the items going into the bag and getting to the property room

21  in terms of who turned it into the property room.  If this

22  witness did, that's fine.  But I don't think I've heard him say

23  that.

24             MR. DEVILLERS:  I think he did say that, yeah.  He

25  said he and his partner would take them.

TRIAL ONE – VOL. 7 –  592

1        THE COURT:  Yeah.  That's my recollection as well.

2        MR. DURKIN:  Okay.

3        THE COURT:  While we're up here, anyone else?  Any

4   other objections?

5        MR. MEYERS:  Not on this one.  Could I flag another

6   thing while we're up here?

7        THE COURT:  Sure.

8        MR. MEYERS:  On that inventory, you haven't moved that

9   in yet, have you?

10        MR. DEVILLERS:  No.

11        MR. MEYERS:  Are you planning on it?

12        MR. DEVILLERS:  Yeah, probably.  Yeah.

13        MR. MEYERS:  Only because, this guy doesn't have

14   personal knowledge of the -- I don't think he has personal

15   knowledge.  There is no foundation, yet, that singles that out,

16   that he has personal knowledge to some of these items to be

17   linked to some of the names of the suspects in this indictment,

18   like Chris Harris.

19        MR. DEVILLERS:  Well --

20        MR. MEYERS:  From that one column, but it says it's

21   coming from, like, Coates or somebody else.

22        MR. DEVILLERS:  I'll say this --

23        THE COURT:  Tell me --

24        MR. DEVILLERS:  -- I met with everyone, including you,

25   in front of this Court, on a pretrial.  And I was told by all

TRIAL ONE - VOL. 7 - 593

1   defense attorneys that this would not be a problem, that all I

2   needed to do was bring in the collector, and it wouldn't be

3   objected to or brought up.  If that has changed, I need to know

4   that.

5          MR. MEYERS:  That's the point I wanted to -- I

6   withdraw it.  I withdraw.  That's -- I agree.  I mean, it could

7   be done.  So I'll forget it.

8          MR. DEVILLERS:  Okay.

9          THE COURT:  All right.  Are there any other matters

10  that we need to take up while we're here?

11        So after you -- are you going to move both of the

12  weapons into evidence?

13        MR. DEVILLERS:  I have a lot more weapons, Your Honor.

14  But, yes.

15        THE COURT:  No.  No.  The only reason I'm asking is,

16  it's noon.  So I assume that you could move these two in, and

17  then the rest of the weapons we'll move in after lunch.

18        MR. DEVILLERS:  Understood, Your Honor.  Okay.

19     (The following proceedings were had in open court.)

20        THE COURT:  Mr. Devillers, please continue.

21        MR. DEVILLERS:  Your Honor, we move into evidence

22  Exhibit 19-9 -- I'm sorry -- 19-4, Your Honor.

23        THE COURT:  Yes.  19-4 is the Ruger?

24        MR. DEVILLERS:  It is, Your Honor.

25        And then, also, 19-8.

TRIAL ONE – VOL. 7 – 594

1    THE COURT:  And 19-8 is the Smith and Wesson pistol?

2    MR. DEVILLERS:  Correct, Your Honor.

3    THE COURT:  I think that there was no objection.  I

4  asked this question at side-bar.  There was no objection to the

5  admission of either of these exhibits.  So, both 19-4 and 19-8

6  will be admitted.

7    Ladies and gentlemen, it is not typically the Court's

8  practice -- even though the guns have no ammunition in them,

9  but it's just been my practice not to pass them around unless

10  there was someone who wanted to see the weapons, which is

11  perfectly fine.  You may.  Otherwise, the extent of the

12  publication would consist of them being viewed by you on the

13  Elmo.

14    And I believe -- You may publish them on the Elmo, Mr.

15  Devillers, if you wish.  And if you wish, for purposes of

16  clarity, to take them out of the plastic bag, you may do so,

17  unless doing so would somehow vitiate the exhibit because you

18  would have to handle it with your bear hands.

19    MR. DEVILLERS:  It may vitiate my hands, Your Honor.

20    THE COURT:  I don't think that it will vitiate your

21  hands.  I was more concerned with the exhibit.

22    MR. DEVILLERS:  Understood, Your Honor.

23    THE COURT:  So, you can publish them if you wish.  And

24  if you opt not to, we'll simply break for lunch.

25    MR. DEVILLERS:  I opt not to.

TRIAL ONE – VOL. 7 –  595

1          THE COURT:  All right.

2      Is there anyone on the jury who wants to see or -- see

3  it, personally, before we move on?

4      (No response.)

5          THE COURT:  All right.

6      Ladies and gentlemen, it's one o'clock.  I mean, it's

7  noon.  We will stand in lunch recess until one o'clock.  All of

8  the admonitions remain the same, with the most important being,

9  enjoy your lunch.

10     (Jury out at 12:01 p.m.)

11         THE COURT:  Please be seated, everyone.

12     Mr. Devillers, is there anything we need to take up from

13  the government before we adjourn for lunch?

14         MR. DEVILLERS:  Not from the government, Your Honor.

15         THE COURT:  Mr. Berndt, on behalf of Mr. Ledbetter?

16         MR. BERNDT:  No, Your Honor.

17         THE COURT:  Mr. Durkin, on behalf of Mr. Harris?

18         MR. DURKIN:  No, Your Honor.

19         THE COURT:  Mr. Miller?

20         MR. MILLER:  No, Your Honor.

21         THE COURT:  Mr. McVay?

22         MR. McVAY:  No, sir.

23         THE COURT:  Mr. Nolder?

24         MR. NOLDER:  No, Your Honor.

25         THE COURT:  All right.

TRIAL ONE – VOL. 7 –  596

1          Enjoy your lunch, everyone.

2          (Lunch recess taken from 12:02 p.m. to 1:00 p.m.)

3                          - - -

4                    WEDNESDAY AFTERNOON SESSION

5                    APRIL 13, 2016

6     (Jury in at 1:11 p.m.)

7          THE COURT:  Mr. DeVillers, are you ready to continue?

8          MR. DEVILLERS:  Thank you, Your Honor.

9     BY MR. DEVILLERS:

10    Q.   Good afternoon, Detective.

11    A.   Good afternoon.

12    Q.   I'm going to kind of recap for the jurors sake and my

13    fault I didn't publish this.

14         MR. DEVILLERS:  May I publish this, Your Honor, it's

15    already been admitted, 19-4?

16         THE COURT:  Yes, you may.

17    BY MR. DEVILLERS:

18    Q.   We did talk.  I won't belabor this but this is you

19    indicated there was a property number on this form?

20    A.   Correct.

21    Q.   Can you, because we haven't done it yet and I want to

22    see if it works, can you touch the screen around where the

23    property number is, circle it a little?

24    A.   (Indicating.)

25    Q.   There's also an item number?

TRIAL ONE – VOL. 7 –  597

1    A.   Correct.

2    Q.   Can you circle that?

3    A.   That was the first one I got up there.

4    Q.   That's the item number?

5    A.   Yeah.

6    Q.   We're not going to do that anymore.  The item number is

7  the top left?

8    A.   Correct.

9    Q.   Okay.  And again, Government Exhibit 19-8.  Same thing,

10  is there a property number and there's an item number on there?

11    A.   Correct.

12    Q.   And that's item number what?

13    A.   Item number 22.

14    Q.   Thank you.

15       I'm now going to show you what's been marked as

16  Government's Exhibit 19-5.  And from your -- do you have your

17  inventory there?

18    A.   Yes.

19    Q.   Please.  And can you tell me what this is, Detective?

20    A.   It's a Ruger .45 caliber pistol, serial number

21  664-23564.

22    Q.   And that's your item number 21?

23    A.   Yes, sir.

24    Q.   And where was that located?

25    A.   First floor middle room on the love seat.

TRIAL ONE - VOL. 7 -  598

1    Q.   By who?

2    A.   Detective John M. Gillis, badge number 340.

3    Q.   I'm going to attempt to show you what's been marked as

4    Government Exhibit 19-6.  I'll show you a part of this.  Can

5    you see that?

6    A.   Yes.

7    Q.   And is there an item number on that?

8    A.   Number 23.

9    Q.   Okay.  What is item number 23?

10   A.   Item number 23 is an SKS assault rifle with a folding

11   stock, serial number A, as in alpha,-709089.

12   Q.   What's a folding stock?

13   A.   It means you can fold it out of the way and use it as

14   like a pistol grip or you can fold it out and put it in your

15   shoulder.

16   Q.   And does this particular weapon also have a bayonet of

17   some sort?

18   A.   Looks like it has, yes, on the bottom there.

19        MR. DEVILLERS:  Your Honor, I would move Government's

20   Exhibit 19-6 into evidence.

21        THE COURT:  Any objection?

22        MR. BERNDT:  No objection, Your Honor.

23        MR. DURKIN:  No, Your Honor.

24        MR. DEVILLERS:  And as I would, Your Honor, to

25   Government's Exhibit 19-5.

TRIAL ONE - VOL. 7 -  599

1          MR. BERNDT:  Again no objection, Your Honor.

2          MR. DURKIN:  No, Your Honor.

3          MR. MILLER:  No, Your Honor.

4          MR. MCVAY:  No, Your Honor.

5          THE COURT:  Mr. Nolder.

6          MR. NOLDER:  No objection, Your Honor.

7          THE COURT:  Neither of them is objected to.  Both are

8     admitted.  You may publish.

9          MR. DEVILLERS:  Thank you, Your Honor.

10   BY MR. DEVILLERS:

11   Q.   Can you tell me where Government's Exhibit 19-6 was

12   located?

13   A.   I'm sorry, which item number is that?

14   Q.   That would be item number 23.

15   A.   Item number 23 was in the first floor middle room.

16   Q.   Now going to show you what's been marked as Government's

17   Exhibit 19-7.  Can you tell me what this is?

18   A.   Item number 24 is an SKS assault rifle with one

19   magazine, 13 live rounds, serial number 21-002293P, as in Paul.

20   Q.   And where was this found?

21   A.   Also in the first floor in the middle room.

22          MR. DEVILLERS:  Your Honor, I'd like to admit

23   Government's Exhibit 19-7.

24          THE COURT:  Any objection?

25          MR. BERNDT:  No objection, Your Honor.

TRIAL ONE – VOL. 7 – 600

1          MR. DURKIN:  No, Your Honor.

2          MR. MILLER:  No objection, Your Honor.

3          MR. MCVAY:  No, Your Honor.

4          MR. NOLDER:  No, Your Honor.

5          THE COURT:  19-7, Mr. DeVillers, also will be received

6    and may be published.

7      BY MR. DEVILLERS:

8      Q.   I'd like to show you what's been marked as Government's

9    Exhibit 19-19.  Can you tell me what that is?  Your item number

10   10.

11     A.   110 grams of marijuana.

12     Q.   And where was that located?

13     A.   In the kitchen cabinet.

14          MR. DEVILLERS:  Your Honor, we'd move Government's

15   Exhibit 19-19 into evidence.

16          THE COURT:  Any objection?

17          MR. BERNDT:  No objection, Your Honor.

18          MR. DURKIN:  No, Your Honor.

19          MR. MILLER:  No, Your Honor.

20          MR. MCVAY:  No, Your Honor.

21          MR. NOLDER:  No, Your Honor.

22          THE COURT:  19-19 will be received.

23     BY MR. DEVILLERS:

24     Q.   Now showing you what's been marked as Government's

25   Exhibit 19-22.  Can you tell me what that is?

TRIAL ONE – VOL. 7 –  601

1    A.    7.7 grams of marijuana.

2    Q.    And where was that -- what item number is that?

3    A.    That would be item number 12.

4    Q.    And where was that located?

5    A.    Mr. Davis' left front pants pocket.

6    Q.    Let me ask you this.  Inside the house, did you review

7    that?  Did it refresh your recollection as to who was actually

8    found inside the house upon entry?

9    A.    Correct.

10   Q.    Who was found inside the house?

11   A.    Tommy Coates, Jr., Larissa Vasser (phonetic),

12   Christopher Harris, Rashaad Davis and Robert Liston.

13   Q.    Would you recognize those people if I showed you any of

14   them?

15   A.    No.

16   Q.    When you indicated once you go inside a house, the

17   statistics, date of birth, Social Security numbers and things

18   are verified; is that right?

19   A.    Correct.

20   Q.    And did you do that in this case?

21   A.    Yes.

22   Q.    And was their date of births and social Security numbers

23   recorded in that report?

24   A.    I'm not sure if it was in this report.  It's probably in

25   the -- I can't think of the name of the --

1    Q.   Tell you what, I'm going to ask you to take a look at

2    Government's Exhibit 19-2-013.

3    A.   Okay.

4    Q.   Do you see that on the screen?

5    A.   Yes.

6    Q.   And do you actually have that in your hand as well?

7    A.   Yes.

8    Q.   All right.  Are there dates of birth and Social Security

9    numbers on those as well?

10   A.   Yes.  Part of the socials are redacted.

11   Q.   Now showing what's been marked as Government's

12   Exhibit 19-26, item number 8.  Can you tell me what that is?

13   A.   It's 11.8 grams of crack cocaine.

14   Q.   And where was that located?

15   A.   In the sweatshirt of Rashaad Davis?

16   Q.   What's crack cocaine?

17   A.   It's cocaine that has been rocked up and hard so that

18   you can smoke it.

19   Q.   Government's Exhibit 19-23.

20        MR. DEVILLERS:  I'm sorry, Your Honor, I'd like to

21   move into evidence Government's Exhibit 19-26.

22        THE COURT:  The 11.8 grams of crack?

23        MR. DEVILLERS:  Correct, Your Honor.

24        MR. BERNDT:  No objection, Your Honor.

25        MR. DURKIN:  No, Your Honor.

TRIAL ONE – VOL. 7 –  603

1          MR. MILLER:  No, Your Honor.

2          MR. MCVAY:  No, Your Honor.

3          MR. NOLDER:  None, Your Honor.

4          THE COURT:  19-26 will be received and you may

5    publish.

6      BY MR. DEVILLERS:

7      Q.   Move on to Government's Exhibit 19-23, your item 5.

8    What is that?

9      A.   Two digital scales.

10     Q.   And where were those located?

11     A.   In the kitchen on the counter.

12         MR. DEVILLERS:  Your Honor, may I publish this to the

13   jury?

14         THE COURT:  Yes.

15         Any objection, Mr. Berndt?

16         MR. BERNDT:  No, Your Honor.

17         MR. DURKIN:  No, Your Honor.

18         MR. MILLER:  No, Your Honor.

19         MR. MCVAY:  No, Your Honor.

20         MR. NOLDER:  None, Your Honor.

21         THE COURT:  You may publish it.  It will be received.

22   You may publish.

23         THE COURT:  That's 19-23?

24         MR. DEVILLERS:  It is, Your Honor.

25

TRIAL ONE – VOL. 7 –  604

1   BY MR. DEVILLERS:

2   Q.   Now I'm going to show you what's been marked as

3   Government's Exhibit 19-20.  It appears to be your item 1; is

4   that correct?

5   A.   Yes.

6   Q.   Okay.  What is this?

7   A.   It's 3.6 grams of crack cocaine.

8   Q.   And where was that located?

9   A.   In the kitchen on the counter.

10      MR. DEVILLERS:  Your Honor, we would move to admit and

11  publish Government's Exhibit 19-20.

12      THE COURT:  It will be received.  Any objection?

13      MR. BERNDT:  No, Your Honor.

14      MR. DURKIN:  No, Your Honor.

15      MR. MILLER:  No, Your Honor.

16      MR. MCVAY:  No, Your Honor.

17      MR. NOLDER:  No, sir.

18      THE COURT:  You may publish it.

19  BY MR. DEVILLERS:

20  Q.   19-21, your item 7?

21  A.   That's 47.1 grams of crack cocaine.

22      MR. DEVILLERS:  Your Honor, I'd like to --

23  BY MR. DEVILLERS:

24  Q.   Where was it located?  I'm sorry.

25  A.   It was in the kitchen on top of the refrigerator.

TRIAL ONE – VOL. 7 –  605

1          MR. DEVILLERS:  Your Honor, I'd like to enter this

2     into evidence and publish it.

3          MR. BERNDT:  No objection, Your Honor.

4          MR. DURKIN:  No, Your Honor.

5          MR. MILLER:  No, Your Honor.

6          MR. MCVAY:  No objection.

7          MR. NOLDER:  No, Your Honor.

8          THE COURT:  19-21 will be received and you may publish

9     it.

10    BY MR. DEVILLERS:

11    Q.   Detective, in your experience regarding crack cocaine,

12    appeared that some of the crack cocaine that you've already

13    identified were in little rocks and this one seems to be in a

14    large chunk.  Is that accurate?

15    A.   That's correct.

16    Q.   Does that mean anything to you?

17    A.   Yes.  The small rocks are unit doses.  That's what they

18    sell.  The large piece, that's how they -- when they cook it

19    up, it comes out usually in a cookie and then they cut that up

20    into the smaller pieces to sell.

21    Q.   What is traditionally crack cocaine cooked in?

22    A.   It can be different stuff.  But usually glass jars so it

23    comes out like a cookie, round.

24    Q.   Does it match the shape of whatever it's cooked in?

25    A.   Sure.

TRIAL ONE - VOL. 7 - 606

1    Q.    Now I'm going to show you what's been marked as

2    Government's Exhibit 19-25, your item number 9.  Can you tell

3    me what that is?

4    A.    That's 16.1 grams of crack cocaine.

5    Q.    Where was this located?

6    A.    It was tied to the sweatpants of Robert Liston.

7            MR. DEVILLERS:  Your Honor, I'd like to move this into

8    evidence.

9            THE COURT:  Yes.

10           MR. BERNDT:  No objection.

11           MR. DURKIN:  No objection, Your Honor.

12           MR. MILLER:  No objection.

13           MR. MCVAY:  No objection.

14           MR. NOLDER:  None, Your Honor.

15           THE COURT:  19-25 will be received and, Mr. DeVillers,

16   you may publish it.

17   BY MR. DEVILLERS:

18   Q.    Exhibit 19-27.  Can you tell me what that is?

19   A.    That's item number 3 would be one gram of crack cocaine.

20   Q.    And where was that recovered?

21   A.    On top of the kitchen cabinet.

22           MR. DEVILLERS:  Your Honor, may I enter this into

23   evidence?

24           THE COURT:  Yes.

25           MR. BERNDT:  No objection.

TRIAL ONE – VOL. 7 –  607

1          MR. DURKIN:  No objection, Your Honor.

2          MR. MILLER:  No objection.

3          MR. MCVAY:  No objection.

4          MR. NOLDER:  None, Your Honor.

5          THE COURT:  19-27 will be received and may be

6     published.

7      BY MR. DEVILLERS:

8      Q.   I'm going to show you what's been marked as Government's

9     Exhibit 19-24.  Can you tell me what that is?

10     A.   Item number 11 is one digital scale.

11     Q.   Where was that located?

12     A.   In the kitchen on the counter.

13          MR. DEVILLERS:  May I publish this to the jury and

14     enter into evidence, Your Honor?

15          MR. BERNDT:  No objection.

16          THE COURT:  Yes, you may.

17          MR. DURKIN:  No objection, Your Honor.

18          MR. MILLER:  No objection, Your Honor.

19          MR. MCVAY:  No objection.

20          MR. NOLDER:  No objection.

21          THE COURT:  19-24, admitted and may be published.

22          MR. DEVILLERS:  Your Honor, I didn't ask specifically

23     for 19-22 to be entered into evidence.  I'd ask that to be

24     entered into evidence as well.

25          THE COURT:  All right.  What was --

TRIAL ONE – VOL. 7 – 608

1    MR. DEVILLERS:  19-22.

2    THE COURT:  All right.

3    MR. DURKIN:  Without objection, Your Honor.

4    MR. BERNDT:  No objection.

5    MR. MILLER:  No objection.

6    MR. MCVAY:  No objection.

7    MR. NOLDER:  None, Your Honor.

8    THE COURT:  And you may publish it.

9   BY MR. DEVILLERS:

10   Q.   Now I want to show you what's been marked as

11  Government's Exhibit 19-13.  Can you tell me what that is?

12   A.   Yeah.  Item number 16 is miscellaneous ammunition.

13   Q.   And where was that located?

14   A.   On the first floor of the residence.

15   Q.   In your experience as a detective, have you seen various

16  types of ammunition?

17   A.   Yes.

18   Q.   From looking at Government Exhibit 19-13, can you tell

19  typically what type of ammunition this is we're looking at?

20   A.   Looks like pistol and rifle rounds.  There's a shotgun

21  round also in there, shotgun shell.

22       MR. DEVILLERS:  Your Honor, may I publish this to the

23  jury?

24       THE COURT:  Yes, you may.

25       MR. DURKIN:  Without objection, Your Honor.

TRIAL ONE – VOL. 7 –  609

1          MR. BERNDT:  No objection, Your Honor.

2          MR. MILLER:  No objection, Your Honor.

3          MR. MCVAY:  No objection.

4          MR. NOLDER:  No objection.

5          THE COURT:  All right.  It will be received and you

6     may publish it, Mr. DeVillers.  That's 19-13.

7     BY MR. DEVILLERS:

8     Q.   Now I'm going to show you what's been marked as

9     Government Exhibit 19-16.  Can you tell me what that is?

10    A.   That's two shotgun shells.

11    Q.   And where were they located?  I'm sorry.  I can help you

12    out a little bit.  I'll flip that over.

13         Where were they located?

14    A.   Is that 2?

15    Q.   I believe it just says -- you tell me what you think it

16    says.

17    A.   It looks like number 2.

18    Q.   Does that match up to your item slip?

19    A.   I'll tell you what it is is it's out of the Ithaca

20    shotgun and I don't know why it has the number 2 on it.  That's

21    what the Ithaca 12 gauge at the bottom.  That would be item

22    number 25.

23    Q.   Was there a 12 gauge shotgun also located at that

24    residence?

25    A.   Yes.

TRIAL ONE – VOL. 7 – 610

1    Q.  If an item is recovered from a residence that was stolen

2  or belongs to another individual, is it eventually given back

3  to that individual?

4    A.  Yes.  That's correct.

5    Q.  I'm now going to show you what's been marked as

6  Government's Exhibit 19-14.  Can you tell me what that is?

7    A.  Yeah.  Those are item number 2, occupancy papers.

8    Q.  And where were they recovered?

9    A.  In the kitchen on the counter.

10    Q.  What do you mean by occupancy papers?

11    A.  Usually they'll be -- they'll have the name of the

12  resident, the resident's address, could be a bill, bank

13  statements.  It could be anything.  But it's usually paperwork

14  that attaches a name to a residence.

15    Q.  I'm going to remove this from the plastic bag for a

16  moment.  Ask you to take a look at Government's Exhibit 19-24.

17  What does that appear to be?

18    A.  It's an AEP bill.

19    Q.  And does it have an address to it?

20    A.  Yes.

21    Q.  What's the address?

22    A.  1338 North Fifth Street.

23    Q.  And is that the address that INTAC hit that night?

24    A.  Correct.

25    Q.  And is there a name as far as an individual who at least

TRIAL ONE - VOL. 7 - 611

1   purports to be billed in this case?

2    A.   Yes.

3    Q.   What is that?

4    A.   Travis S. McGinnis.

5         MR. DEVILLERS:  Your Honor, may I publish this to the

6   jury and enter it into evidence?

7         THE COURT:  Yes, you may.

8         MR. DURKIN:  Without objection, Your Honor.

9         MR. BERNDT:  No objection.

10        MR. MILLER:  No objection.

11        MR. MCVAY:  No objection.

12        MR. NOLDER:  No, Your Honor.

13        MR. DEVILLERS:  And it's 19-14.

14        THE COURT:  All right.  19-14 will be admitted and

15   published.

16   BY MR. DEVILLERS:

17    Q.   Was Mr. McGinnis found in the house that evening?

18    A.   No.

19    Q.   Now I'm going to show you what's been marked as

20   Government's Exhibit 19-18.  Can you tell me what that is?

21    A.   That's a photo of City buy money.

22    Q.   Stop you there.  What's City buy money?

23    A.   That's the money that we use to purchase the crack

24   cocaine on the prebuy.

25    Q.   How do you know that's that money, the money that you

TRIAL ONE – VOL. 7 –  612

1    used?

2    A.    Because we record the serial number.

3    Q.    And is this the actual bill itself or a photocopy of it?

4    A.    It's a photo.

5    Q.    And where was this located?

6    A.    Pants pocket of Mr. Coates.

7            MR. DEVILLERS:  Your Honor, may I publish this to the

8    jury and enter it into evidence?

9            THE COURT:  Yes, you may.

10            MR. BERNDT:  No objection, Your Honor.

11            MR. DURKIN:  Without objection, Your Honor.

12            MR. MILLER:  No objection.

13            MR. MCVAY:  No objection.

14            MR. NOLDER:  No objection.

15    BY MR. DEVILLERS:

16    Q.    Now I'm going to show you what's been marked as

17    Government's Exhibit 19-12.  Can you tell me what that is?

18    A.    Item number 15 is $160 in United States currency.

19    Q.    It doesn't appear to be in the bag.  Did something

20    happen to the money?

21    A.    They deposited it.

22    Q.    Okay.  When money is recovered by CPD or any agency in a

23    criminal investigation, what happens to the money?

24    A.    It gets deposited in the bank so that it doesn't sit in

25    the property room.  That way there's millions and millions of

TRIAL ONE – VOL. 7 –  613

1   dollars in the property room.

2   Q.   So at one point was the money, this $160, in this bag?

3   A.   It was in the bag when it was turned in to the property

4   room.

5   Q.   And where was this located?

6   A.   Second floor middle room.

7        MR. DEVILLERS:  May I publish this to the jury and

8   enter into evidence, Your Honor?

9        THE COURT:  Yes, you may.

10       MR. BERNDT:  No objection.

11       MR. DURKIN:  Without objection, Your Honor.

12       MR. MILLER:  No objection.

13       MR. MCVAY:  No objection.

14       MR. NOLDER:  No objection.

15  BY MR. DEVILLERS:

16  Q.   I'm now going to show you what's been marked as

17  Government's Exhibit 19-11.  Can you tell me what that is?

18  A.   Item number 17 is $3,340 in United States currency.

19  Q.   And, again, this is an empty bag.  Was this deposited

20  into some sort of bank account?

21  A.   Correct.

22  Q.   And where was this located?

23  A.   In the second floor west bedroom on the floor.

24       MR. DEVILLERS:  May I publish this to the jury and

25  enter into evidence, Your Honor?

TRIAL ONE – VOL. 7 – 614

1    MR. DURKIN:  Without objection.

2    MR. BERNDT:  No objection.

3    MR. MILLER:  No objection.

4    MR. MCVAY:  No objection.

5    MR. NOLDER:  No objection, Your Honor.

6    THE COURT:  It will be admitted and you may publish

7  it.

8  BY MR. DEVILLERS:

9  Q.   I'm now going to show you what's been marked as

10  Government's Exhibit 19-17.  Can you tell me what that is?

11  A.   Item number 14 is $135 in United States currency.

12  Q.   And where was that located?

13  A.   In Tommy Coates' pants pocket.

14    MR. DEVILLERS:  May I enter this in evidence and

15  publish it to the jury, Your Honor?

16    THE COURT:  Yes, you may.

17    MR. BERNDT:  No objection.

18    MR. DURKIN:  Without objection, Your Honor.

19    MR. MILLER:  No objection.

20    MR. MCVAY:  No objection.

21    MR. NOLDER:  No objection.

22  BY MR. DEVILLERS:

23  Q.   I now want to show you what's been marked as

24  Government's Exhibit 19-10.  Can you tell me what this is?

25  A.   Item number 18 is $1,913 in United States currency.

TRIAL ONE - VOL. 7 -   615

1    Q.   And again, it's an empty bag.  Was that placed in the

2    bank account as well?

3    A.   Yes.

4    Q.   And where was this located?

5    A.   Chris Harris' pants pocket.

6         MR. DEVILLERS:  May I publish this to the jury and

7    enter it into evidence, Your Honor?

8         THE COURT:  Yes, you may.

9         MR. BERNDT:  No objection, Your Honor.

10        MR. DURKIN:  Without objection, Your Honor.

11        MR. MILLER:  No objection.

12        MR. MCVAY:  No objection.

13        MR. NOLDER:  No objection.

14        THE COURT:  It may be published and it's received,

15   Mr. DeVillers.

16   BY MR. DEVILLERS:

17   Q.   Finally like to show you what's been marked as

18   Government's Exhibit 19-15.  Can you tell me what that is?

19   A.   Item number 13 is $40 in United States currency.

20   Q.   And where was that located?

21   A.   On Mr. Davis' person.

22        MR. DEVILLERS:  May I publish this to the jury and

23   enter into evidence, Your Honor?

24        THE COURT:  Yes, you may.

25        MR. BERNDT:  No objection.

TRIAL ONE - VOL. 7 - 616

1    MR. DURKIN:  Without objection.

2    MR. MILLER:  No objection.

3    MR. MCVAY:  No objection.

4    MR. NOLDER:  No objection.

5    MR. DEVILLERS:  May I have a moment, Your Honor?

6    THE COURT:  Yes, you may.

7    MR. DEVILLERS:  No further questions, Your Honor.

8    THE COURT:  Thank you, Mr. DeVillers.

9         Mr. Berndt, any cross?

10    MR. BERNDT:  Your Honor, just very briefly.

11    THE COURT:  All right.

12                    - - -

13              CROSS-EXAMINATION

14  BY MR. BERNDT:

15  Q.    Detective, good afternoon.

16  A.    Afternoon.

17  Q.    Detective, my name is Jeff Berndt.  I'm a lawyer.  I

18  represent Robert Ledbetter.  Okay?

19  A.    Yes.

20  Q.    To the best of your personal knowledge, the evidence

21  which was just submitted to you for identification, admission

22  into evidence, publication to the jury, nothing to do with

23  Mr. Ledbetter, correct?

24  A.    Not that I know of.

25    MR. BERNDT:  Thank you.

1          THE COURT:  Mr. Durkin.

2          MR. DURKIN:  Thank you, Your Honor.

3                         - - -

4                    CROSS-EXAMINATION

5     BY MR. DURKIN:

6     Q.    Good afternoon, Detective.

7     A.    Afternoon.

8     Q.    So since this time you were going at the rate of 400

9     searches a year?

10    A.    Correct.

11    Q.    And that's ten years ago?

12    A.    Correct.

13    Q.    Would you say this is a perfect example of why you write

14    everything down?

15    A.    Correct.

16    Q.    And just so I understand this, you don't have an

17    independent recollection of this event; is that right?  I mean,

18    you're relying on the documents?

19    A.    I remember the warrant but I do rely on the documents

20    for specific questions.

21    Q.    Okay.  And I'm from Youngstown but I still have trouble

22    with vowels sometimes on names.  It was Detective Galaffo, am I

23    pronouncing that right?

24    A.    Galiffo.

25    Q.    He's the one who filed the affidavit?

TRIAL ONE – VOL. 7 –  618

1   A.   He's the one, he was the search warrant affiant, yes,

2   sir.

3   Q.   And I'm just looking at the documents.  Is he the person

4   that completes the chain of evidence?  Did he turn the evidence

5   in to the property room?

6   A.   We both turned it in.

7   Q.   Okay.  And the reason I ask is because the documents I

8   looked at indicated that he was.

9   A.   I'm sorry, he wasn't?

10  Q.   That he was the person who turned it in.

11  A.   We both go to the property room.

12  Q.   Okay.  And so they just put down one name?

13  A.   Correct.

14  Q.   Fine.  When Mr. DeVillers was showing you some of the

15  items, they looked -- they looked black, some of them.  Is that

16  a reflection of bad housekeeping at the property room or?

17  A.   I'm sorry, I don't understand what you're saying.

18  Q.   It just looked like there was a blackish material on

19  some of the items.  Would that be from like doing tests on

20  them?

21  A.   I don't know.

22  Q.   That's, again, out of your -- okay.

23       When the search happens, there's an inventory of the

24  property and, for the lack of a better term, inventory of the

25  people; is that right?

TRIAL ONE – VOL. 7 –   619

1    A.    Correct.

2    Q.    And the property that -- it goes to the property room.

3  What happens to the people inside the house who are

4  inventoried?

5    A.    That depends.  If they're arrested, then they are

6  processed and taken to the Franklin County jail.  If they're

7  not arrested, then they're released when we leave.

8    Q.    All right.  And that's what happened to Mr. Harris?

9    A.    I don't know.

10    Q.    Okay.

11         MR. DURKIN:  Thank you, Your Honor.

12         THE COURT:  Thank you, Mr. Durkin.

13      Mr. Miller, any cross?

14         MR. MILLER:  Briefly, Judge, thank you.

15                            - - -

16                     CROSS-EXAMINATION

17  BY MR. MILLER:

18    Q.    Detective, you testified that there was some cocaine

19  that was found tied to the leg of an individual; is that

20  correct, sir?

21    A.    Tied to the sweatpants.

22    Q.    Sweatpants, leg.  I think you said Robert Liston; is

23  that correct?  Can you look on your sheet?

24    A.    Uh-huh.  Yes.  Robert Liston.  Item number 9.

25    Q.    Not Rashad; Robert?

TRIAL ONE - VOL. 7 -  620

1   A.   It says Robert Liston.

2            MR. MILLER:  Thank you.  That's all I have, Your

3   Honor.

4            MR. MCVAY:  No questions, Your Honor.

5            MR. NOLDER:  No questions.

6            THE COURT:  Any redirect, Mr. DeVillers?

7            MR. DEVILLERS:  No, Your Honor.

8            THE COURT:  Detective Garrison, thank you very much,

9   sir.  You may be excused.

10           THE WITNESS:  Thank you, Your Honor.

11           MR. DEVILLERS:  May I have a moment just to clean up?

12           THE COURT:  Yes.

13        Mr. Kelley, your next witness.

14           MR. KELLEY:  Thank you, Your Honor.  David Dennison.

15           THE COURTROOM DEPUTY:  Sir, come forward and be sworn,

16   please.  Raise your right hand.

17      (Witness sworn.)

18           THE COURT:  Mr. Kelley, please proceed.

19                            - - -

20                       DAVID DENNISON

21   Called as a witness on behalf of the Plaintiff, being first

22   duly sworn, testified as follows:

23                       DIRECT EXAMINATION

24   BY MR. KELLEY:

25   Q.   Would you please state your name and spell your last

TRIAL ONE - VOL. 7 - 621

1   name for the jury?

2   A.   David Dennison, D-E-N-N-I-S-O-N.

3   Q.   Who do you work for, Mr. Dennison?

4   A.   City of Columbus, Division of Police.

5   Q.   What kind of work do you do?

6   A.   I'm a homicide detective, sir.

7   Q.   And how long have you been a homicide detective?

8   A.   A few more days, ten years, sir.

9   Q.   And to be fair, what shift do you work currently?

10  A.   Third shift, 11:00 p.m. to 7:00 p.m.

11  Q.   So we dragged you in here today on short sleep, right?

12  A.   Yes, sir.

13  Q.   I want to take your attention back to 2006.  What kind

14  of work were you doing back in 2006?

15  A.   I just started in the homicide squad, sir.

16  Q.   Specifically I'm going to ask you about April 16th, 2006

17  in a murder investigation.  Do you recall being involved in one

18  at that time?

19  A.   Yes, sir.

20  Q.   Do you remember ultimately who was the deceased that

21  we're talking about?

22  A.   Alan Johnson, sir.

23  Q.   What was your role in this murder investigation?

24  A.   Detective John Weeks requested that I would be the scene

25  detective.

TRIAL ONE – VOL. 7 – 622

1   Q.   And what does a scene detective do?

2   A.   Scene detective basically looks at the scene and a

3   cursory overview and writes down what we observed.

4   Q.   Basically describing the physical layout, would that be

5   it?

6   A.   Yes.  Yes.  That's part of it, yes, sir.

7   Q.   Can you tell us about this particular scene, the

8   generalities, the physical layout as to what you all found

9   there?

10  A.   The address was 5861 Hallworth Road, Apartment B, as in

11  boy, Scottlawn (sic) apartment complex, I believe.  It was a

12  second-floor apartment.  The front door to the apartment was

13  kicked open with force; deadbolt was still engaged.  There was

14  physical damage to the door casing and the door was kicked in

15  with so much force that when it hit the wall, the drywall

16  behind it, the doorknob went through and the deadbolt also

17  caused damage to the drywall.

18  Q.   Once you've entered the apartment, tell us where you

19  find Mr. Johnson?

20  A.   He was on, well, he was inside the bedroom, northwest

21  corner, west side.  He was in front of the bed laying on the

22  floor, hands above his head with wearing a white tank top

23  T-shirt type and I think black and white boxers.

24  Q.   Could you tell what had happened to him just from a

25  cursory look?

TRIAL ONE - VOL. 7 - 623

1   A.   It appeared at that time that he was shot multiple

2   times, I believe six times, sir.

3   Q.   And he was dead when you got there?

4   A.   Yes, sir.

5   Q.   Was anyone else at the scene or indicated that they were

6   at the scene when this happened?

7   A.   Yes.  I know an individual named China Hester was at the

8   scene and a very small child.

9   Q.   You described your role in describing the scene.  What

10  other roles are undertaken by various people at the scene of a

11  homicide?

12  A.   Well, we have a primary detective at that time was John

13  Weeks and then the primary detective has a secondary detective

14  assisting them.  I can't recall.  It may have been Phil Paley

15  but I can't recall.  Then you have your scene detective.  If

16  there's a victim that is transported to the hospital you will

17  have a hospital scene detective that goes there and talks to

18  the doctor and if any witnesses that are there.  This did not

19  happen.  The decedent, the victim was dead at scene.

20       And then you have your support detectives that just may

21  do canvassing, go back and do search warrants for you, any

22  other leg work that needs to be done.  If a witness leaves and

23  they call, they may have to go and find that witness at a

24  different location.

25  Q.   Who's responsible for taking photographs or retrieving

TRIAL ONE - VOL. 7 - 624

1   evidence?

2   A.   That would be Crime Scene Search Unit, sir.

3   Q.   And that's their job specifically, not yours?

4   A.   Yes, sir.  That's their job.

5   Q.   Were you aware of any bullets recovered at the scene or

6   were you involved in that in any way?

7   A.   I know there were bullets recovered at the scene.

8   Several bullets.  But the number, I do not know.

9   Q.   You were not involved in that?

10  A.   No.

11       MR. KELLEY:  If I may have a moment, Your Honor.

12       THE COURT:  Yes, you may.

13       MR. KELLEY:  Nothing further, Your Honor.  Thank you.

14       THE COURT:  Mr. Durden?

15       MR. DURDEN:  Yes, Your Honor.

16                         - - -

17                   CROSS-EXAMINATION

18  BY MR. DURDEN:

19  Q.   Good afternoon, Detective.

20  A.   Hello, sir.

21  Q.   My name is Aaron Durden I represent Mr. Robert

22  Ledbetter.  You indicated you were Honor the scene detective

23  only?

24  A.   I think I helped Detective Weeks on maybe a few

25  interviews afterwards but my primary role was the scene

TRIAL ONE – VOL. 7 – 625

1    detective, sir.

2      Q.   In fact, there was a follow-up interview that there was

3    a Mr. Lawrence Springer that you followed up on some days

4    later?

5      A.   Well, yes.  Mr. Lawrence called and talked to Detective

6    Weeks, John Weeks, and during that phone call he relayed

7    information that Mr. Springer found the additional spent case

8    or round in I believe the laundry basket, sir.

9      Q.   Let's get back to the scene itself.  I understand that

10   Officer Tim Shepard, a K-9 officer, was the first to arrive

11   at 12:25 a.m.?

12     A.   I believe he was but I didn't have any contact with -- a

13   lot of contact with him.

14     Q.   And then do you know what time you arrived at the scene?

15     A.   It was early.  I'm not positive what time right now.

16   But soon as we got to our shift, I believe we were sent out.

17   This was the first scene I ever did by myself so it really

18   sticks in my mind.

19     Q.   So that answers my next question.  Were you with someone

20   else, Weeks or anyone else?  You were the first --

21     A.   Well, Detective Weeks and the secondary, Phil Paley, Jay

22   Fulton, when you get up there you kind of match with another

23   detective.  So it was Jay Fulton that worked along with me.  I

24   would ask questions to him.  If I had a question I'd go outside

25   and ask him a question or John or Detective Weeks or Detective

TRIAL ONE - VOL. 7 -   626

1    Paley about certain things.

2    Q.   So is Detective Foley the detective you're now recalling

3    that may have been working with Detective Weeks?

4    A.   Paley I think it was.

5    Q.   Paley?

6    A.   Yes.

7    Q.   So is it fair to say you then were the second

8    officer/detective to arrive after Patrolman Larry Brown?

9    A.   No, sir.  We all show up.  And I may have been there

10   before them but you wait outside the scene until the primary

11   detective gets there.  And usually -- Sergeant Dana Norman was

12   the sergeant.  You wait for them as the primary as the

13   direction and the sergeant makes sure we get what we need but

14   also has some direction or has direction because they're a

15   supervisor also in the case.  But the primary is the one that

16   manages the case, the scene, the people.

17   Q.   So that's my point.  So as you enter the residence

18   having seen during your cursory review, do you hear Detective

19   Weeks speak with China Hester and/or the young child?

20   A.   No.

21   Q.   Did you speak with China Hester?

22   A.   No.

23   Q.   Did China Hester volunteer any statements to you?

24   A.   No.

25   Q.   You spoke of the six rounds that were fired.  Do you

TRIAL ONE – VOL. 7 –  627

1    know whether or not they were from one weapon?

2    A.   I believe we found seven shell casings.

3    Q.   Seven?

4    A.   I believe I stated he was shot six times, sir.

5    Q.   I apologize.

6    A.   Cursory view at that time.

7    Q.   And, again, do you know whether or not that was from one

8    weapon or numerous?

9    A.   I do not know, sir.

10   Q.   So it's fair to say that you have not followed up beyond

11   having spoken with Mr. and I apologize, Mr. --

12   A.   Springer.

13   Q.   Springer three days later?

14   A.   That would be Detective Weeks would follow up with that,

15   sir.

16   Q.   So he called Detective Weeks?

17   A.   Yes.

18   Q.   But it's in your report.

19   A.   Yes.  I was with Detective Weeks when he was talking to

20   Mr. Springer on the phone, and then I know Detective Weeks sent

21   Officer Robert Thissen out to collect that extra spent casing,

22   sir.

23   Q.   You had no further participation in this investigation

24   then?

25   A.   I think I went out with Detective Weeks a few times

TRIAL ONE – VOL. 7 – 628

1    looking for China Hester because I remember being on North

2    Fifth.  And it was ten years ago.  I remember being down there

3    with him looking for Ms. China Hester.

4      Q.    And did you and/or Detective Weeks find her?

5      A.    I don't believe so, sir.

6      Q.    How many attempts did you make, Detective?

7      A.    I was only with Detective Weeks once when we attempted.

8    I don't know how many attempts he made, sir.

9      Q.    Thank you.

10           MR. DURDEN:  A moment, Your Honor?

11           THE COURT:  Yes.

12           MR. DURDEN:  No further questions, Your Honor.

13           THE COURT:  Mr. Gatterdam?

14                      - - -

15                  CROSS-EXAMINATION

16    BY MR. GATTERDAM:

17      Q.    Afternoon, Detective.  Do you recall if all the

18    casings -- you didn't have a role in picking them up.  That

19    would be CSSU, right?

20      A.    Yes, sir.  That's CSSU's job, yes, sir.

21      Q.    But your experience, would your experience tell you they

22    were all .45 casings or do you know?

23      A.    I do not know, sir.

24      Q.    Were you involved in examining the residence in terms of

25    determining if there were other weapons or persons inside the

TRIAL ONE – VOL. 7 –   629

1    residence?

2       A.   That's usually first responders get there and they

3    secure the residence.  Yes, while I'm in there if there's

4    someone else in there but they secure the residence and CSSU

5    picks up all the evidence, takes photographs and sketches.

6       Q.   And would CSSU be looking in the residence to determine

7    if there were any firearms there that were not obvious like

8    laying out in plain sight?

9       A.   Yes, sir.

10      Q.   Who makes the decision on whether to, say, dust a door

11   or a window for fingerprints?

12      A.   That's usually the direction of the primary detective

13   that requests that I tell CSSU or they may tell CSSU to dust

14   something.  Sometimes CSSU detectives see something and think

15   it's important and they will dust it as evidence, sir.

16      Q.   Okay.  In this particular instance did anybody come to

17   you and say, tell CSSU to dust this?

18      A.   I don't recall, sir.

19      Q.   And was there any swabs that you know of taken for DNA

20   comparison?

21      A.   I do not know, sir.

22      Q.   And fair to say, no suspect or suspects were arrested at

23   or near the scene that evening?

24      A.   No, sir.

25      Q.   And fair to say that no charges had ever been filed in

TRIAL ONE - VOL. 7 - 630

1   state court against anybody from this scene, correct?

2   A.   I don't -- I don't think so, sir.  You'd have to ask

3   John -- Detective John Weeks on that.

4   Q.   So other than what Mr. Durden asked you in terms of

5   follow-up, that limited -- that was your role in this case.  It

6   stopped shortly after the incident?

7   A.   I believe, sir.  Yes.  I mean, I know I went out with

8   Detective Weeks to look for a few people and that sometimes

9   happens when the secondary is not there.  The scene detective

10  may go along with that detective because we have -- we have

11  knowledge of the scene.  So when we talk to the individual we

12  know what the scene -- so we can tell them if they're being

13  truthful if they were there at the scene.

14  Q.   How long after this first time that you go there do you

15  think is your last involvement?  Was it a week, two weeks,

16  three weeks later?

17  A.   I don't know, sir.

18  Q.   Suffice to say, you haven't been doing work on this case

19  in the years that passed April of 2006, correct?

20  A.   No, sir.

21       MR. GATTERDAM:  Nothing further.

22       THE COURT:  Mr. Miller?

23       MR. MILLER:  No questions, Your Honor.

24       THE COURT:  Mr. McVay?

25       MR. MCVAY:  No.

TRIAL ONE – VOL. 7 –  631

1          THE COURT:  Mr. Nolder?

2          MR. NOLDER:  No questions, Your Honor.

3          THE COURT:  Any redirect, Mr. Kelley?

4          MR. KELLEY:  I promise just one.

5          THE COURT:  All right.

6                         - - -

7                    REDIRECT EXAMINATION

8    BY MR. KELLEY:

9    Q.   You were asked about casings.  Can you tell us what

10   impact the type of weapon has on whether casings are found?

11   A.   Casings are found it's a semiauto -- usually

12   semiautomatic, not a revolver.

13          MR. KELLEY:  No further questions, Your Honor.  Thank

14   you.

15          THE COURT:  Thank you, Mr. Kelley.

16          MR. DURDEN:  One, I promise.

17                         - - -

18                   RECROSS-EXAMINATION

19   BY MR. DURDEN:

20   Q.   To your knowledge, were the casings, were they indeed

21   semiautomatic, belonging to a semiautomatic weapon?

22   A.   I don't know.  Usually if they are injected and they're

23   laying, they're usually a semiautomatic, sir.

24   Q.   And you've done no follow-up to determine whether that's

25   accurate or not in this instance?

TRIAL ONE – VOL. 7 – 632

1    A.    That would be by our forensic unit would tell us.

2         MR. DURDEN:  Thank you.  No further questions.

3         MR. KELLEY:  No further questions, Your Honor.

4         MR. GATTERDAM:  No questions.

5         MR. MILLER:  No, Your Honor.

6         THE COURT:  Thank you very much, Officer Dennison.

7    You may be excused.

8         Your next witness, Mr. Martinez.

9         MR. MARTINEZ:  Your Honor, United States calls

10   Detective Yvonne Taliaferro.

11        THE COURT:  Ms. Taliaferro, please come forward and be

12   sworn.

13     (Witness sworn.)

14        THE COURT:  Please proceed.

15        MR. MARTINEZ:  Thank you, Your Honor.

16                        – – –

17                   YVONNE TALIAFERRO

18   Called as a witness on behalf of the Plaintiff, being first

19   duly sworn, testified as follows:

20                   DIRECT EXAMINATION

21   BY MR. MARTINEZ:

22   Q.   Good afternoon, ma'am.

23   A.   Good afternoon.

24   Q.   Would you please state your name for the record and

25   spell your last name?

TRIAL ONE – VOL. 7 –  633

1    A.   Detective Yvonne Taliaferro, T-A-L-I-A-F-E-R-R-O.

2    Q.   Detective, where are you currently employed?

3    A.   Columbus Division of Police, Crime Scene Search Unit.

4    Q.   When did you join the Columbus Division of Police?

5    A.   1988.

6    Q.   Twenty-eight years?

7    A.   Yes, sir.

8    Q.   What are your current duties with the Columbus Division

9    of Police?

10   A.   Crime Scene Search Unit detective.

11   Q.   When did you begin in the Crime Scene Search Unit?

12   A.   About 2004.

13   Q.   Let's talk for a minute about the Crime Scene Search

14   Unit.  What does that mean?

15   A.   Crime Scene Search Unit, we offer support for the

16   different, the parts of the detective bureau in processing

17   scenes.

18   Q.   So let's talk about processing scenes.  What are your

19   duties and responsibilities with processing a crime scene?

20   A.   We basically get a call that there was a scene that

21   needs to be processed.  We respond.  We get a brief scenario.

22   We get a walk-through.

23   Q.   By whom?  Who gives the scenario and the walk-through?

24   A.   The lead detective.  And they let us know what they want

25   us to do.

TRIAL ONE – VOL. 7 –  634

1    Q.   What are some of the typical things you are asked to do

2    as a CSSU detective?

3    A.   Photographs, some processing, latent processing, search,

4    evidence collection.  It's a variety of things.

5    Q.   All right.  Let's take those one at a time.  Let's talk

6    about the photographs.  How does that process work?

7    A.   After we get the walk-through through the scene, the

8    detective let's us know if he wants us to concentrate on a

9    particular room.  Mainly we four-corner a room with our camera,

10   north, south, east, west.  And if there's something in the room

11   that they want us to concentrate on, that's what we concentrate

12   on.

13   Q.   All right.  Do you maintain any sort of log or

14   documentation of the photographs that are taken?

15   A.   Yes, sir.

16   Q.   Tell me about how that works.

17   A.   For each photograph there's a number and that number

18   corresponds with that photograph.

19   Q.   You write all that down?

20   A.   Yes.

21   Q.   I think you also mentioned collection of evidence.  Is

22   that another responsibility that you would have at a crime

23   scene?

24   A.   Yes, sir.

25   Q.   And tell me about how that process works.

TRIAL ONE - VOL. 7 - 635

1   A.   We -- once we find out what they want us to collect, we

2   put a cone on it, a numbered cone, and we photograph that cone.

3   On our evidence list, which is a dual copy of the photo sheet,

4   it's just one check mark photo 1 evidence, we basically put the

5   number up there, it's number 1, tell what it is and then on the

6   side tell where we found it and we also put the time.

7   Q.   So just so I understand, the number on the cone that you

8   put next to the piece of evidence matches the number on the

9   log?

10   A.   Yes.

11   Q.   And how do you go about physically picking up and

12   collecting the evidence?

13   A.   We use gloves.  Everything that we pick up is in its own

14   container and that's how we basically do it.  Then we put the

15   information, say if it's a bag, we put something in a brown

16   paper bag, it will be cone number, whatever cone number it is,

17   what it is and usually what time we picked it up.

18   Q.   Do you also sometimes use plastic evidence baggies to

19   collect evidence?

20   A.   Yes.

21   Q.   So when you're finished collecting evidence at a scene,

22   what do you do with those items that you picked up?

23   A.   We take them back to our office and we have to double

24   check and make sure everything is on our sheets.  Then we

25   submit them to the CPD property room.

1    Q.   Are they submitted with some sort of property number?

2    A.   Yes, sir.

3    Q.   Are you ever called upon to make diagrams or sketches of

4    crime scenes?

5    A.   Yes, sir.

6    Q.   Tell me about how that works.

7    A.   Usually in homicides or more eminent scenes we are asked

8    to do a drawing.  Say if they want this room, we'd draw the

9    room itself, draw everything in the room and then measure it

10   and put it in that drawing.

11   Q.   What happens to that drawing when you're finished with

12   it?

13   A.   We take it back to our office, we have the software on a

14   map computer and by those measurements that we take, we make

15   out a computer drawing from our reference sketch that we have.

16   Q.   I think you also mentioned fingerprints.

17   A.   Yes, sir.

18   Q.   So are there times when you're asked to look for

19   fingerprints?

20   A.   Yes, sir.

21   Q.   Tell me how that process works.

22   A.   If you have a screen and that screen's been touched,

23   what we would do is take -- the detective would ask us to

24   process that for latent fingerprints.  We would just take a

25   brush, black print powder and just brush over it until we see

1    something that pops up at us.  Usually if you do it that way,

2    you do it enough, it will pop up.  Then we take clear evidence

3    tape and put it over that print, lift that print off, it gets a

4    number also, we lift that print off and we put it on a lift

5    print card.

6    Q.    What do you do with that print card?

7    A.    We send it to the CPD latent section.

8    Q.    So do you as a CSSU detective have any role whatsoever

9    in analyzing that fingerprint?

10   A.    No, sir.

11   Q.    You collect it and then you pass it on?

12   A.    Yes, sir.

13   Q.    Are there times when you dust an area as you were just

14   describing and no fingerprints show up?

15   A.    Yes, sir.

16   Q.    What do you call that?

17   A.    Negative.

18   Q.    Finally, DNA.  Do you have any kind of responsibility in

19   looking for or collecting DNA samples?

20   A.    Usually when we hear the scenario from that lead

21   detective, they tell us little things like this was touched,

22   but instead of printing it, we'd like to have it swabbed for

23   DNA.  In that case, we will use our cotton-tip swabs, which are

24   sterile, and we use distilled water to just wet the tips of the

25   swab, rub it over the surface of whatever he wants us to swab,

TRIAL ONE - VOL. 7 - 638

1   then take that swab, put it in a box, seal it.  It's just a

2   small paper box.  We seal it and put the same information if

3   it's swab number 1, 2, 3.  Everything has an order that it has

4   to go in.  Then we send it to the crime lab.

5   Q.   I want to be clear on that last point.  Do you as a CSSU

6   detective have any role at all in analyzing a sample for DNA?

7   A.   No, sir.

8   Q.   That's the crime lab?

9   A.   That's the crime lab.

10  Q.   Detective Taliaferro, let me direct your attention to

11  April 16th and blending into the 17th of 2006.  Do you recall

12  responding to a homicide scene at 5861 Hallworth Avenue?

13  A.   Yes, sir.

14       MR. MARTINEZ:  May I have Exhibit 20-1, please?

15       Your Honor, may I approach the witness?

16       THE COURT:  Yes, you may.

17  BY MR. MARTINEZ:

18  Q.   Detective Taliaferro, I'm going to actually hand you a

19  hard copy of Exhibit 20-1.  You can keep that.

20       THE COURT:  Are you going to pull it up on the

21  computer?

22       MR. MARTINEZ:  Yes.

23  BY MR. MARTINEZ:

24  Q.   Detective Taliaferro, what is that document,

25  Exhibit 20-1?

TRIAL ONE - VOL. 7 -  639

1    A.    This is a crime scene procedures form.

2    Q.    And what is a crime scene procedures form?

3    A.    On this form whenever, we get a call, we have a book in

4    our office and we start with crime scene numbers if it's number

5    1 and we just keep going and going.  On this one it's 06 for

6    the year and then it's 309C.  And C is in third shift.  That's

7    what I was working then.

8    Q.    Okay.

9    A.    We also have the date.  We have the offense.  Everything

10   that we do has an incident number and that's what's right

11   there.  That's what we refer to.  We have the address, we

12   have -- if we know the victim, we have a victim's name to put

13   in.  If we don't, as you can see, we just put John Doe because

14   we did not have one at the time.  We've got the crime scene

15   personnel that responded to this scene and the lead

16   investigator's name in those top header boxes.

17   Q.    Before you go on, let me ask just a couple questions

18   about this.  Who typically -- strike that.

19         Do one of the CSSU detectives at the scene fill out this

20   document?

21   A.    Yes.

22   Q.    And is this document created at or around the time that

23   you respond to a crime scene?

24   A.    This particular document is created once we get back and

25   get all our paperwork together.

TRIAL ONE – VOL. 7 –  640

1    Q.   So shortly after you process the scene?

2    A.   Yes, sir.

3    Q.   Is it CSSU's regular practice to keep crime scene

4    procedure documents like this one?

5    A.   Yes, sir.

6    Q.   And so this document is regularly kept in the course of

7    your work?

8    A.   Yes, sir.

9         MR. MARTINEZ:  Your Honor, I'd like to admit

10   Exhibit 20-1 into evidence.

11        THE COURT:  Any objection?

12        MR. BERNDT:  No objection.

13        MR. GATTERDAM:  No objection.

14        MR. MILLER:  No objection.

15        MR. MCVAY:  No objection on this one, Your Honor.

16        MR. NOLDER:  No objection.

17        THE COURT:  20- 1 will be received, Mr. Martinez, and

18   you may publish.

19        MR. MARTINEZ:  Thank you, Your Honor.

20   BY MR. MARTINEZ:

21   Q.   Detective Taliaferro, you were kind of describing some

22   of the information that's on Exhibit 20-1.  You talked about

23   the date, incident number and so on.  Can you go through just

24   from the top there so the jury can understand what's on the

25   document?

TRIAL ONE – VOL. 7 – 641

1    A.    From the very top?

2    Q.    Yes.  Go from the top.

3    A.    Okay.  This is our crime scene procedures form and like

4    I said, when we get a run from one of the detectives, it's

5    always assigned a crime scene number and that's what you see

6    where you see CSSU number.  That's our number for this

7    particular incident.  We have the date, we have the offense.

8    That's usually what it is.  It can be anywhere from like this,

9    a homicide, to an ag adult.  It's all depending on who calls us

10   and what detective squad they're in.

11        Everything has a incident report number.  Even the

12   patrol officers that get sent to like this particular address,

13   they will all have this one particular report number because

14   that run is generated by the dispatch.  You have your location.

15   Like I said, you have your victim.  In this case we did not

16   know our victim's name at the time we got the call.  So we

17   always just use either John Doe or Jane Doe.

18        You have your CSSU personnel.  In this case it was

19   myself, Detective Mitchell and Detective Castle.  You have your

20   lead investigator and in this case it was Detective Weeks.

21   Q.    Can I stop you there, ma'am?  So on the left side, tell

22   me about these boxes that are checked or unchecked.  What does

23   that mean when you check one of the boxes on the left side of

24   Exhibit 20-1?

25   A.    We're checking where it says scene, we're just checking

TRIAL ONE - VOL. 7 -  642

1  that the scene was either inside or outside.  You can see that

2  it is checked.  We have evidence.  Basically when you have

3  something, you check the box.

4  Q.   Okay.  So the photo box is checked here.  What does that

5  mean?

6  A.   There were photos taken.

7  Q.   And how many?

8  A.   Fifty-six.

9  Q.   I see the latent print box is checked.  What does that

10  mean?

11  A.   We processed.  We were requested to process something.

12  We did, but there were no latents that were -- that came out.

13  Q.   So that would be a negative as you said before?

14  A.   Yes.

15  Q.   And the scene diagram box is checked.  What does that

16  mean?

17  A.   That the rough sketch was done of the scene.

18  Q.   All right.  So moving over to the right side of the page

19  there I see the evidence box is checked.  What does that mean?

20  A.   We had evidence from the scene and it was turned in to

21  the property room and that's why the property room box is

22  checked.

23  Q.   And the property number, what is the significance of

24  that number?

25  A.   Anything that we turned in from this case on that day

1    that involved Crime Scene Search Unit got that property number.

2    Q.   I see the attachments box is checked.  What does that

3    mean?

4    A.   You have different forms that come with this packet.

5    You have your photo list, your evidence list, you might have

6    your NIBIN.  It's just different forms.  Whatever is with this

7    pocket, we check it on here.

8    Q.   And those are the documents you talked about a moment

9    ago, the photo list and the exhibit list?

10   A.   Yes.

11   Q.   Or excuse me, the evidence list?

12   A.   Yes.

13   Q.   And I see there are also dates and times on the form.

14   A.   Time dispatched.  We have the time when we get the call.

15   We put it in our run book.  Then we have the time that we

16   arrived at the scene.  When we get there, we write the time on

17   the run card.  Then we have the time that we clear that

18   particular scene.  If there's any other scenes or any other

19   runs after that involving this incident, they go in the next

20   block, and so on and so on.

21   Q.   So let's talk about this particular scene at Hallworth

22   Avenue on April 16th and 17.  I believe you said there were

23   photographs taken; is that correct?

24   A.   Yes, sir.

25        MR. MARTINEZ:  May we have Exhibit 20-2, please?

TRIAL ONE - VOL. 7 - 644

1          May I approach the witness, Your Honor?

2              THE COURT:  Yes, you may.

3      BY MR. MARTINEZ:

4      Q.   Detective Taliaferro, I'm going to hand you a

5   document --

6              THE COURT:  Before you do that, Mr. Martinez, would

7   you --

8              MR. MARTINEZ:  I thought it was up on the computer,

9   Your Honor.  I apologize.

10             THE COURT:  Is that the document you're giving to her?

11             MR. MARTINEZ:  Yes.

12             THE COURT:  Go ahead.

13     BY MR. MARTINEZ:

14     Q.   Exhibit 20-2.  Just a hard copy for you.

15     A.   Yes.

16     Q.   Thank you.

17          What is Exhibit 20-2, ma'am?

18     A.   That is the dual list that we use for photographs and

19   evidence, and in this case this is the photograph because it's

20   got the check mark.

21     Q.   And I believe you described that before, that's

22   basically a log of all the photographs you took?

23     A.   Yes, sir.

24     Q.   Who creates -- strike that.

25          Is this document created by one of the CSSU detectives

TRIAL ONE – VOL. 7 – 645

1    at the scene?

2      A.   Yes, sir.

3      Q.   And is it created at or about the time that the photos

4    are taken?

5      A.   If possible.  I do believe this was, sir.

6      Q.   Excellent.  And is this document regularly kept in the

7    course of CSSU's work?

8      A.   Yes, it is.

9           MR. MARTINEZ:  Your Honor, I'd ask that Exhibit 20-2

10   be admitted into evidence.

11          THE COURT:  Thank you, Mr. Martinez.  It will be.

12          Any objection, Mr. Durden?

13          MR. DURDEN:  No objection, Your Honor.

14          MR. GATTERDAM:  No objection.

15          MR. MILLER:  No objection.

16          MR. MCVAY:  No objection.

17          MR. NOLDER:  No, sir.

18          MR. MARTINEZ:  And published to the jury, Your Honor?

19          THE COURT:  You may.  It will be received and you may

20   publish it.

21          MR. MARTINEZ:  Thank you, Your Honor.

22     BY MR. MARTINEZ:

23     Q.   So let's just generally talk about, we don't need to go

24   line by line, Detective Taliaferro, but generally describe for

25   the jury what's on this particular document.

TRIAL ONE – VOL. 7 –  646

1    A.   The first line it says photo card.  That's a card that

2    we take a picture of.  When we get the call in our office, we

3    not only have to fill out our log book.  We also have to fill

4    out a photo card.  And when we get to the scene, we finish

5    putting in the information on that photo card when we take a

6    picture of it and that's what that one is and what time we took

7    it.

8    Q.   And then from there down are you just describing

9    individual photos, is that what's on the list?

10   A.   Yes, sir.

11   Q.   Let's talk about the columns.  What's the first column?

12   A.   The first column is the numbers.  The second column is

13   the direction in which we're facing taking that picture.

14   Q.   Okay.  Third column?

15   A.   That's identifying what we're taking a picture of.

16   Q.   Like the chair or the bed?

17   A.   Yes.

18   Q.   And the fourth column?

19   A.   The location of that picture.

20        MR. MARTINEZ:  Special Agent, may I have

21   Exhibit 20-2#?

22        Your Honor, may I approach?

23        THE COURT:  Yes.

24   BY MR. MARTINEZ:

25   Q.   Detective Taliaferro, I'm handing you a set of

TRIAL ONE – VOL. 7 –  647

1   photographs that have been marked Exhibit 20-2# through

2   20-2#-056.  I would ask that you quickly just thumb through

3   those.

4        Do you recognize those photos, ma'am?

5   A.   Yes, I do.

6   Q.   What are those photographs?

7   A.   These are the photographs that I took of the scene.

8   Q.   On April 17, 2006?

9   A.   Yes, sir.

10  Q.   And do those photographs fairly and accurately represent

11  the scene as it appeared on that date?

12  A.   Yes, sir.

13       MR. MARTINEZ:  Your Honor, I'd ask that Exhibits 20-2#

14  through 20-2#-056 be admitted into evidence.

15       THE COURT:  They will be received and you may publish

16  it.

17       Any objection, Mr. Durden?

18       MR. DURDEN:  No objection, Your Honor.

19       THE COURT:  Mr. Gatterdam?

20       MR. GATTERDAM:  No, Your Honor.

21       THE COURT:  Mr. Miller?

22       MR. MILLER:  No, Your Honor.

23       THE COURT:  Mr. McVay?

24       MR. MCVAY:  No, Your Honor.

25       THE COURT:  Mr. Nolder?

TRIAL ONE – VOL. 7 –  648

1          MR. NOLDER:  No, sir.

2     BY MR. MARTINEZ:

3     Q.   So, Detective Taliaferro, I'd like to now show you some

4     of the photographs that are there.

5          MR. MARTINEZ:  Special Agent, may I have

6     Exhibit 20-2#-003?

7     BY MR. MARTINEZ:

8     Q.   Detective Taliaferro, why don't you tell us what's

9     depicted in that photograph?  This is number 3.

10    A.   This is an east shot and it is IDing the front of the

11    location.

12    Q.   May I have Exhibit 20-2#-004?

13         Ma'am, what's in that exhibit?

14    A.   These are the steps to Apartment B and the opening to

15    Apartment A of that same location.

16    Q.   So the location was on the second floor?

17    A.   Yes.

18    Q.   May I have Exhibit 20-2#-007, please?

19         What are we looking at in that exhibit, Detective

20    Taliaferro?

21    A.   The entryway and the damage done to the frame of the

22    door.

23    Q.   Exhibit 20-2#-008, please.

24         Detective Taliaferro, what is depicted in that

25    photograph?

TRIAL ONE - VOL. 7 -  649

1    A.    The entry door and the damage to the wall inside the

2   apartment.

3    Q.    Exhibit 20-2#-016, please.

4         MR. GATTERDAM:  Your Honor, may we approach?

5         THE COURT:  Yes.

6     (Thereupon, the following proceeding was held at side-bar.)

7         MR. GATTERDAM:  Your Honor, I don't have an objection

8   on authenticity because I think she's testified these are the

9   photos she took.  But as I flip through them I think my

10  objection is going to be the cumulative nature of several of

11  the pictures with the alleged victim's body being shown.

12  Specifically -17, -18, -19, a foot in -20 and then there are

13  multiple other pictures towards the back -49, -50, -51, -52.

14  All seem to show very similar pictures of the victim's body.

15  They're very gruesome, they're very graphic and I don't think

16  the jury needs to see multiple pictures.

17        THE COURT:  Mr. Martinez.

18        MR. MARTINEZ:  Your Honor, as Detective Taliaferro

19  testified, there are 56 photos.  I do not intend to show all 56

20  photos.  This is why we approached it this way.  I understand

21  there are many photos of the dead body.  I intend to show three

22  of them.

23        THE COURT:  Okay.  And I take it that the three will

24  have different --

25        MR. MARTINEZ:  Different angles and views, exactly

TRIAL ONE – VOL. 7 –  650

1    right.

2         THE COURT:  All right.  Do you know right now,

3    Mr. Martinez, which specific body shots you intend to show?

4         MR. MARTINEZ:  Yes.  Let me be clear.  So the first

5    one is 18 which is view into the entry into the room.  The

6    second one is 50 to show the wounds to the body and the last

7    one is 49 which is so you can see the person's face.

8         THE COURT:  Okay.  I'm going to allow those three.  If

9    you object to those, you may make your objection for the

10   record.  But I think that those three show different vantage

11   points of the body and it is not cumulative in that respect.

12   So I will be inclined to allow him.

13        Do you have any objection to those three?

14        MR. GATTERDAM:  Yes.  Same reasons.

15        THE COURT:  Anyone else have any objection?

16        MR. DURDEN:  For the record, object for the record.

17        THE COURT:  You object for the record?

18        MR. MARTINEZ:  To all the photos?

19        MR. DURDEN:  To the three.

20        THE COURT:  To the three.  That's what I'm asking

21   about now.

22        MR. MCVAY:  We join.

23        MR. MILLER:  Join.

24        MR. NOLDER:  I'll join.

25        THE COURT:  All right.

TRIAL ONE – VOL. 7 –   651

1        MR. MARTINEZ:  One other thing.  One other photo.

2   There's 53 also.  It's a bullet but you can see a piece of the

3   body.  I want it because the bullet is found underneath his

4   body, the bullet underneath his body.

5        THE COURT:  All right.  I will allow that one as well.

6   I'm going to assume that your objection extends to that fourth

7   photo?

8        MR. GATTERDAM:  It does.

9        MR. MCVAY:  Yes.

10       THE COURT:  For the record, all defense counsel

11  object.

12       MR. MARTINEZ:  Thank you, Your Honor.

13     (The following proceedings were had in open court.)

14   BY MR. MARTINEZ:

15   Q.   Detective Taliaferro, I believe before the side-bar we

16  were looking at Exhibit 20-2#-016.  Can you please tell us

17  what's depicted in that photograph?

18   A.   This is the entry shot into the bedroom.

19   Q.   Can we please see Exhibit 20-2#-018?

20       And what is depicted in that photograph, ma'am?

21   A.   This is the victim on the floor and cone around the

22  victim.

23       THE COURT:  And what around the victim, ma'am?  Cone.

24  Okay.

25

1    BY MR. MARTINEZ:

2    Q.    May I please see Exhibit 20-2#-050?

3          What is depicted in photograph 050?

4    A.    These are the wounds to the chest area of the victim.

5    Q.    May I please see Exhibit 20-2#-049?

6          What is depicted in that exhibit, ma'am?

7    A.    This is a face ID of the victim.

8    Q.    May I please see Exhibit 20-2#-053?

9          Detective Taliaferro, what can we see in this exhibit?

10   A.    This is a spent bullet that was found under the victim

11   after he was moved.

12   Q.    With your finger, can you just -- if you touch the

13   screen, point to the screen and show us where the bullet is?

14   A.    Here.

15   Q.    Can you circle it?

16   A.    (Indicating.)

17   Q.    May I please see Exhibit 20-2#-037?

18         What do we see in that exhibit, Detective Taliaferro?

19   A.    This is cone number 3 marking a spent casing on the

20   bathroom floor.

21   Q.    Exhibit 20-2#-039.  What's in that photograph, ma'am?

22   A.    This is cone number 5 marking a spent casing in the

23   bedroom.

24   Q.    Let's do Exhibit 20-2#-041.  What's in that photograph,

25   ma'am?

TRIAL ONE – VOL. 7 – 653

1    A.    This is cone 7 marking a spent casing also in the

2    bedroom.

3    Q.    Exhibit 20-2#-046.  What's in that photograph, ma'am?

4    A.    This is cone 12 marking a cell phone.

5    Q.    Exhibit 20-2#-022.  What's in that photo, ma'am?

6    A.    This is cone 14 marking something that's on the bed.

7    Q.    And, finally, let's look at Exhibit 20-2#-048.  And

8    what's in that photograph, ma'am?

9    A.    That's a phone.

10   Q.    Is it under the bed?

11   A.    Yes, sir.

12   Q.    Detective Taliaferro, I believe you testified a little

13   while ago that in addition to taking photographs, you and your

14   colleagues also collected physical evidence at the scene; is

15   that correct?

16   A.    Yes, sir.

17   Q.    Can we have Exhibit 20-3, please?

18        THE COURTROOM DEPUTY:  Is this within the same

19   exhibits?

20        MR. MARTINEZ:  No.  Different exhibit.

21        Your Honor, may I approach the witness, please?

22        THE COURT:  Yes, you may.

23   BY MR. MARTINEZ:

24   Q.    Detective Taliaferro, I'm handing you a document marked

25   Exhibit 20-3.  Will you please tell me, do you recognize

TRIAL ONE – VOL. 7 –   654

1   Exhibit 20-3?

2     A.   Yes, sir.

3     Q.   What is that document?

4     A.   This is the same form.  It's a dual form.  And this one

5   is marked as the evidence collection form.

6     Q.   And is this form like the others created at or around

7   the time that you collect evidence from the scene?

8     A.   Yes, sir.

9     Q.   Is it your regular practice as a CSSU detective to keep

10  and maintain documents like Exhibit 20-3?

11    A.   Yes, sir.

12         MR. MARTINEZ:  Your Honor, the government moves for

13  the admission of Exhibit 20-3.

14         THE COURT:  Any objection, Mr. Durden?

15         MR. DURDEN:  No objection, Your Honor.

16         THE COURT:  Mr. Gatterdam?

17         MR. GATTERDAM:  No.

18         THE COURT:  Mr. Miller?

19         MR. MILLER:  No.

20         THE COURT:  Mr. McVay?

21         MR. MCVAY:  No, Your Honor.

22         THE COURT:  Mr. Nolder?

23         MR. NOLDER:  No, Your Honor.

24         THE COURT:  20-3 will be received, Mr. Martinez.  You

25  may publish it.

TRIAL ONE – VOL. 7 – 655

1    MR. MARTINEZ:  Thank you, Your Honor.

2    BY MR. MARTINEZ:

3    Q.   So, Detective Taliaferro, now that we have this document

4    up for the jury's consideration, I believe the top part is the

5    same but can you tell us what information is in the various

6    columns on Exhibit 20-3?

7    A.   In reference to the cones that we marked, cone number 1

8    would be item number 1, the time we picked it up, it describes

9    that item, and where we picked it up from.

10   Q.   All right.

11   MR. MARTINEZ:  May I approach, Your Honor?

12   THE COURT:  Yes, you may.

13   BY MR. MARTINEZ:

14   Q.   Detective Taliaferro, I'm handing you what's been marked

15   as Exhibit 20-14.  If you could take a look at that.  I believe

16   it corresponds to various items on your log, specifically items

17   3 through 10, 15, 16 and 18.

18   A.   Yes, sir.

19   Q.   So can you tell the members of the jury what's in

20   Exhibit 20-14?

21   A.   20-14?

22   Q.   Item number 3 through 10 and then 15, 16 and 18.

23   A.   Number 3 is a spent casing; number 4 is a spent casing.

24   Q.   Can we slow down?  Item number 3, where was that found?

25   A.   On the bathroom floor in Apartment B.

1    Q.    Item number 4?

2    A.    Item number 4 is a spent casing found on the bedroom

3  floor Apartment B.

4    Q.    Item 5?

5    A.    Spent casing on the bedroom floor Apartment B.

6    Q.    And item 6?

7    A.    Spent casing, bedroom floor, Apartment B.

8    Q.    Item 7?

9    A.    Spent casing, bedroom floor, Apartment B.

10    Q.    Item 8?

11    A.    Spent casing, bedroom floor, Apartment B.

12    Q.    Item 9?

13    A.    Spent casing, bedroom floor, Apartment B.

14    Q.    Item 10?

15    A.    Spent casing, bedroom floor, Apartment B.

16    Q.    Let's go to item 15.

17    A.    Spent bullet in the clothes basket in Apartment A.

18    Q.    How about item 16?

19    A.    Spent bullet under the victim.

20    Q.    So that was the bullet we saw a moment ago that was

21  underneath the body?

22    A.    Yes, sir.

23    Q.    And item 18?

24    A.    Spent bullet in the shoe box, Apartment B.

25    Q.    Detective Taliaferro, is there a property number on the

TRIAL ONE – VOL. 7 –   657

1  exhibit that you're holding in your hand, the spent casings?

2  A.   Yes, sir.

3  Q.   What is that property number?

4  A.   06009109.

5  Q.   And what is the property number on the evidence log?

6  A.   06009109.

7  Q.   Do those numbers match?

8  A.   Yes, sir.

9       MR. MARTINEZ:  Your Honor, I'd move for the admission

10  of Exhibit 20-14.

11       THE COURT:  Any objection to 20-14?

12       MR. DURDEN:  No objection, Your Honor.

13       MR. GATTERDAM:  No, Your Honor.

14       MR. MILLER:  No objection.

15       MR. MCVAY:  No objection.

16       MR. NOLDER:  No, sir.

17       THE COURT:  20-14 will be admitted.  You may publish

18  it.

19       MR. MARTINEZ:  May I hand it to the ladies and

20  gentlemen of the jury, Your Honor?

21       THE COURT:  Yes.

22       MR. MARTINEZ:  May I approach, Your Honor, to retrieve

23  the evidence?

24       THE COURT:  Yes.

25       MR. MARTINEZ:  May I approach, Your Honor?

TRIAL ONE – VOL. 7 – 658

1        THE COURT:  Yes, you may.

2   BY MR. MARTINEZ:

3   Q.   Detective Taliaferro, I'm going to hand you what's been

4   marked as Exhibit 20-16.  It's your item number 12.  Can you

5   please take a look and let me know if you recognize that

6   exhibit?

7   A.   Yes, sir.

8   Q.   What is that?

9   A.   It's a cell phone.

10  Q.   Can you tell me based on your evidence log what kind of

11  cell phone that is, item 12?

12  A.   NEXTEL.

13  Q.   Is there a property number on the outside of the bag

14  there?

15  A.   Yes, sir.

16  Q.   What's the property number?

17  A.   06-9109.

18  Q.   Does that match the number on the evidence log?

19  A.   Yes, sir.

20       MR. MARTINEZ:  Your Honor, we move into evidence

21  Exhibit 20-16.

22       THE COURT:  It will be received.

23       Mr. Durden, any objection to the cell phone?

24       MR. DURDEN:  No objection, Your Honor.

25       MR. GATTERDAM:  No objection.

TRIAL ONE – VOL. 7 –  659

1           THE COURT:  Mr. Miller?

2           MR. MILLER:  No objection, Your Honor.

3           THE COURT:  Mr. McVay?

4           MR. MCVAY:  No objection.

5           THE COURT:  Mr. Nolder?

6           MR. NOLDER:  No, sir.

7           MR. MARTINEZ:  May I approach, Your Honor?

8           THE COURT:  Yes.  20-16 will be received.  You may

9    publish it.

10          MR. MARTINEZ:  Thank you, Your Honor.  Exhibit 20-16.

11    BY MR. MARTINEZ:

12    Q.    Detective Taliaferro, I'm going to hand you what's been

13    marked as Exhibit 20-17.  It's your item number 13.  Can you

14    please take a look and tell me if you recognize that exhibit?

15    A.    Yes, sir.

16    Q.    And what is your item number 13?

17    A.    It's a cell phone.

18    Q.    And where was this phone found?

19    A.    On the nightstand in the bedroom.

20    Q.    Is there a property number on the outside of the bag

21    there?

22    A.    Yes, sir.

23    Q.    What's that number?

24    A.    06-9109.

25    Q.    Does that match the property number on the exhibit --

TRIAL ONE – VOL. 7 – 660

1   the evidence log?

2    A.   Yes, sir.

3         MR. MARTINEZ:  Your Honor, the United States moves

4   into evidence Exhibit 20-17.

5         THE COURT:  Any objection?

6         MR. DURDEN:  No objection, Your Honor.

7         MR. GATTERDAM:  No objection.

8         MR. MILLER:  No, Your Honor.

9         MR. MCVAY:  No, Your Honor.

10         MR. NOLDER:  No, sir.

11         THE COURT:  20-17 will be received and you may

12   publish, Mr. Martinez.

13         MR. MARTINEZ:  Thank you, Your Honor.

14       May I approach, Your Honor?

15         THE COURT:  Yes.

16         MR. MARTINEZ:  Exhibit 20-17.

17       Your Honor, may I approach?

18         THE COURT:  Yes.

19    BY MR. MARTINEZ:

20    Q.   Detective Taliaferro, I'm handing you what's been marked

21   as Exhibit 20-15.  It's your item number 14.  Please take a

22   look.

23    A.   It's a cell phone, sir.

24    Q.   And this is item 14.  So what kind of cell phone is

25   that?

TRIAL ONE – VOL. 7 –   661

1    A.    This one is a Motorola.

2    Q.    And where was that piece of evidence found?

3    A.    Under the bed.

4    Q.    Is there a property number on the outside of the bag

5    there?

6    A.    Yes, sir.

7    Q.    What is that number, ma'am?

8    A.    06-9109.

9    Q.    Does that match the number on the log?

10   A.    Yes, sir.

11        MR. MARTINEZ:  Your Honor, the United States offers

12   into evidence Exhibit 20-15.

13        THE COURT:  It will be received.

14        Any objection, Mr. Durden?

15        MR. DURDEN:  No objection, Your Honor.

16        MR. GATTERDAM:  No objection.

17        MR. MILLER:  No objection, Your Honor.

18        MR. MCVAY:  No, Your Honor.

19        MR. NOLDER:  No, Your Honor.

20        MR. MARTINEZ:  May I approach, Your Honor?

21        THE COURT:  You may approach, and 20-15 will be

22   received and you may publish it.

23        MR. MARTINEZ:  Thank you, Your Honor.

24        Exhibit 20-15.

25

TRIAL ONE – VOL. 7 –  662

1    BY MR. MARTINEZ:

2    Q.   Detective Taliaferro, before we leave this evidence log

3    that you have, I want to go back to item number 15.

4    A.   Fifteen?

5    Q.   Fifteen on the log there.

6    A.   Yes, sir.

7    Q.   What is item 15 again, please?

8    A.   Spent bullet.

9    Q.   And where was that found?

10   A.   In a clothes basket.

11   Q.   In which apartment?

12   A.   A.

13   Q.   The murder scene was Apartment B?

14   A.   B.

15   Q.   But you found this in Apartment A?

16   A.   Yes, sir.

17   Q.   So next door?

18   A.   Yes, sir.

19   Q.   How do you explain that?

20   A.   Basically it went through the floor or a wall.

21   Q.   Into the next apartment?

22   A.   Yes.

23   Q.   I believe you testified to this earlier but what did you

24   and your colleagues do with all the evidence we've just looked

25   at after you left the scene?

TRIAL ONE - VOL. 7 -   663

1    A.    Took it back to our office, made sure that our list was

2    correct and submitted it to the property room.

3    Q.    May I please have Exhibit 20-4?

4          Detective Taliaferro, do you recognize Exhibit 20-4 on

5    your screen there?

6    A.    Yes, sir.

7    Q.    What is Exhibit 20-4?

8    A.    This is the computer drawing that we generated out of

9    the rough sketch that we did at the scene.

10   Q.    And does Exhibit 20-4 fairly and accurately depict the

11   crime scene as it appeared when you were there on April 17,

12   2006?

13   A.    Yes, sir.

14         MR. MARTINEZ:  Your Honor, we'd ask for the admission

15   of Exhibit 20-4.

16         MR. DURDEN:  No objection.

17         MR. GATTERDAM:  No objection.

18         MR. MILLER:  No objection, Your Honor.

19         MR. MCVAY:  No objection.

20         MR. NOLDER:  None, Your Honor.

21         THE COURT:  20-4 will be received.  Mr. Martinez, you

22   may publish it.

23         MR. MARTINEZ:  Thank you, Your Honor.

24   BY MR. MARTINEZ:

25   Q.    So, Detective Taliaferro, now that the ladies and

TRIAL ONE – VOL. 7 –   664

1   gentlemen of the jury can see Exhibit 20-4, why don't you

2   please describe what's in this exhibit?

3     A.    This is a layout of the scene, the apartment.  You have

4   your living room area, your entry, your kitchen area, your

5   bedroom and your bathroom.

6     Q.    And what do the numbers correspond to on the exhibit?

7     A.    If you look for number 1 and then you look into the

8   legend you'll see that number 1 are shoes.

9     Q.    And I see you also list, for example, the various shell

10  casings that were found?

11    A.    Yes, sir.

12    Q.    And the numbers in the diagram correspond to the numbers

13  in the legend; is that right?

14    A.    Yes, sir.

15    Q.    I'd like to switch gears now, move on to a different

16  scene.  Fast forward about a year to April the 22nd of 2007.

17  Do you recall responding to a scene at 1322 Sharon Green Drive

18  here in Columbus?

19    A.    Yes, sir.

20    Q.    May I have Exhibit 113-1, please?

21        MR. MARTINEZ:  Your Honor, may I approach?

22        THE COURT:  Yes, you may.

23  BY MR. MARTINEZ:

24    Q.    Detective Taliaferro, I'm handing you Exhibit 113-1.  Do

25  you recognize that document, ma'am?

TRIAL ONE – VOL. 7 –   665

1   A.   Yes, sir.

2   Q.   And what is Exhibit 113-1?

3   A.   Our crime scene procedures form.

4   Q.   And once again, is this a document that was created at

5   or around the time that you responded to this particular scene?

6   A.   Yes, sir.

7   Q.   And is it your regular practice as a CSSU detective to

8   maintain records such as this one?

9   A.   Yes, sir.

10       MR. MARTINEZ:  Your Honor, government moves for the

11   admission of Exhibit 113-1.

12       THE COURT:  It will be received unless there's an

13   objection.

14       MR. DURDEN:  No objection.

15       MR. GATTERDAM:  No objection.

16       THE COURT:  Mr. Miller?

17       MR. MILLER:  No objection, Your Honor.

18       MR. MCVAY:  No objection.

19       MR. NOLDER:  No objection.

20       THE COURT:  113-1 will be received into evidence.

21   Mr. Martinez, you may publish it.

22       MR. MARTINEZ:  Thank you, Your Honor.

23   BY MR. MARTINEZ:

24   Q.   Detective Taliaferro, please tell us about your response

25   then to this crime scene April the 22nd, 2007.

1   A.   We had received a phone call to respond to 1322 Sharon

2   Green Drive to process a scene at the time out of an aggravated

3   assault.

4   Q.   Do you know more about the assault?  Was there a

5   shooting, a beating?  Do you know what kind of assault it was?

6   A.   Shooting.

7   Q.   What did you do when you got to the scene?

8   A.   We met with the scene detective.  They walked us through

9   and let us know what they wanted us to do in processing the

10  scene.

11  Q.   And do you recall what you were asked to do at this

12  particular scene?

13  A.   We were asked to photograph -- take photographs

14  depicting the scene and to collect evidence/property.

15  Q.   When you arrived on the scene was the victim there?

16  A.   No, sir.

17  Q.   Do you know where the victim was when you got to the

18  scene?

19  A.   No, sir.

20  Q.   Did you later learn information about what happened to

21  the victim?

22  A.   Yes, sir.

23  Q.   What did you learn?

24  A.   That the victim was transported and later the victim was

25  pronounced deceased.

TRIAL ONE - VOL. 7 -  667

1    Q.    And can you tell me the name of the victim which is

2    there on the top of the form?

3    A.    Marschell Brumfield.

4    Q.    So did you and your team in fact take photographs at

5    this scene?

6    A.    Yes, sir.

7    Q.    May I have Exhibit 113-2, please?

8         MR. MARTINEZ:  May I approach, Your Honor?

9         THE COURT:  Yes.

10   BY MR. MARTINEZ:

11   Q.    Detective Taliaferro, I'm handing you what's been marked

12   as Exhibit 113-2.  Do you recognize that document, ma'am?

13   A.    Yes, sir.

14   Q.    And what is Exhibit 113-2?

15   A.    This is the dual sheet that we use and this one is

16   signifying that this is the photo list.

17   Q.    How many photos were taken at this scene, according to

18   the log?

19   A.    Twenty-two.

20   Q.    Was this document created at or about the time that the

21   photographs were taken?

22   A.    Yes, sir.

23   Q.    And is it the regular practice of CSSU detectives like

24   yourself to maintain documents like this one?

25   A.    Yes, sir.

TRIAL ONE – VOL. 7 – 668

1      MR. MARTINEZ:  Your Honor, the government would ask

2  for the admission of Exhibit 113-2.

3      THE COURT:  Exhibit 113-2 will be admitted.

4      Any objections, Mr. Durden?

5      MR. DURDEN:  No, Your Honor.

6      THE COURT:  Mr. Gatterdam?

7      MR. GATTERDAM:  No, Your Honor.

8      THE COURT:  Mr. Miller?

9      MR. MILLER:  No.

10      THE COURT:  Mr. McVay?

11      MR. MCVAY:  No.

12      THE COURT:  Mr. Nolder?

13      MR. NOLDER:  No.

14      THE COURT:  You may publish it if you wish to.

15      MR. MARTINEZ:  I'd like to publish it, Your Honor,

16  very briefly.

17  BY MR. MARTINEZ:

18  Q.   Detective Taliaferro, does Exhibit 113-2 contain similar

19  information as the log we looked at just a little while ago?

20  A.   Yes, sir.

21      MR. MARTINEZ:  May I approach, Your Honor?

22      THE COURT:  Yes, you may.

23  BY MR. MARTINEZ:

24  Q.   Detective Taliaferro, I'm going to hand you what's been

25  marked Exhibit 113-2# through 113-2#-022.  I'll ask you to just

TRIAL ONE – VOL. 7 – 669

1   briefly flip through those pages and I'll ask you some

2   questions.

3       Do you recognize that, ma'am?

4   A.   Yes, I do.

5   Q.   What is contained in that set of exhibits?

6   A.   Photos taken of the scene.

7   Q.   And do those photographs fairly and accurately depict

8   the scene as it existed on April the 22nd, 2007?

9   A.   Yes, sir.

10      MR. MARTINEZ:  Your Honor, at this time, the United

11  States requests the admission of Exhibits 113-2# through

12  113-2#-022, 22 photographs.

13      THE COURT:  I take it that all defense counsel have

14  seen those photos?

15      MR. MCVAY:  That is correct.

16      THE COURT:  Are there any objection to those photos?

17      MR. DURDEN:  No.

18      MR. GATTERDAM:  No.

19      MR. MILLER:  No, Your Honor.

20      MR. MEYERS:  No.

21      MR. NOLDER:  No, Your Honor.

22      THE COURT:  Exhibits 113-2# through 113-2#-022 which

23  are 22 photographs will be received into evidence.

24      Mr. Martinez, you may publish them if you wish.

25      MR. MARTINEZ:  Thank you, Your Honor.

TRIAL ONE - VOL. 7 -  670

1    BY MR. MARTINEZ:

2    Q.    May I please have Exhibit 113-2#-003?

3          Detective Taliaferro, can you please tell us what's in

4    photograph 3?

5    A.    A photograph of the street name.

6    Q.    Sharon Green?

7    A.    Sharon Green Drive.

8    Q.    May I please have Exhibit 113-2#-004.

9          And what is depicted there in photograph number 4?

10   A.    It is a scene overview of the area in front of that

11   address.

12   Q.    All right.  May I please have Exhibit 113-2#-006.

13         What is depicted in that photograph, ma'am, number 6?

14   A.    It's also a scene overview of 1326 Sharon Green Drive.

15   Q.    May I please have Exhibit 113-2#-008?

16         What is depicted in that photograph, Detective

17   Taliaferro?

18   A.    Cone number 1, a blue ball cap.

19   Q.    May I please have Exhibit 113-2#-010?

20         What's depicted in that photograph, ma'am?

21   A.    Cones number 3 through 6 and cone number 8 in front of

22   1340 Sharon Green Drive.

23   Q.    May I please have Exhibit 113-2#-011?

24         What's in that photograph, ma'am?

25   A.    Cone number 3, a spent casing in front of 1340 Sharon

TRIAL ONE – VOL. 7 –  671

1    Green Drive.

2        Q.    May I please have Exhibit 113-2#-012?

3              What's in that photograph, ma'am?

4        A.    Cone number 4, a spent casing.

5        Q.    And can you, for the ladies and gentlemen of the jury,

6    would you circle where the casing is there, please, so --

7        A.    (Indicating.)

8        Q.    Okay.  Thank you.  May I please have Exhibit 113-2#-013?

9              What's in that photograph, Detective?

10       A.    Cone number 5 which is also a spent casing.

11       Q.    And again, would you mind circling -- there.  Thank you

12   very much.  You read my mind.

13             May I please have Exhibit 113-2#-014?

14             What's in that photograph, ma'am?

15       A.    Cone number 6 which is also a spent casing.

16       Q.    Thank you.  113-2#-018.  What is depicted in that

17   exhibit, ma'am?

18       A.    A shirt.  Cone number 10 marking a shirt.

19       Q.    And finally, Exhibit 113-2#-020.

20       A.    Cone number 8, tennis shoe.

21       Q.    Detective Taliaferro, I believe you testified a moment

22   ago that you were asked to collect some physical evidence at

23   this scene; is that correct?

24       A.    Yes, sir.

25       Q.    May I have Exhibit 113-3, please?

TRIAL ONE – VOL. 7 –  672

1          MR. MARTINEZ:  And may I approach, Your Honor?

2          THE COURT:  Yes, you may.

3     BY MR. MARTINEZ:

4     Q.    Detective Taliaferro, I'm going to hand you what's been

5     marked as Exhibit 113-3.  Do you recognize Exhibit 113-3,

6     ma'am?

7     A.    Yes, sir.

8     Q.    What is that document?

9     A.    This is our dual list again.  And this time it is an

10    evidence collection list.

11    Q.    Was that evidence list created at or around the time you

12    and your team collected evidence at this scene?

13    A.    Yes, sir.

14    Q.    And is it CSSU's regular practice to maintain documents

15    such as this exhibit?

16    A.    Yes, sir.

17         MR. MARTINEZ:  Your Honor, at this time we'd ask for

18    the admission of Exhibit 113-3.

19         THE COURT:  Any objection?

20         MR. DURDEN:  No objection, Your Honor.

21         MR. GATTERDAM:  No objection.

22         MR. MILLER:  No objection, Your Honor.

23         MR. MCVAY:  No objection.

24         MR. NOLDER:  No, Your Honor.

25         THE COURT:  113-3 will be received.

1      Mr. Martinez, you may publish it.

2          MR. MARTINEZ:  Thank you, Your Honor.

3          MR. MARTINEZ:  Your Honor, may I approach?

4          THE COURT:  Yes, you may.

5          MR. MARTINEZ:  Thank you.

6   BY MR. MARTINEZ:

7   Q.    Detective Taliaferro, I'm going to hand you what's been

8   marked Government Exhibit 113-10 and these correspond to items

9   3, 4, 5 and 6 on your evidence log.  You recognize that

10  exhibit, ma'am?

11  A.    Yes, I do.

12  Q.    And what is that exhibit?

13  A.    You want me to read them off of here?

14  Q.    Yeah.  So it would be items 3, 4, 5 and 6.

15  A.    They're all spent casings.

16  Q.    And where were those found?

17  A.    In front of 1340 Sharon Green Drive.

18  Q.    Is there a property number on that bag, Detective

19  Taliaferro?

20  A.    Yes, sir.

21  Q.    And what's the property number, please?

22  A.    07009135.

23  Q.    And what's the property number on your evidence log?

24  A.    07009135.

25  Q.    Do those numbers match?

TRIAL ONE – VOL. 7 – 674

1    A.    Yes, sir.

2          MR. MARTINEZ:  Your Honor, at this time we'd ask for

3    the admission of Exhibits 113-8 through 113-11.

4          THE COURT:  You've seen those?

5          MR. DURDEN:  Yes, Your Honor.

6          THE COURT:  Any objection?

7          MR. DURDEN:  No objection.

8          MR. GATTERDAM:  No objection.

9          MR. MILLER:  No objection, Your Honor.

10         MR. MCVAY:  No objection.

11         MR. NOLDER:  No, Your Honor.

12         THE COURT:  113-8 through 113-11 will be received,

13   Mr. Martinez.  They may be published.

14         MR. MARTINEZ:  Thank you, Your Honor.  May I approach?

15         THE COURT:  Yes.

16   BY MR. MARTINEZ:

17   Q.    Detective Taliaferro, when you and your team were

18   finished processing this scene, what did you do with all the

19   evidence you collected?

20   A.    We transported it back to our office, made sure our list

21   was correct and then submitted them to the property room.

22         MR. MARTINEZ:  Thank you, Detective.  I don't have any

23   further questions right now.

24         If I may have just a moment to clean up, Your Honor.

25   Thank you.

TRIAL ONE – VOL. 7 – 675

1      THE COURT:  Thank you.

2    Mr. Durden, cross.

3      MR. DURDEN:  Yes, Your Honor.

4                - - -

5                CROSS-EXAMINATION

6    BY MR. DURDEN:

7    Q.   Good afternoon, Detective.

8    A.   Good afternoon.

9    Q.   My name is Aaron Durden.  I represent Mr. Robert

10   Ledbetter.  Detective Taliaferro, I want to go back to Exhibit

11   Number 20-1, the crime scene of February 7, I'm sorry,

12   April 17, 2006.  So at the time of your arrival you had not

13   known the decedent's name?

14   A.   No, sir.

15   Q.   And it appears that you and your team arrived together?

16   A.   Yes, sir.

17   Q.   And your team consisted of Detective Mitchell and

18   Detective Castle?

19   A.   Yes, sir.

20   Q.   You three work, three detectives work in tandem on the

21   crime scene?

22   A.   Yes, sir.

23   Q.   And I understand the tasks were sort of split.  Before I

24   get to that, your arrival was at 01:35 a.m. in the morning,

25   correct, if you look at the right-hand column?

TRIAL ONE - VOL. 7 -  676

1    A.   Yes, sir.

2    Q.   For convenience, you cleared the scene at 4:55 a.m.?

3    A.   Yes, sir.

4    Q.   It appears that from there it reads morgue or property

5    room?

6    A.   Property room.

7    Q.   So it was a five-minute drive back to the precinct?

8    A.   We got back to the property room -- that's what it says,

9    sir.

10   Q.   Thank you, Detective.

11        Now, I want to go to the second bottom half of page one,

12   there.  We can highlight.  Yes.  Thank you.

13        So as it goes here it appears that you three detectives

14   split the tasks up, correct?

15   A.   Yes, sir.

16   Q.   You took the photos?

17   A.   Yes, sir.

18   Q.   Detective -- both yourself and Detective Mitchell, I

19   understand, collected the bags of evidence, correct?

20   A.   Yes, sir.

21   Q.   And Detective Castle was instructed by Detective, the

22   lead detective to go inside and do some other tasks, correct?

23   To process the interior wall, I understand?

24   A.   Detectives Mitchell, Taliaferro and Castle.

25   Q.   Okay.  By the way, who was the lead detective?  I

TRIAL ONE – VOL. 7 –  677

1   believe it was Detective Weeks, would you agree?

2   A.   I need to see it, sir.

3   Q.   Sure.  Take your time.

4   A.   Our form says Detective Weeks.

5   Q.   Detective, did you write the information on this

6   Exhibit 20-1?

7   A.   No, sir.  That's not my handwriting.

8   Q.   And whose handwriting is it?

9   A.   Detective Mitchell.

10  Q.   Okay.  Thank you.

11       Did you gather any of the phones or any of the other

12  items?  You did.  You answered the question.  Nineteen

13  different items you gathered them yourself, correct?

14  A.   Yes, sir.

15  Q.   And for clarification, two of them were indeed Motorola

16  phones and one was a NEXTEL or were they all three Motorola

17  phones?

18  A.   On the Hallworth run I have a cell phone, silver NEXTEL;

19  a cell phone, blue NEXTEL; and a cell phone Motorola model 415

20  Boost Mobile.

21  Q.   I just looked at all three of them and they were

22  Motorolas.  You have it listed as two NEXTELs.  There were two

23  Motorolas listed and one NEXTEL.

24  A.   May I see them, please?

25       MR. DURDEN:  May I approach the witness, Your Honor?

TRIAL ONE - VOL. 7 -  678

1          THE COURT:  Yes, you may.

2          THE WITNESS:  This number 13, it does say Motorola and

3    it also says NEXTEL.

4    BY MR. DURDEN:

5    Q.   Okay.  So whereas the -- would you consider that the

6    brand name Motorola or NEXTEL?

7    A.   I just consider what I see and write it down.

8    Q.   That's fair.  Okay.  Thank you.

9    A.   The other ones?

10   Q.   Please.  Yes.

11   A.   Number 14 is a Motorola and it also has NEXTEL.

12   Q.   Okay.

13   A.   Number 12 Motorola, silver and it says NEXTEL on the

14   form.  I do not see that on here.

15   Q.   Okay.  Thanks for solving the mystery, Detective.

16          So let me move on to an issue of the fingerprints.  Were

17   you asked to take fingerprints or anything of that sort while

18   at the scene or any of your team?

19   A.   On Hallworth, yes, sir.

20   Q.   And were you able to retrieve any?

21   A.   No, sir.

22   Q.   When I use the term team, is that how you work in tandem

23   with the other two detectives?

24   A.   I'm sorry?

25   Q.   Is that how you work in tandem with the other two

TRIAL ONE – VOL. 7 –   679

1   detectives?

2     A.   When we get there we discussed which one of us are going

3   to do what and then once one gets finished, they help the other

4   one out.

5     Q.   I see.

6     A.   And in this case, we all threw the dust powder on the

7   wall.

8     Q.   Okay.  And I also understand there are various

9   detectives doing various things.  But for your team is there a

10  lead?

11    A.   For our team, no, sir.

12    Q.   Okay.  Item number 15 I think is found on Exhibit 20-3.

13  If we can highlight Exhibit 15.

14         Is this published for the jury?

15         THE COURTROOM DEPUTY:  You want this one published?

16         MR. DURDEN:  Yes, please.

17  BY MR. DURDEN:

18    Q.   Do you see that, Detective?

19    A.   Yes, sir.

20    Q.   I believe there was a discussion that that spent bullet

21  was found in another apartment, correct?

22    A.   It has it listed at apartment number A.

23    Q.   You indicated that was adjacent to the apartment that

24  you were investigating, Apartment B?

25    A.   I do believe one was up and one was down, sir.

TRIAL ONE – VOL. 7 – 680

1    Q.    So to clarify, Apartment A is a downstairs apartment,

2    correct?

3    A.    I don't recall.

4    Q.    Then I'd like to move on to your other scene.  Just a

5    few questions on that issue, Detective.  If we can pull up

6    report Exhibit 113-1.  And, again, if you can highlight the

7    bottom half of the report.

8          So, again, Detective Taliaferro, yourself, Detective

9    Jackson this time I understand and Detective Green arrived at

10   the scene, correct?

11   A.    Detective Jackson, Detective Mitchell and myself.

12   Q.    So to be clear, all the photos and the rough sketch of

13   the area taken by both yourself and Detective Green were taken

14   of the outside, correct?

15   A.    Sir, who is Detective Green?

16   Q.    I apologize.  Who were the three detectives assigned?

17   A.    Is this on Sharon Green Drive?

18   Q.    Yes.  On April 22nd, 2007.

19   A.    Detective Mitchell, Detective Jackson and Detective

20   Taliaferro.

21   Q.    Okay.  And you prepared a rough sketch, Detective,

22   correct?

23   A.    No, sir.

24   Q.    You took photos, correct?

25   A.    Yes, sir.

TRIAL ONE – VOL. 7 –  681

1   Q.   Detective Jackson completed the evidence list, correct?

2   A.   Yes, sir.

3   Q.   And it reads here, no further requests were made of the

4   CSSU unit and you cleared the scene?

5   A.   Yes, sir.

6   Q.   Now, you remained outside throughout that investigation,

7   correct?

8   A.   This was an outside scene, yes, sir.

9   Q.   Do you recall who the lead detective was in that

10  instance?

11  A.   Detective Marilynn Seamans.

12  Q.   And did Detective Seamans, Marilynn Seamans, ask any of

13  your team to go inside and take any photos?

14  A.   No, sir.

15  Q.   Did they ask you to go inside to draw a rough sketch?

16  A.   No, sir.

17  Q.   Did they ask you to go inside to retrieve any items?

18  A.   No, sir.

19  Q.   How long were you at the second scene, Detective?

20  A.   We received the call at 5:15 a.m.  We arrived

21  at 5:50 a.m. and we cleared at 6:50 a.m.

22  Q.   Upon arrival, do you recall your team speaking with the

23  lead detective?

24  A.   Upon arrival, assault squad detective Delbert Chapman

25  and Glen Siniff explained the scene as it was known to them and

TRIAL ONE – VOL. 7 –  682

1    requested us to process the scene.

2    Q.    And as explained to you and your team, it was your

3    understanding, Detective, that the only assault site occurred

4    outside?

5    A.    Yes, sir.

6    Q.    Thus no need to go inside?

7    A.    Exactly.

8         MR. DURDEN:  May I have a moment, Your Honor?

9         THE COURT:  Yes, you may, Mr. Durden.

10   BY MR. DURDEN:

11   Q.    To clarify, Detective, you were asked to report to 1322

12   Sharon Green Drive?

13   A.    Yes, sir.

14   Q.    Yet your sketching and photos were taken at another

15   site, correct?

16   A.    My photo card says 1322 Sharon Green Drive.

17   Q.    But as we've seen in Exhibit 113 -- 113-2-006.

18   Detective Taliaferro, do you see that photo?

19   A.    Yes, sir.

20   Q.    Where is that in proximity to the address of the arrival

21   scene, the 1322 Sharon Green Drive?

22   A.    It's a scene overview.

23   Q.    Do you know how far in distance it is?

24   A.    No, sir.

25   Q.    Is it fair to say that the investigation took place --

1    A.   I'm sorry?

2    Q.   Is it fair to say that the investigation took place in

3  an outside area not in close proximity of the apartment itself?

4    A.   Wherever the tape is, that's where our scene is.  And in

5  this case right here they have boundaries where they used the

6  tape.

7    Q.   I understand.

8    A.   We might get sent to a certain address but when we get

9  there it might not be in front of that address.  It might be

10  just like an apartment building.  That's one apartment, that's

11  two apartments but our scene is here.

12    Q.   So in this instance you were dispatched to go to an

13  apartment but --

14    A.   We were dispatched to go to this address, yes.

15    Q.   And upon arrival, after speaking with the lead

16  detective, you then began your investigation in an area other

17  than the apartment itself, fair?

18    A.   Other than this apartment?

19    Q.   Yes, sir.

20    A.   Outside, in front of, yes.

21         MR. DURDEN:  Thank you.  No further questions, Your

22  Honor.

23         THE COURT:  Mr. Gatterdam, any cross?

24         MR. GATTERDAM:  Yes, Your Honor.

25

TRIAL ONE - VOL. 7 - 684

1                              - - -

2                      CROSS-EXAMINATION

3     BY MR. GATTERDAM:

4     Q.    Good afternoon, Detective.

5     A.    Good afternoon, sir.

6     Q.    We'll go back to the Hallworth Avenue scene first.  And

7     just generally, as the CSSU person, when you get your marching

8     orders, if you will, from the detective, how do you process the

9     scene?  In other words, do you -- when you start taking

10    pictures, do you take pictures from inside out or outside in?

11    A.    That could vary.  We try to start with our photo card.

12    We try to go in a sequence of how the incident took place, so

13    to speak.

14    Q.    Okay.

15    A.    Once we get walked through a scene and we find out like

16    maybe the first shot was inside but we have to, as crime scene

17    detectives, we have to show a location and an address, so

18    instead of going inside, we do our perimeter scenes outside.

19    Q.    Okay.  And that's something you brought up.  In a scene

20    where the body is there, in other words, a person is deceased,

21    you're not going to be the first person in there, correct?

22    A.    That's correct.

23    Q.    So there's going to be whoever may have also been in

24    that room before 911 was called, correct?

25    A.    That's correct.

TRIAL ONE – VOL. 7 – 685

1  Q.   There's then going to be at least a first responder

2  police officer, correct?

3  A.   Yes, sir.

4  Q.   And perhaps many more police officers?

5  A.   It varies, yes, sir.

6  Q.   Then there's going to be detectives, correct?

7  A.   It varies, yes, sir.

8  Q.   And in fact, there's so many people and it's so

9  important to note is there's generally a crime scene guard log

10 established, correct?

11 A.   Yes, sir.

12 Q.   And if you know, what's the purpose of a crime scene

13 guard log?

14 A.   So that you can keep track of persons in and out of the

15 scene.

16 Q.   So either the persons in and out of the scene have to

17 sign in or out or somebody is in charge of making sure they

18 note who's going in and out, correct?

19 A.   Yes, sir.

20 Q.   You also, in some scenes, you're going to have EMS

21 personnel going in and out?

22 A.   Yes, sir.

23 Q.   Now, each of those people we've just talked about may

24 inadvertently disturb the crime scene, correct?

25 A.   It's possible.

TRIAL ONE – VOL. 7 –  686

1    Q.    And they may be trying to render aid to somebody and

2    going in to look at things and they may kick a casing, for

3    example, correct?

4    A.    Yes, sir.  It's possible.

5    Q.    They may have footprints that they bring into the place,

6    correct?

7    A.    Yes, sir.

8    Q.    So by the time you get there, fair to say it's an

9    imperfect scene?

10   A.    We process what we find.

11   Q.    Correct.  And so for a scene like the one at Hallworth

12   Avenue or Hallsworth Avenue, do you work from where the body is

13   towards the outside or do you start outside the apartment and

14   start taking photos in?

15   A.    As I mentioned before, I have to take my outside -- I

16   have to show my location and my address first.

17   Q.    And as we just talked about, because if you go inside

18   first, you could also inadvertently disturb something in the

19   scene, correct?

20   A.    We get a walk-through when we get there.  This is prior

21   to taking any photographs whatsoever.  So we basically know at

22   that time what's going to be labeled as evidence.

23   Q.    Now, if I could show you a few photos.  Special Agent

24   Lauber, 20-2-008.

25        MR. GATTERDAM:  May I have the jury see this, too, as

TRIAL ONE – VOL. 7 – 687

1   I ask the questions, Your Honor?

2   BY MR. GATTERDAM:

3   Q.   Does that appear to be a photograph you or one of the

4   agents took of the door?

5   A.   Yes, sir.

6   Q.   And does it appear to be heavily damaged, correct?

7   A.   The door or the wall?

8   Q.   The wall.  I'm sorry.

9   A.   The wall, sir, yes.

10  Q.   In fact, it appears that the imprint of the doorknob hit

11  through the drywall, correct?

12  A.   Yes, sir.

13  Q.   And are we looking from inside the apartment right now

14  looking out?

15  A.   Yes, sir.  I'm inside the apartment.

16  Q.   Okay.  And then there's obviously it shows a deadbolt

17  and the doorknob, correct?

18  A.   Yes, sir.

19  Q.   And when you or one of the other two agents processed

20  for prints, do you know if it was that doorknob that they

21  processed?

22  A.   It doesn't say the doorknob, sir.

23  Q.   What does it say?

24  A.   Detectives Mitchell, Taliaferro and Castle processed the

25  interior doorway walls of Apartment B with black print powder

TRIAL ONE - VOL. 7 -  688

1    receiving negative results.

2    Q.   Okay.  So would that be, as best as you recall, would

3    that be that wall where that hole is in the drywall?  Is that

4    the wall you think they're talking about?

5    A.   Seeing that's the only wall I see but I'm not sure which

6    wall it was.  It was so long ago.

7    Q.   Okay.  So the doorknob itself, as far as you can tell,

8    was not dusted, nor was any other areas on the outer door

9    dusted based on the report you have?

10   A.   It does not say, no.

11   Q.   And you talked about being able to dust for prints, and

12   you went over how you do that, and you also talked about being

13   able to do DNA and taking a swab, correct?  You can do either

14   of those things?

15   A.   Yes, sir.

16   Q.   Now, is it fair to say once you dust for prints, you

17   can't then go and try to get DNA.  You can't do the swabbing of

18   the DNA, correct?

19   A.   That's correct.

20   Q.   And why is that?

21   A.   You're contaminating the DNA with the print powder.

22   Q.   Okay.  So you got to do one or the other.  Or could you

23   do the DNA swab first and then do the print?

24   A.   No, sir.  You will obliterate the print by doing the

25   swab.

TRIAL ONE – VOL. 7 – 689

1    Q.   So it's one or the other, correct?

2    A.   Yes, sir.

3    Q.   Now, it does not appear from your report that there was

4 fingerprinting done on the outer door. But does it appear that

5 any DNA testing swabbing was done on the outer door or

6 doorknob?

7    A.   I do not have any DNA swabs on my list.

8    Q.   And that would be one of two things. Either, one, the

9 detectives, when they walked you through, didn't ask you to do

10 that, correct?

11    A.   That's correct.

12    Q.   And/or you or your other CSSU individuals did not

13 independently decide, hey, let's do some DNA testing on the

14 door, correct?

15    A.   No, we didn't.

16    Q.   Do you recall on this scene whether you ever discovered

17 in searching the residence or in doing what you did whether you

18 recovered any weapons, any guns?

19    A.   There are none on my list, sir.

20    Q.   And fair to say your list indicates that you had 19 bags

21 of evidence collected, correct?

22    A.   Yes, sir.

23    Q.   You collected quite a bit of material, correct?

24    A.   Nineteen bags, yes, sir.

25    Q.   Would you or your group be the ones that would actually

1   be collecting the casings?

2   A.   Yes, sir.

3   Q.   But you're not -- is it not in your area of expertise to

4   determine what caliber the casings are?

5   A.   Only when we get back to our office because we have to

6   have that on our list.

7   Q.   And fair to say on your list all the casings you

8   collected appear to be the same caliber of .45?

9   A.   Yes, sir, they are.

10  Q.   Thank you.  Can you put up 20-4?

11       Does this appear to be the sketch that you did?

12  A.   I personally, no, sir.

13  Q.   That one of the other CSSU agents did?

14  A.   Yes, sir.

15  Q.   If you see where it says number 19, do you see that on

16  the sketch?

17  A.   A cup, yes, sir.

18  Q.   So that's the front entranceway, correct?

19  A.   Yes, it is.

20  Q.   And the area where the body is, is to the left, correct?

21  A.   That's the bedroom.

22  Q.   So is that facing out towards the west?

23  A.   Is what facing out towards the west?

24  Q.   I'm sorry.  That's a bad question.  That bedroom there

25  where the body is found is facing out towards the west,

TRIAL ONE – VOL. 7 –  691

1    correct?

2    A.   It's on the west side.

3    Q.   And then when you come in if you were coming in the

4    doorway and there appears to the right to be a couch and

5    kitchen area.  Do you see that?

6    A.   Yes, sir.

7    Q.   That would be based on the diagram to the east, correct?

8    A.   Yes, sir.

9    Q.   And I'm not sure if you know or have any independent

10   recollection, but if you go to the east, is that where the

11   parking lot area and the back --

12   A.   I do not know, sir.

13   Q.   And I assume if it was not in your packet, there were no

14   photographs taken of that area?

15   A.   Of the parking?

16   Q.   Of the area out behind to the east here?

17   A.   No, sir.

18   Q.   But can you tell from the sketch here was there any back

19   entrance to this apartment or is there simply one entrance in

20   the front?

21   A.   I have one entrance in the front.

22   Q.   And would you have noted or would the sketch artist have

23   noted if there was a back patio or porch or sliding glass door

24   or something like that?

25   A.   Probably.

TRIAL ONE - VOL. 7 - 692

1    Q.    Do you see any such indication in this?

2    A.    No, sir.

3    Q.    And you indicated that inside the bedroom you put a cone

4    or one of the agents put a cone number 14 for the phone that

5    was found underneath the bed.  You recall that?

6    A.    Yes, sir.

7    Q.    And number 18 indicates that there was a spent

8    projectile found on the mattress; is that correct?

9    A.    Number 18?

10   Q.    Yes.  In the sketch.  Does that indicate a projectile?

11   A.    Yes, sir.

12   Q.    And if that's all that's indicated on the mattress,

13   there were no other items that you saw of evidentiary value,

14   correct?

15   A.    Fourteen and 18.

16   Q.    I want to move to the other scene.  I don't have many

17   questions.

18        Same situation for this scene, April 22nd, 2007.  Now

19   you have another added element here because this was out --

20   this scene was outside, correct?

21   A.    Yes, sir.

22   Q.    So now you have the any elements in terms of problems

23   for you in photographing the scene, you have any elements

24   outside that could create a problem for you, correct?

25   A.    I'm not sure I understand you.

TRIAL ONE - VOL. 7 -   693

1    Q.   Weather?

2    A.   Yes.  It could have, yes.

3    Q.   Light or darkness?

4    A.   Yes.

5    Q.   And in this case -- can we do 113-2-006, please?

6         You were shown this picture previously.

7         MR. GATTERDAM:  Is this being shown to the jury?

8         THE COURTROOM DEPUTY:  Yes.

9    BY MR. GATTERDAM:

10   Q.   Do you recall this picture?

11   A.   Yes, sir.

12   Q.   Now, do you know which way that is looking, like what

13   direction?

14   A.   If this is picture number 6.

15   Q.   It is.

16   A.   On the list they've got it west.

17   Q.   And do you know is that towards the parking lot?

18   A.   I have no idea.

19   Q.   But you would agree with me in this picture you can't

20   really see what's off in the distance there?

21   A.   No, sir.

22   Q.   And it appears, correct me if I'm wrong, that these

23   trees are showing some foliage which obviously would block

24   views of individuals that were up above?

25   A.   Probably.

TRIAL ONE - VOL. 7 -  694

1    Q.    And what is creating the light that we are seeing right

2    there?  Is that you or whoever is taking the picture?  Is that

3    your camera?

4    A.    That's the flash.

5    Q.    Now, if we could have 113-2#-004.  You see a door to one

6    of the apartments here?

7    A.    Yes, sir.

8    Q.    Does it appear that to the right of that door is a

9    light?

10   A.    Yes, sir.

11   Q.    To the best of the your knowledge, would that be the

12   only lighting in the area of the lights that were on for those

13   apartments going down the row?

14   A.    I cannot answer that.

15   Q.    Your picture, the last one we showed, most of the

16   lighting was from your light, correct?

17   A.    That was my flash.

18   Q.    And it's a courtyard type area, correct?

19   A.    Yes, it is.

20   Q.    So other than the lighting from any of these doors that

21   are open, that would be the only lighting at all in that

22   courtyard, correct?

23   A.    Probably so, sir.

24   Q.    Now, you talked about a few items that were collected

25   that you found on the ground out there, correct?

TRIAL ONE – VOL. 7 –  695

1    A.    Yes, sir.

2    Q.    Were you ever asked to do any DNA swabs or

3  fingerprinting of any of the items that you collected?

4    A.    No, sir.

5    Q.    And if you didn't do it at the scene, is there still a

6  further opportunity after you place it in the evidence room for

7  the detective to do that?

8    A.    That would be for the lead detective to submit the

9  paperwork to have it done.

10   Q.    And I think you sort of covered this with Mr. Durden.

11 But you were never asked to go into any other apartment to do

12 photographs, DNA, fingerprints, correct?

13   A.    That's correct.

14   Q.    And you didn't do any DNA or fingerprints on any of the

15 outer doors of these apartments, correct?

16   A.    That's correct.

17        MR. GATTERDAM:  May I have a moment, Your Honor?

18        THE COURT:  Yes, you may.

19        MR. GATTERDAM:  Nothing further, Your Honor.

20        THE COURT:  Ladies and gentlemen, it's 3:40.  It's

21 time for our afternoon recess.  We will stand in recess

22 until 3:55 then we will resume with the cross-examination by

23 Mr. Miller.

24    (Recess taken from 3:40 p.m. to 3:55 p.m.)

25        THE COURT:  Mr. Berndt, go ahead.

TRIAL ONE – VOL. 7 –  696

1          MR. BERNDT:  Your Honor, my anticipation is a

2   gentleman by the name of Michael Boyd is going to be called to

3   testify by the government, and I think we'll get to him today.

4          THE COURT:  Michael?

5          MR. BERNDT:  Boyd, B-O-Y-D.  And, Your Honor, Michael

6   Boyd has a criminal history.

7          THE COURT:  Yes.

8          MR. BERNDT:  His criminal history is, basically, I

9   think everything would qualify as crimes of dishonesty or

10  deceit.  One of them is from February 24 of 2003, by my notes.

11  And sometimes these records are a little hard to read so I'm --

12         THE COURT:  That was the date of the conviction?

13         MR. BERNDT:  I believe so, Your Honor.  And he got

14  five years suspended.

15         THE COURT:  Okay.

16         MR. BERNDT:  And the question is under 609 whether or

17  not I can cross-examine -- I can bring that up in

18  cross-examining him.

19         THE COURT:  What was the underlying crime?  What was

20  the crime in falsity?

21         MR. BERNDT:  Obtaining money by false pretenses.

22         And, Your Honor, the other balance of his record are

23  things like theft, things like insurance fraud, maybe arson,

24  things that appear to be same or similar.

25         609 seems to me to indicate that if it's over 10 years

TRIAL ONE - VOL. 7 - 697

1 old, it can't be used unless we revert to Subsection B, which

2 talks about probative value versus prejudice. And I would just

3 say that he just has a history of this type of conduct since --

4 basically since he was 25 years old, and I just didn't want to

5 talk about it in front of the jury if it was inappropriate so I

6 thought it was best to bring it up now.

7 And I've disclosed all of this to the government.

8 THE COURT: Whose witness is this? Mr. Kelley?

9 MR. KELLEY: Yes, Your Honor.

10 THE COURT: What's --

11 MR. KELLEY: Well, I mean, my first reaction, I don't

12 believe theft and arson are the same as the false pretenses.

13 THE COURT: Well, that -- well, I'm assuming that the

14 theft and arson convictions were felonies.

15 MR. KELLEY: I believe so, yes, Your Honor.

16 But as to the first one, the obtaining money by false

17 pretenses, I believe the conviction date is August of 2004, but

18 it would still be outside the 10-year window.

19 THE COURT: It would be outside the 10-year window

20 unless there was a later date such as when he went off of

21 parole or -- they don't have supervised release in state. It's

22 parole, right?

23 MR. BERNDT: He was given five years of probation, not

24 confinement.

25 THE COURT: And so if you add the five years probation

TRIAL ONE - VOL. 7 - 698

1   on, that's 2009 so it would be within the ambit of the rule.

2           MR. BERNDT:  Okay.  I just wanted to make sure that I

3   was --

4           MR. KELLEY:  I didn't think the probation, Your Honor,

5   was the same as confinement.  He did have five years of

6   probation.

7           THE COURT:  Well, there is some split in authority of

8   whether it's confinement because some courts look at it in

9   terms after whether there's actual confinement, some courts

10  look at it as to whether you're under any type of legal

11  disability, whether it's reporting, as in the case of

12  probation, or some kind of confinement -- as probation or

13  supervised release, or some kind of confinement with respect to

14  prison or jail.

15          MR. KELLEY:  And this one is unsupervised probation

16  according to the record.

17          THE COURT:  All right.

18          MR. BERNDT:  So I can inquire as to that?

19          THE COURT:  Yes, I'm going to allow you to inquire.

20          MR. BERNDT:  Thank you, Your Honor.

21             (Whereupon, the Jury entered the courtroom.)

22          THE COURT:  Mr. Miller, do you have any cross of

23  Ms. Taliaferro?

24          MR. MILLER:  Yes, Your Honor.

25

1                              – – –

2                      CROSS-EXAMINATION

3      BY MR. MILLER:

4      Q.   Good afternoon, Detective.

5      A.   Good afternoon.

6      Q.   I just want to ask a few questions.  I'm dealing with

7    the incident at Sharon Green, the second one in 2007, April.

8      A.   Yes, sir.

9      Q.   Some questions came out about you did not go inside, and

10   I believe you had stated earlier the general procedure is you

11   don't do that.  You take your orders, if you will, from the

12   investigating detective who tells you to go in and do this or

13   not go in and do this; is that right?

14     A.   Yes, sir.

15     Q.   And since this was outside, you had no purpose of going

16   in there?

17     A.   Just a minute.

18          That's correct, sir.

19     Q.   All right.  You collected a number of items of evidence

20   which we have been over, and they basically consist of casings,

21   a cell phone, which I look at as kind of metallic items which,

22   I believe, would be sometimes good places to print.  You can

23   get prints off something like that, can you not --

24     A.   Yes, sir.

25     Q.   -- on occasion?

1        And you had other items with clothing; I think there was

2    a ball cap and a tennis shoe.  And I don't know whether it was

3    brought up, but a black headband, which is in parenthesis on

4    your sheet as a Du Rag?

5    A.   Yes, sir.

6    Q.   Pretty much not susceptible to prints; is that right, or

7    am I wrong?

8    A.   Yes, sir.

9    Q.   Okay.  And I understand you've told us very clearly that

10   if you do one, if you test one for prints, you can't test the

11   other for DNA and vice versa.

12   A.   It's according to what the material is, yes, sir.

13   Q.   Yes, ma'am.

14        Now, did you -- I believe it was indicated that you did

15   not or were not asked to test any of these items for

16   fingerprints, correct?

17   A.   That's correct.

18   Q.   And you also were not asked, if I understood, to test

19   any of the items for DNA.

20   A.   That's correct.

21   Q.   All right.  Is that unusual at all, or does it vary from

22   the detective and their preferences?

23   A.   It varies from detective to detective and scenario,

24   also.

25   Q.   I'm sorry, and?

TRIAL ONE - VOL. 7 - 701

1    A.    Scenarios.

2    Q.    Okay.  Depending on what the -- what's out there, what

3  facts you believe there to be?

4    A.    Yes, sir.  Everything is different.

5    Q.    Okay.  But they can be asked for later on providing the

6  evidence is protected well and chain of custody and all that?

7    A.    Yes, sir.

8          MR. MILLER:  All right.  That's all I have.  Thank

9  you, ma'am.

10         THE COURT:  Thank you, Mr. Miller.

11       Mr. McVay, do you have questions for Detective

12  Taliaferro?

13         MR. MCVAY:  I do.  Thank you.

14                        - - -

15                   CROSS-EXAMINATION

16    BY MR. MCVAY:

17    Q.    Good afternoon, Detective Taliaferro.

18    A.    Good afternoon, sir.

19    Q.    My name is Kirk McVay.  Greg Meyers and I represent

20  Deounte Ussury in this case. I have a few questions for you.

21         When you are called to a crime scene, it is fair to say

22  that time is of the essence, correct?

23    A.    It's fair to say.

24    Q.    I mean, you work third shift, right?

25    A.    At that time, yes, sir.

TRIAL ONE – VOL. 7 –  702

1    Q.    And someone is always working third shift in the crime

2    scene and search unit squad; is that fair to say?

3    A.    Yes, sir.  We're 24/7.

4    Q.    Okay.  And the importance there is that if evidence is

5    present at a scene and is not recovered, it's not discovered,

6    it's not gathered, if it's not collected, then that would

7    affect ultimately the testing of it and perhaps even the

8    credibility of that evidence, right?

9    A.    Possibility.

10   Q.    It's important that you get there quickly?

11   A.    Possibility.

12   Q.    And when you arrive there, you arrive carrying all the

13   tools that you might conceivably need basically for just about

14   any homicide because you never know at the beginning of a work

15   shift what kind of case you're going to be called out on,

16   correct?

17   A.    No, sir.

18   Q.    When you arrive at a crime scene, say, like the one on

19   Sharon Green Drive, how do you arrive there, in what type of

20   vehicle?

21   A.    In my wagon.

22   Q.    In your wagon.

23         And what do you have in your wagon as standard

24   inventory, if you will, for completing your work?

25   A.    Evidence bags, paperwork, tape, tape measures, trash

TRIAL ONE – VOL. 7 –   703

1   can.

2          It's just a hodgepodge of things that we have.

3     Q.   Okay.  Battery powered lighting for when you arrive at a

4   night screen?

5     A.   Yes, sir.

6     Q.   And is some of that battery powered lighting like for

7   setting up on tripods and things like that to illuminate larger

8   areas than just what a flashlight would do?

9     A.   Yes, sir.

10    Q.   And you had that when you arrived at Sharon Green,

11   correct?

12    A.   Yes, sir.

13    Q.   Okay.  I'm going to -- I want to look first, though, at

14   the crime scene at 5861 Hallworth Drive, Apartment B.

15          Okay.  When you arrived there, again, the important

16   thing is that you meet with whatever detective is the lead

17   detective on the scene, and they give you a brief description

18   of what they believe occurred; is that correct?

19    A.   The lead or the scene detective, yes, sir.

20    Q.   And they describe for you where they think the crime

21   occurred and what may have happened, correct?

22    A.   They explain to us what they know.

23    Q.   All right.  And it's important that when you arrive at a

24   scene for a shooting, you're going to be looking for evidence

25   of that shooting, right?

TRIAL ONE – VOL. 7 – 704

1    A.   Yes, sir.

2    Q.   So you're going to be looking for any kind of ballistics

3  information, shell casing --

4    A.   Yes, sir.

5    Q.   -- correct?

6       Spent projectiles?

7    A.   Yes, sir.

8    Q.   Firearms, if there are any left on the scene --

9    A.   Yes, sir.

10    Q.   -- correct?

11       MR. MCVAY:  Can we have, Agent Lauber, the crime scene

12  diagram?  I believe it's Government Exhibit 20-4.

13   BY MR. MCVAY:

14   Q.   And you have that in front of you?

15   A.   Yes, sir.

16       MR. MCVAY:  Can we also display that to the jury,

17  Your Honor?

18       THE COURT:  Yes.  It's been admitted.

19       MR. MCVAY:  Thank you.

20   BY MR. MCVAY:

21   Q.   Okay.  As you look at that scene, it says number 19

22  towards the lower portion of that diagram.  That is the entry

23  door, is it not?

24    A.   Yes, sir.

25   Q.   Okay.  And we see a kitchen to the right, a living room

1    to the right, and it's pretty much undisturbed at least with

2    regard to adding any kind of descriptions or numbers or other

3    diagrams in those rooms; fair to say?

4    A.    I'm not understanding what you're asking me, sir.

5    Q.    As we look at the diagram, there are no evidence

6    numbers, things like that, in the living room or in the

7    kitchen.  In the kitchen, in particular.  But in the living

8    room I think we have a number 2 which is right there at the

9    entrance to that, correct?

10   A.    Yes, sir.

11   Q.    Okay.  So basically what you see is that what is

12   understood from this diagram, I suppose, would be that what

13   occurred occurs in the bedroom, correct?

14   A.    Yes, sir.

15   Q.    Okay.  And as you go through that short hallway from the

16   front door and then off to the left into the bedroom,

17   immediately to your right there is a square area there which

18   appears to have a door on what would be the lower side of that

19   box; is that fair to say?

20   A.    It appears to be, yes, sir.

21   Q.    Do you recall what that is?  Is it a closet?

22   A.    It might be.

23   Q.    Okay.  And as you proceed further into the room going

24   along the line of where it says 7 feet 9 inches, if you go all

25   the way to the other wall, there's a rectangular more than

TRIAL ONE - VOL. 7 -  706

1   likely a piece of furniture, maybe a dresser or something.  Is

2   that -- do you recall that from that crime scene?

3     A.   It can be.

4     Q.   And then towards the bottom of the diagram, then there's

5   another smaller rectangular thing and another section in that

6   lower left-hand corner of that room; is that correct?

7     A.   Yes, sir.

8     Q.   What is that area of the room?  Is that a walk-in closet

9   of sorts?

10    A.   I'm not sure, sir.

11    Q.   You don't recall?

12    A.   No, sir.

13    Q.   Okay.  Is it fair to say, though, that nevertheless when

14  you're looking at a crime scene and you're trying to gather all

15  the evidence which might be relevant, that you would have, in

16  effect, gone through all of those areas with a fine-tooth comb

17  to try to find whatever evidence may exist, correct?

18    A.   Possibility, yes, sir.

19    Q.   You would have looked in closets?

20    A.   Yes, sir.

21    Q.   You would have looked under the bed?

22    A.   Yes, sir.

23    Q.   In fact, you found a cell phone under the bed, correct?

24    A.   Yes, sir.

25         MR. MCVAY:  And I don't believe -- if we could see,

TRIAL ONE – VOL. 7 – 707

1  what is it?  20-3, is that the evidence log?

2     BY MR. MCVAY:

3   Q.   Okay.  Looking at that list, have you had an opportunity

4  to review that?

5   A.   I'm looking at it, sir.

6   Q.   Okay.  And is it fair to say that you recovered evidence

7  from many parts of that room, on the bed, under the bed?

8   A.   Floor, yes, sir.

9   Q.   On the floor?  You looked in the closets?  Is that fair

10  to say?

11   A.   Looked in the closet?

12   Q.   Yes.

13   A.   I don't have that on here as looking in a closet.

14   Q.   Okay.  Is it fair to say that that would be a fairly

15  standard procedure, though, as you go into a crime scene?

16   A.   Possibility.

17   Q.   Okay.  Now, let's turn our attention to the 1322 Sharon

18  Green Drive crime scene.  And you indicated there --

19        MR. MCVAY:  If we could have 113-3 on the evidence

20  log.  Do you have that, 113-3?

21        Thank you, Agent.

22     BY MR. MCVAY:

23   Q.   And on that that is your evidence collection log; is

24  that correct?

25   A.   Yes, sir.

TRIAL ONE – VOL. 7 – 708

1    Q.    And it shows Items 3, 4, 5 and 6 being spent casings,

2    correct?

3    A.    Yes, sir.

4    Q.    Item 3 being a .40 caliber Smith and Wesson/WIN?

5    A.    Yes, sir.

6    Q.    Item 4 being a .40 caliber Smith and Wesson/WIN again,

7    same thing?

8    A.    Yes, sir.

9    Q.    Item 6 being the same thing, correct?

10   A.    WCC.

11   Q.    No, I'm sorry, Item 6.  I skipped one.

12   A.    Item 6, yes.

13   Q.    And then Item 5 would be the WCC, which is a

14   9-millimeter, right?

15   A.    May I see the casing itself?  I can't read this.

16   Q.    Apparently that has been removed from the courtroom.

17   A.    Oh.

18   Q.    We can establish that through some other means at a

19   later time.

20        Okay.  Each of those four items being shell casings had

21   been, one would expect, ejected from a firearm as it had been

22   fired, correct?

23   A.    Possibility.

24        MR. MCVAY:  Okay.  If we could show the respective

25   photos for that.  I think it's 113-2#-011 that's Item 3.

TRIAL ONE – VOL. 7 – 709

1      BY MR. MCVAY:

2    Q.   And Item 3, again, on your evidence log was shown to be

3  a shell case, spent casing, correct?

4    A.   Yes, sir.

5    Q.   And on that photograph that you have in front of you --

6         MR. MCVAY:  And these are all being shown to the jury,

7  correct, Judge?

8         THE COURT:  Yes.

9      BY MR. MCVAY:

10    Q.   On that photograph, can you circle where the shell

11  casing is on that?

12    A.   (Indicating).

13    Q.   Okay.  Hard to see; is that fair to say?

14    A.   Stovetop, sir.

15    Q.   I'm sorry?

16    A.   That's the position that it's in, stovetop.

17    Q.   Okay.  All right.  Now, just for clarification, when you

18  arrived, that was -- was that cone already there?

19    A.   No, sir.  We put our own cones out.

20    Q.   That is what the Crime Scene Search Unit does.

21    A.   Yes, sir.

22    Q.   Okay.  And then in the next picture, which would be the

23  same preface to it, 012, it should be Item Number 4.

24    A.   Yes, sir.

25    Q.   And on that one can you circle -- well, on my screen

TRIAL ONE - VOL. 7 -  710

1   there's already a circle.

2        Okay.  Can you circle where the shell casing is on that

3   photo?

4    A.   (Indicating).

5    Q.   All right.  And the next photo in sequence would be as

6   to Item Number 5, the 013.

7        And, again, if you can circle on that photo where the

8   shell casing is.

9    A.   (Indicating).

10    Q.   And then the next one in sequence, being 014 for Item

11   Number 6.  Now, that shell casing appears to be sitting on top

12   of the cone.

13    A.   Yes, sir.

14    Q.   That's -- I'm presuming that's not how you found that

15   shell casing.

16    A.   No, sir, it's not.

17    Q.   So how would -- how would it be that that shell casing

18   would be on top of that cone?

19    A.   Do you see how flat the grass is around there?  When I

20   moved that cone and then I sat it back down, I accidentally hit

21   that shell casing and it topped right there on my cone.

22    Q.   Okay.  So sometimes things happen where shell casings or

23   other pieces of evidence will inadvertently be moved but not

24   substantially so?

25    A.   Yes, sir.

TRIAL ONE – VOL. 7 –   711

1    Q.   Okay.  Thank you.

2         Now, again, time being of the essence, the evidence that

3    you collected at 5861 Hallworth and the evidence you collected

4    at 1322 Sharon Green Drive, those were collected on the nights

5    that you arrived to do the crime scene search work, correct?

6    A.   Yes, sir.

7    Q.   So as to Hallworth, that would have been on or about

8    April 17 of 2006?

9    A.   Yes, sir.

10   Q.   And on Sharon Green Drive, that would have been on or

11   about April 22 of 2007?

12   A.   Yes, sir.

13   Q.   And it's important, again, not only for the collection

14   of evidence but for the processing and testing of evidence,

15   that it be submitted contemporaneous to the crime itself,

16   correct?

17   A.   Yes, sir.

18   Q.   Otherwise, evidence may degrade?

19   A.   Possibility, yes.

20   Q.   And what evidence that was submitted for testing would

21   have been submitted close in time to that date that it was

22   collected in these two instances as well; is that fair to say?

23   A.   It varies.

24   Q.   Okay.  In this case it was submitted within a couple of

25   weeks, though, in both cases, correct?

TRIAL ONE – VOL. 7 – 712

1   A.   Testing?

2   Q.   The request for testing.

3   A.   I'm not sure.  I don't do the request for testing, sir.

4        MR. MCVAY:  Is it 113-5, I believe, if I'm not

5   mistaken?

6      BY MR. MCVAY:

7   Q.   Okay.  What is it that you have before you there,

8   Detective?

9   A.   This is a laboratory -- a request for laboratory

10  examination.

11  Q.   Okay.  And when was that submitted, if you know?

12  A.   By the date on here, 5-8-07.

13  Q.   So that would be within a couple of weeks, two to three

14  weeks of the April 22 homicide date, correct?

15  A.   Probably.

16       MR. MCVAY:  Okay.  Thank you, Detective.  I have no

17  further questions.

18       THE COURT:  Thank you, Mr. McVay.

19       MR. NOLDER:  No questions, Your Honor.

20       THE COURT:  Thank you, Mr. Nolder.

21      Any redirect, Mr. Martinez?

22       MR. MARTINEZ:  I'll be brief, Your Honor.

23       THE COURT:  All right.

24       MR. MARTINEZ:  May I see Exhibit 20-2#-008, please?

25      I would like to publish that for the jury if we haven't

TRIAL ONE – VOL. 7 –  713

1    already.

2                              –  –  –

3                     REDIRECT EXAMINATION

4    BY MR. MARTINEZ:

5    Q.    Detective Taliaferro, I believe it was Mr. Gatterdam who

6    asked you some questions about this particular photo here.

7    A.    Yes, sir.

8    Q.    Let me ask you this:

9          If that door was kicked open with a foot with great

10   force, you as a CSSU detective, would it make sense to do

11   fingerprints on the door?

12   A.    Not unless I'm asked.

13   Q.    And I think you addressed this next point on

14   cross-examination, but with respect to the Sharon Green, the

15   April 2007 incident, did you testify that that scene was all

16   outside?

17   A.    Yes, sir.

18   Q.    Would it make any sense to you to then do processing

19   work inside?

20   A.    Sir, one of the -- the Sharon Green?

21   Q.    The Sharon Green, the outside.

22   A.    It came in as an aggravated assault.

23   Q.    Right.

24   A.    And that was treated entirely different from a homicide.

25   Q.    Okay.  I guess my question is a little different.

TRIAL ONE – VOL. 7 –   714

1      If you are told that the scene is all outside, would

2  you -- would it make any sense to you to then go inside the

3  house?

4  A.   No, sir.

5  Q.   Okay.  Last question.  Are you familiar with revolvers?

6  A.   Yes, sir.

7  Q.   Are you familiar with semiautomatic handguns?

8  A.   Yes, sir.

9  Q.   Is there a difference in the way shell casings are or

10  are not ejected from those two types of guns?

11  A.   Yes, sir.

12  Q.   What's the difference?

13  A.   Revolver, you have your cylinder, your ammo goes into

14  each hole of the cylinder.  As it is fired, the hammer hits

15  that primer on that casing.  As it's fired, it stays within the

16  cylinder, the casing does.

17  Q.   So with the revolver, the casing doesn't get ejected

18  from the cylinder?

19  A.   No.

20  Q.   How about a semiautomatic?

21  A.   Semiautomatic, same thing.  Once that primer is ignited,

22  the bullet goes out the muzzle, the casing goes out to the

23  right and back.

24  Q.   Out of the gun?

25  A.   Yes.

TRIAL ONE – VOL. 7 –  715

1            MR. MARTINEZ:  Okay.  No further questions,

2      Your Honor.

3            THE COURT:  Is there anything further, Mr. Durden?

4            MR. DURDEN:  Yes, Your Honor.

5                           - - -

6                    RECROSS-EXAMINATION

7        BY MR. DURDEN:

8      Q.   Detective, let me start off by asking about 5861

9      Hallworth Avenue.  Your investigative team did not determine

10     whether or not the door was, indeed, kicked in, did they?

11     A.   Sir, I was just asked to take the pictures.

12     Q.   So, again, but there was no -- no finding that the door

13     may have, indeed, been kicked in, was there?

14     A.   I don't know, sir.

15            MR. DURDEN:  Give me a second, Your Honor.

16            THE COURT:  Detective, you don't know whether there

17     was a finding or you don't know whether the door was kicked in?

18          I just want the record to be clear.

19            THE WITNESS:  Both of them, sir.

20            THE COURT:  You don't know one way or another; is that

21     right?

22            THE WITNESS:  No, sir.  I was just asked to take

23     pictures.

24            THE COURT:  And I guess by implication -- and that's

25     why I'm trying to make it clear for the jury and for the

TRIAL ONE - VOL. 7 - 716

1   record -- you were not asked as a member of that team to make a

2   determination of whether the door was kicked in.

3           THE WITNESS:  That's correct, sir.

4           THE COURT:  Or, otherwise, how entry was gained by the

5   assailants.

6           THE WITNESS:  That's correct, sir.

7           THE COURT:  All right.

8           MR. DURDEN:  Thank you, Your Honor.

9       BY MR. DURDEN:

10   Q.   And, again, a question was asked by Mr. Martinez about

11   the addresses that you were -- concerning the second event on

12   April 17, 2007.

13           In looking at this exhibit --

14           MR. DURDEN:  Is it published?

15           MR. MARTINEZ:  Your Honor, objection.  This isn't in

16   evidence, Your Honor.

17           MR. DURDEN:  It's not?  Okay.  Well --

18           THE COURT:  You're right.  You are right,

19   Mr. Martinez, it is not in evidence.

20           MR. MARTINEZ:  Thank you, Your Honor.

21           MR. DURDEN:  And I'm not asking it be admitted,

22   Your Honor, but I do have a question --

23           THE COURT:  It's not being displayed to the jury.

24   Just to the witness and counsel.

25       BY MR. DURDEN:

TRIAL ONE – VOL. 7 –   717

1    Q.   So, Detective, in looking at the location, can you read

2    the address for the request for laboratory examination?

3    A.   The one that's on the screen?

4    Q.   Yes, Detective.

5    A.   Front of 1326 Sharon Green Drive.

6    Q.   And that differs from the address where you got the call

7    on the night of the event, correct?

8    A.   I have 1322.

9    Q.   In fact, Detective, there were actually four addresses

10   noted when you were -- well, when the call came out to arrive

11   at the scene of the assault; isn't that true?

12   A.   I have several addresses where I picked up evidence.

13        MR. DURDEN:  Thank you.  No further questions.

14        THE COURT:  Anything further, Mr. Gatterdam?

15        MR. GATTERDAM:  Yes, Your Honor.

16                        – – –

17                  RECROSS-EXAMINATION

18     BY MR. GATTERDAM:

19   Q.   As CSSU, you weren't there when the crime was committed.

20   I know that's a dumb question, but that's correct, right?

21   A.   That's correct.

22   Q.   You're asked to process the scene, correct?

23   A.   Yes, sir.

24   Q.   So that the detectives can try to figure out who did

25   what.

TRIAL ONE – VOL. 7 –   718

1     A.    Yes, sir.

2     Q.    So when you get there to the Hallworth Avenue scene, you

3    don't know whether the person grabbed ahold of the door and

4    then kicked it or shouldered it.  You have no idea, correct?

5     A.    That's correct.

6     Q.    Did you see any shoe prints on the door?

7     A.    I was not asked to take photos.  Just the damage.

8    That's all.

9     Q.    All right.

10         THE COURT:  I'm sorry.  Would you read back the

11   question, please, Ms. Coulter?

12      (Thereupon, the last question was read by the court

13   reporter.)

14         THE WITNESS:  No, sir.

15     BY MR. GATTERDAM:

16     Q.    And when it comes to processing evidence and you talked

17   about the DNA or fingerprinting as it relates to the door, you

18   can -- you can do DNA testing -- if you properly preserve by

19   doing that swabbing that night and properly preserve it, you

20   could test it against a suspect years and years later, correct?

21     A.    If asked.

22         MR. GATTERDAM:  Thank you.  Nothing further.

23         THE COURT:  Mr. Miller, anything further?

24         MR. MILLER:  No, Your Honor.  Thank you.

25         THE COURT:  Mr. McVay, anything further?

TRIAL ONE – VOL. 7 –  719

1      MR. MCVAY:  No, Your Honor.

2      MR. NOLDER:  No, Your Honor.

3      THE COURT:  Mr.Martinez, do you have any sur-redirect?

4      MR. MARTINEZ:  No, Your Honor, I do not.

5      THE COURT:  Officer Taliaferro, thank you very much,

6  ma'am.  You may be excused.

7      THE WITNESS:  Thank you, sir.

8      THE COURT:  Mr. Kelley, I think we have time for

9  your -- one more witness.

10     MR. KELLEY:  It will be Michael Boyd, Your Honor.  It

11  will be a lengthy witness, but we can start him if you wish.

12    (Thereupon, Court and Counsel conferred out of the hearing

13  of open court and off the record.)

14    (The following proceedings were had in open court.)

15     THE COURT:  Mr. Kelley?

16     MR. KELLEY:  Thank you, Your Honor.

17     THE COURT:  Mr. Boyd?

18     MR. KELLEY:  Michael Boyd.

19     THE CLERK:  Sir, come forward and be sworn, please.

20    (Witness sworn.)

21     THE COURT:  Mr. Boyd, please bend the microphone

22  toward you and speak clearly into it.

23     THE WITNESS:  No problem, Your Honor.

24     THE COURT:  Thank you, sir.

25     Mr. Kelley, please proceed.

TRIAL ONE – VOL. 7 –  720

1          MR. KELLEY:  Thank you, Your Honor.

2                         – – –

3                      MICHAEL BOYD

4     Called as a witness on behalf of the Plaintiff,

5     being first duly sworn, testified as follows:

6                   DIRECT EXAMINATION

7     BY MR. KELLEY:

8     Q.   Will you please state your name and spell your last name

9     for the jury?

10    A.   Michael Boyd, B-O-Y-D.

11    Q.   Mr. Boyd, I want to take you back to the time frame

12    around 2006, 2007.  Can you tell the members of the jury what

13    kind of work you were doing back then?

14    A.   I owned a chain of cellular stores, and I owned an adult

15    entertainment establishment, a bar.

16    Q.   Let's start with the boring one first.  What were you

17    doing in terms of the cellular phone stores?

18    A.   I think I had maybe four Nextel locations.

19    Q.   And what was your position as it relates to them?

20    A.   I owned them.

21    Q.   How many people did you have working for you?

22    A.   I would say 20.

23    Q.   And as the owner, were you also hands-on in relation to

24    those stores?

25    A.   Yeah.  I was really hands-on with the more profitable

TRIAL ONE – VOL. 7 –  721

1    ones, but I just would pop in to each one every day to check

2    the books.

3      Q.   And then regarding the gentleman's club, tell us about

4    that.

5      A.   I also owned a gentleman's club and I ran it, the

6    day-to-day operations, and I was at both of them.

7      Q.   Where was the club located?

8      A.   On Greenlawn.

9      Q.   Greenlawn Avenue here in Columbus?

10     A.   Correct.  Yes, sir.

11     Q.   Can you give us a very brief description of the kind of

12   entertainment you provided there?

13     A.   It was a strip club.

14     Q.   And your position with the strip club?

15     A.   I didn't strip but, I mean, I ran the establishment.

16     Q.   Were you the owner of the club?

17     A.   Correct, yeah, I was one of the managing owners.

18     Q.   Managing owners?

19     A.   Yeah.

20     Q.   Help me understand, because I think it's important, your

21   role as to what you were doing day-to-day when it came to that

22   club.

23     A.   Liquor orders, ran everything, counted the money down.

24   I dealt with all the money.

25     Q.   Are you familiar with someone by the name of Latonya

1   Boyce?

2    A.   Yes, I am.

3    Q.   Can you tell the jury how you first came to know

4   Ms. Boyce?

5    A.   Ms. Boyce was introduced to me by a family friend, and

6   she actually helped run my stores for me, my cellular stores.

7    Q.   Can you give us a time frame when you all first met.

8    A.   Beginning '05.

9    Q.   Okay.  And was your relationship with Ms. Boyce strictly

10   a work relationship or --

11    A.   Strictly a work relationship.  We were friends.

12    Q.   And how often would you be seeing each other?

13    A.   Every day.

14    Q.   Any particular store, or did she also move from store to

15   store?

16    A.   She kind of would do overflow because she kind of ran a

17   lot of the -- she knew everything, but basically our Livingston

18   Avenue location.

19    Q.   Were you familiar with who Ms. Boyce was dating during

20   that time?

21    A.   Yes.

22    Q.   Tell us about that.  First, how did you become familiar?

23    A.   Just introduced as friends, and I just kind of went with

24   the flow.  I didn't ask any questions.

25    Q.   Do you know, who was she dating at this time, 2005,

TRIAL ONE – VOL. 7 – 723

1   2006?

2   A.   Well, that's two years, so -- but I believe -- I do know

3   some of the people she dated, yes.

4   Q.   Can you tell us who those people were?

5   A.   I think Rodriccos Williams and Brandon Ledbetter.

6   Q.   Had you known Rodriccos Williams other than through

7   Ms. Boyce?

8   A.   No.

9   Q.   Had you known Brandon Ledbetter other than through

10  Ms. Boyce?

11  A.   No.

12  Q.   Would there be times that you would see either one of

13  them during this time frame?

14  A.   Yes.

15  Q.   And, again, we're trying to give the jury a picture

16  here.  Were they exclusive with each other, or was there some

17  overlap in those relationships?

18  A.   I really wasn't paying much attention, but I would say

19  there was overlap.

20  Q.   Would they ever come to the stores themselves?

21  A.   Yes.

22  Q.   Did you socialize with either of the boyfriends?

23  A.   Hello, how you doing.

24  Q.   Keeping it short?

25  A.   Yeah.

TRIAL ONE - VOL. 7 -  724

1    Q.   Are you aware that ultimately Ms. Boyce got married?

2    A.   Yeah, I was aware.

3    Q.   And who did she marry?

4    A.   Rodriccos Williams.

5    Q.   Do you know a time when she married Rodriccos?

6    A.   That, I can't remember.

7    Q.   Can you estimate for us?

8    A.   '07-ish.

9    Q.   And are you aware ultimately what happened to Rodriccos

10   Williams?

11   A.   He's no longer with us.

12   Q.   Do you know when he passed away?

13   A.   I believe in '07.

14   Q.   Regarding Brandon Ledbetter, would you recognize Brandon

15   Ledbetter if you saw him again today?

16   A.   I think so.

17   Q.   Look around the courtroom and tell me if you see him

18   here today.

19   A.   I see him.

20   Q.   Tell me where he is in the courtroom and what he's

21   wearing.

22   A.   He's wearing a red tie, bald.

23   Q.   Coat or no coat?

24   A.   No coat.

25        MR. KELLEY:  Your Honor, I think the record reflects

TRIAL ONE – VOL. 7 –  725

1   he has identified the defendant Brandon Ledbetter.

2          THE COURT:  The record will so reflect.

3     BY MR. KELLEY:

4    Q.   Can you recall any incidents involving Mr. Ledbetter

5   where you were around him and he was very emotional?

6    A.   It was a couple.  I think there was one in my cellular

7   store where he seemed a little perturbed.  Me not really

8   wanting to be in anybody's business, I kind of walked into our

9   inventory area but he seemed frustrated.

10   Q.   Did he say anything that he shared with you why he was

11  upset?

12   A.   I think somebody got killed.

13   Q.   Do you know who it was that got killed?

14   A.   I think it was his youngest brother or younger brother.

15   Q.   Had you met his younger brother before?

16   A.   No, I don't believe so.

17   Q.   Did he describe or explain the situation or how he was

18  killed?

19   A.   I believe he was killed --

20          MR. BERNDT:  Your Honor, I object.  If we could have a

21  sidebar.

22          THE COURT:  Yes.

23                       - - -

24     Thereupon, the following proceeding was held at side bar

25  out of hearing of the jury:

1          MR. BERNDT:  I apologize, Your Honor.  Your Honor, my

2     objection is simply based upon the fact that the last two

3     answers to his questions have been couched in terms that do not

4     necessarily indicate that he is speaking from personal

5     knowledge.  He's saying I believe, he's saying I think.  I

6     would just ask that the questions be directed to him in a

7     fashion where he commits to his answer.  I mean -- and, again,

8     he may be just saying I believe because that's how he speaks,

9     but this is also a gentleman who has a significant history of

10    fraudulent conduct.  This is somebody who is about to testify

11    to things that he says he heard in a matter of a couple of

12    minutes, and I just want to make sure that he's testifying from

13    what he actually knows, not what he thinks he knows or what he

14    heard from somebody else.

15         THE COURT:  Okay.  Well, you can -- do you want to

16    respond?

17         MR. KELLEY:  I think it's appropriate for cross,

18    Your Honor.  I don't think it's appropriate in any way to

19    strike or challenge the response.

20         THE COURT:  I don't know that you are making an

21    objection at this time, are you, Mr. Berndt?

22         MR. BERNDT:  Your Honor, I am to the extent if he says

23    he believes, to my brain that means he doesn't know.

24         THE COURT:  Well, here's the dilemma that I have.  It

25    could be speculation, but it could -- I haven't heard the

TRIAL ONE - VOL. 7 -  727

1    response yet so, you know, I could hear the response and,

2    Mr. Kelley, you might know what the response is.  What response

3    do you anticipate?

4         MR. KELLEY:  He's going to say his brother had been

5    killed.  I don't think he knows the circumstances.  And then

6    he's going to say Mr. Ledbetter made a statement in response to

7    that, and the statement about, you know, taking care of the

8    situation.  It was more graphic than that.  But he's going to

9    say those were made in front of him.  That's what he knows.

10        THE COURT:  All right.  If that's -- if that is the

11   answer that you anticipate, then I think that's totally

12   permissible because this is not hearsay.

13        MR. BERNDT:  We'll see what his answer is, I agree.

14        THE COURT:  Now, if -- Mr. Kelley, if you think that

15   there is any possibility that it would be otherwise, we can

16   certainly -- we could voir dire the witness and you could hear

17   it out of the presence of the jury.

18        MR. BERNDT:  It's important because this gentleman is

19   going to say he basically hears Mr. Ledbetter confess to

20   killing Alan Johnson as well as Rodriccos.

21        THE COURT:  What I'm going to do is allow the

22   questioning to stand.  I'm going to allow you to examine him on

23   this point alone outside the presence of the jury so that I can

24   hear the complete answers to determine whether they are

25   objectionable or otherwise, and then I'll bring the jury in and

TRIAL ONE – VOL. 7 –  728

1    you can go through it again.  Okay?

2              MR. KELLEY:  Okay.  Yes, Your Honor.

3              THE COURT:  That's what I'll do.

4         (The following proceedings were had in open court.)

5              THE COURT:  Okay.  Ladies and gentlemen, we have

6    another one of those evidentiary issues that the Court needs to

7    resolve that is not consistent at this point with your fact

8    finding mission so we're going to have you excused for no more

9    than five minutes.  So I'm going to have you excused, and then

10   we're going to bring you back in in about five minutes.

11        (Whereupon, the Jury exited the room.)

12             THE COURT:  Mr. Kelley, please proceed.

13             MR. KELLEY:  Your Honor, I apologize.  If we can go

14   back to the question asked.

15             THE COURT:  Absolutely.  Ms. Coulter, would you read

16   back the question that Mr. Kelley asked?

17        (Thereupon, the last question was read by the court

18   reporter.)

19             THE COURT:  Go ahead, Mr. Boyd.

20             THE WITNESS:  Can you repeat the question so I'm

21   understanding it correctly?

22        BY MR. KELLEY:

23   Q.   You were asked did Mr. Ledbetter describe or explain the

24   situation of how his brother was killed?

25   A.   That he was shot in the same street his father was shot.

TRIAL ONE – VOL. 7 –  729

1          THE COURT:  Wait a minute.  Say that again.

2          THE WITNESS:  I think he described his brother being

3   shot on the same street his father was shot.

4      BY MR. KELLEY:

5   Q.   The he being who?  Who was the he that you referred to?

6   A.   His brother.

7          THE COURT:  Who was the speaker?  Who told you that

8   his brother was shot the same way his father was shot?

9          THE WITNESS:  I believe Mr. Brandon Ledbetter.

10     BY MR. KELLEY:

11  Q.   And so our record is clear, you say I believe.

12  A.   Mr. Brandon Ledbetter is the one who told me that.

13  Q.   And that question, I think, covers what's going --

14         THE COURT:  It does.  It does.  You may bring --

15         MR. BERNDT:  Thank you, Your Honor.

16         THE COURT:  Yes.

17     You may bring the jury back in.

18         (Whereupon, the Jury entered the courtroom.)

19         THE COURT:  Ladies and gentlemen of the jury, thank

20  you very much for your patience.

21     Mr. Kelley, please continue.

22         MR. KELLEY:  Thank you, Your Honor.

23     BY MR. KELLEY:

24  Q.   Mr. Boyd, my question to you was did Mr. Ledbetter say

25  anything to you as to the manner or what had happened to his

TRIAL ONE – VOL. 7 –   730

1    brother?

2       A.    He said he was shot and murdered on the same street his

3    father was killed.

4       Q.    And when you say his father, that's referring to who?

5       A.    Brandon Ledbetter.

6       Q.    Did Mr. Ledbetter then say anything additional adding on

7    to that?

8       A.    Not that I remember.  He seemed frustrated.

9       Q.    Did you stick around for more of the conversation?

10      A.    No.

11      Q.    And how would you describe the scene or the setting at

12   the time?  Is it a comfortable setting, awkward?

13      A.    Awkward.

14      Q.    Then you do what?

15      A.    I think I went in my inventory room to kind of get away

16   from things.

17      Q.    Do you have additional times where you spend any kind of

18   time with Brandon Ledbetter?

19      A.    Not personally, but it might have been surrounded by my

20   businesses, whether he might have been bringing something for

21   Tonya or he stopped by my bar.

22      Q.    Okay.  And was there a particular time that he stopped

23   by your bar that stands out for you?

24      A.    Yeah.  He stopped by with a couple, I guess, of his

25   friends, and they were kind of -- it was a couple of them.  And

TRIAL ONE – VOL. 7 –   731

1   we wouldn't let them in because of what they had on.  So they

2   go and change, and we let them in and we had a conversation.

3    Q.   Let me back you up through a few steps of that.

4        When you say he and some friends, can you tell us how

5   many people?

6    A.   I mean, once again this was every bit of, I don't know,

7   eight, nine years ago, but -- eight years ago at least.

8   10-ish?

9    Q.   And there was a problem with how they were dressed?

10  Describe it for the jury.

11   A.   Yeah, they had the Rest-In-Peace T-shirts on.  Somebody

12  got killed.

13   Q.   Why was that a concern to you?

14   A.   Because I ran a legal establishment, and the last thing

15  I needed was more Rest-In-Peace problems there.

16        THE COURT:  I'm sorry.  What was the name of your

17  establishment?

18        THE WITNESS:  Allure Gentlemen's Club.

19        THE COURT:  Allure?

20        THE WITNESS:  Yes, sir.

21        THE COURT:  Allure, A-L-L-U-R-E?

22        THE WITNESS:  Yes, Your Honor.

23    BY MR. KELLEY:

24   Q.   And then you indicated they came back?

25   A.   Maybe not all of them.  Some of them did.  They changed,

TRIAL ONE – VOL. 7 –   732

1    maybe put just plain T-shirts or polos on.

2    Q.   Who were among the people that came back?

3    A.   Mr. Ledbetter.

4    Q.   And, again, did you recognize or know any of the other

5    people with him?

6    A.   No.

7    Q.   While I'm thinking of it, do you know anyone by the name

8    of Chris Harris?

9    A.   I don't believe so.

10   Q.   Do you know anyone by the name of Rashad Liston?

11   A.   I don't believe so.

12   Q.   Do you know anybody by the name of Earl Williams?

13   A.   Yes, I do.

14   Q.   How do you know Earl Williams?

15   A.   I was locked up with him.

16   Q.   When were you locked up with him?

17   A.   Maybe July of 2014 to December 2014.

18   Q.   Did you know Mr. Williams before being locked up with

19   him?

20   A.   Never met him.

21   Q.   And how is it that you met him then?

22   A.   He was actually a barber.

23   Q.   Within the jail?

24   A.   Correct.

25   Q.   All right.  Now, back to this meeting at the bar,

TRIAL ONE – VOL. 7 –   733

1   ultimately they're let back in?

2   A.   Yes.

3   Q.   Let into the bar?

4   A.   Correct.

5   Q.   What happens next?

6   A.   We were sitting talking in a private area, and he just

7   communicated his opinion about people.

8   Q.   Who is we?  Who was sitting together?

9   A.   Me and him.

10  Q.   Who is him?

11  A.   I'm sorry.  Mr. Ledbetter.

12  Q.   All right.  And when he's communicating, what is he

13  talking about?

14  A.   Just about how it would probably be in my best interest

15  to team up with him financially and just about his reputation

16  in the streets.

17  Q.   Let's take it step-by-step.

18  A.   Okay.

19  Q.   How did he suggest he could help you financially?

20  A.   I don't think necessarily he would help me financially.

21  More in protection.

22  Q.   How did he say he could provide protection?

23  A.   Just because he knew everybody, and you would be an

24  idiot to cross him.

25  Q.   Did he say how he could provide this protection or how

TRIAL ONE – VOL. 7 – 734

1   he would do it?

2     A.   Because he had some goons.

3     Q.   Were those his words?

4     A.   I don't know if those are his words.  I'm paraphrasing.

5   But he said he had people that you would be foolish to cross.

6     Q.   And it's real important when I'm asking you things that

7   he said if you're not sure of the wording, you tell us.

8     A.   Okay.

9     Q.   But --

10    A.   I don't remember exactly what was said.

11    Q.   All right.  What caused this conversation?

12         MR. BERNDT:  Your Honor, move to strike.  He doesn't

13   remember what was said.

14         THE COURT:  What he said was he didn't remember

15   exactly what he said.  So at this point I'm going to deny your

16   motion.  You may -- you may make your motion again at the

17   appropriate time with respect to discrete conversations, but at

18   this point there's no evidence that he did not know that about

19   which he has testified previously.

20         Please continue, Mr. Kelley.

21     BY MR. KELLEY:

22    Q.   Did Mr. Ledbetter tell you what his business was?

23    A.   Not specifically.  He hinted around.

24    Q.   And when you say hinting around, I mean what are the

25   topics that he's hinting at?

TRIAL ONE – VOL. 7 –  735

1   A.   Well, we spoke mainly about how he -- just his

2   reputation.  He went above and beyond to convince me on so many

3   different levels that he was somebody not to play with.

4   Q.   What kind of things did he tell you to convince you of

5   that?

6   A.   That he's hurting people, he's not playing.

7   Q.   Did he say what people?

8   A.   No, he didn't go into detail.

9   Q.   Did he talk about anybody in particular?

10  A.   He did speak about Ms. Latonya Boyce and her

11  relationship, and that's how Rodriccos Williams was brought up.

12  Q.   What did he have to say about Rodriccos Williams?

13  A.   Just basically that he was not very fond of him.  And I

14  don't know if I'm allowed to say verbatim what I believe was

15  said, but just that he wasn't very fond of him and that he just

16  wasn't putting him on, just a bunch of different things, and he

17  was dealing with Tonya and that was his girl.

18  Q.   Yes, we're in a court of law, but if you remember

19  specific words that he used, tell the jury what specific words

20  he used.

21  A.   I think he wouldn't put me on, and he's fucking my

22  bitch.  That stands out to me.

23  Q.   Referring to Latonya?

24  A.   Correct.

25  Q.   Why would he share this with you?

TRIAL ONE - VOL. 7 -  736

1    A.   I'm not sure.  That's a great question.  Because me and

2    him weren't close enough for him to communicate -- I would not

3    have communicated that to him.

4    Q.   Were other people around sitting with you at the time?

5    A.   No.

6    Q.   Did other people come and go around you?

7    A.   Bartenders, maybe.

8    Q.   What about the people who were with him?

9    A.   Oh, they were in the front.

10   Q.   Did he say anything as it related to Rodriccos and what

11   kind of business Rodriccos did?

12   A.   Marijuana.

13   Q.   Was that something known to you?

14   A.   I mean, yeah.  But since I'm not in that business, it

15   kind of went over my head.

16   Q.   Were you aware that Rodriccos Williams was involved in

17   marijuana?

18   A.   Yes.

19   Q.   How were you aware of that?

20   A.   I mean, everybody knew.

21   Q.   You need to help explain how everybody knew.  In

22   particular, how did you know?

23   A.   I think I knew because there was a kidnapping attempt at

24   one of my stores over something like that.

25   Q.   And you believe that related to Rodriccos?

TRIAL ONE – VOL. 7 –  737

1   A.   Very much so.  I don't think people were frustrated

2   because of the car charger warranties we had so I think that

3   went towards that.

4   Q.   Did Rodriccos ever share with you specifics of his

5   business?

6   A.   No.

7   Q.   Are you aware of Rodriccos conducting business in your

8   club?

9   A.   I wouldn't say business.  I think he might have had

10   meetings there.

11   Q.   Were there meetings there or not?

12   A.   I believe so, yes.

13   Q.   Do you think some of those meetings were drug-related?

14   A.   Yes, I do.

15   Q.   Why do you think that?

16   A.   That's just the feeling I got because of who he was

17   bringing around.  They didn't look like it would be people that

18   would support our business.

19   Q.   Did he share specifics with you that caused you to think

20   that?

21   A.   Yes, he did.

22   Q.   And what kind of specifics did he share?

23   A.   I guess his supplier would come in there.

24   Q.   And you're talking about Rodriccos' supplier?

25   A.   Yes.

TRIAL ONE – VOL. 7 –   738

1    Q.   Did he say what substances he was dealing with with this

2    man?

3    A.   Marijuana.

4    Q.   Was this supplier the subject of much conversation or

5    concern?

6    A.   No, not really.

7    Q.   So that aspect of Rodriccos is not a surprise to you?

8    A.   No.

9    Q.   Is that something that Mr. Ledbetter talked about?

10   A.   Not in detail, but I believe it was just from the

11   conversation that he knew what Rodriccos was doing.

12   Q.   Did Mr. Ledbetter talk about any people that he did

13   things with?

14   A.   No, he didn't speak about anybody specific.  He said

15   something about his little crew.

16   Q.   Did he describe this little crew or use any terms?

17   A.   Through a name.

18   Q.   What name?

19   A.   Cut Throat Committee.

20   Q.   Did he say what Cut Throat Committee was?

21   A.   I kind of made an assumption so he didn't have to.

22   Q.   Assumption based on what?

23   A.   The name itself.

24   Q.   Did he say what people did for Cut Throat Committee?

25   A.   No.  He just said that they handle business.

TRIAL ONE – VOL. 7 –   739

1    Q.   And by business, did he clarify what business he's

2   talking about?

3    A.   The way that the atmosphere was and the environment, he

4   didn't have to.

5    Q.   Based on the context of the conversation, you took it?

6    A.   Correct.

7    Q.   But did he share enough specifics that you felt it was

8   clear?

9    A.   Yeah, he shared enough specifics where I was

10   uncomfortable.  Uncomfortable enough that I communicated with

11   somebody that I knew that it was probably in his best interest

12   not to come up to my establishment.

13    Q.   Tell us about that.  What did you do?

14    A.   I believe I might have excused myself to go maybe get

15   his drinks, and while I was there I made a phone call.

16    Q.   Who did you call?

17    A.   I believe I called Rodriccos Williams first and told him

18   not to come up to my location.

19    Q.   Why did you do that?

20    A.   Just because it seems like there's some dudes here that

21   are not liking you, and they are kind of pissed off.

22    Q.   How did Rodriccos react?

23    A.   Kind of blew up.

24    Q.   What's he saying?

25    A.   Screw them.  I'm on my way up there.

TRIAL ONE – VOL. 7 – 740

1  Q.  Did that concern you?

2  A.  A lot.

3  Q.  What do you do?

4  A.  Then I believe I hang up, and I call Latonya Boyce.

5  Q.  What's that conversation about?

6  A.  Tonya, whatever you got to do to keep him at the house,

7  figure it out, keep him there.

8  Q.  Do you go back and talk to Mr. Ledbetter?

9  A.  Yeah, I'm sure I did.  I didn't give him the heads up

10  that I called Rod, no, but I played it smooth as I could.

11  Q.  Did Mr. Ledbetter ever indicate he was going to do

12  something to Rodriccos?

13  A.  No.  He didn't ever indicate he was going to do

14  something.  He just made it real clear that there were problems

15  there.

16  Q.  Now, do you recall meeting with the investigators in

17  this case in the last six months?

18  A.  Yes.

19  Q.  Do you recall telling them something a little different

20  than that?

21  A.  Well, I remember telling them that he was mad, and I'm

22  positive about that.  He was mad, he was furious, and he made

23  it real clear that he had a problem with Rod.

24  Q.  Did he threaten to do something to Rod?

25  A.  Yeah.  He said he was going to fuck Rod up, yeah.

TRIAL ONE – VOL. 7 –  741

1    Q.   And by fuck him up, what do you think he meant?

2          MR. BERNDT:  Objection, Your Honor.

3          THE COURT:  Sustained.

4      BY MR. KELLEY:

5    Q.   Did he offer any additional comments as to what he was

6    going to do to him?

7    A.   Well, he indirectly threatened everybody.

8    Q.   And when you say everybody, who are you --

9    A.   I'm sorry, indirectly threatened me.  I felt threatened,

10   and he --

11         MR. DURKIN:  Your Honor, I'm going to object to how he

12   felt.

13         THE COURT:  Overruled.

14     BY MR. KELLEY:

15   Q.   You can answer.

16   A.   He indirectly threatened me by just some -- it was

17   almost as if he was just trying to convince me to spook me, if

18   that made sense.

19   Q.   Why would he want to spook you?

20   A.   I'm not exactly sure, but I think really it was more or

21   less for me to kind of get down with him.

22         THE COURT:  Just a second, Mr. Kelley.

23         When you say get down with him, would you explain to the

24   ladies and gentlemen of the jury what you mean by that phrase?

25         THE WITNESS:  I think maybe do business on some kind

TRIAL ONE – VOL. 7 –   742

1   of level.  It was as if I was getting recruited.

2       BY MR. KELLEY:

3    Q.   Did he offer specifics as to what kind of business?

4    A.   No.  But, I mean, it just came along the lines of maybe

5   people didn't like me, and by being with him I wouldn't have

6   problems.

7    Q.   And did he ever specify what services he was offering?

8    A.   I mean, no.  He made it clear he was hurting people.

9    Q.   There was no doubt in your mind?

10   A.   No.

11   Q.   Was this along the lines of the protection that he had

12  offered?

13   A.   I mean, correct, that's what I assumed it to be.

14   Q.   Did Rodriccos Williams show up at the club?

15   A.   He showed up late after everybody was gone and drunk and

16  gone.

17   Q.   Had Mr. Ledbetter left by that time?

18   A.   Yes.

19   Q.   Was there any further discussion with you and Ledbetter

20  before he left along these lines?

21   A.   Probably be careful and bye.

22   Q.   Did you share the gist of this conversation at all with

23  Rodriccos Williams?

24   A.   Yeah, I definitely did.

25   Q.   And that was yet that night?

TRIAL ONE – VOL. 7 – 743

1    A.    Maybe, or the day after.  But, yeah, I probably said

2    something because Tonya communicated what I told him.  That's

3    why he didn't come up there.

4    Q.    In terms of the timing of this conversation, can you

5    pinpoint the time frame for when this took place?

6    A.    It'd probably been around last call.

7    Q.    In terms of the evening?

8    A.    I'm sorry, 2:15-ish in the morning.

9    Q.    How about in terms of the calendar date, when was this

10   conversation taking place?

11   A.    That, I can't recall.

12   Q.    Can you tell us using the murder of Rodriccos Williams

13   as a benchmark how far before that it would have occurred?

14   A.    Three to four weeks.

15   Q.    You think it's that close in time?

16   A.    I believe.  That's -- I'm speculating.  Once again it

17   was eight years ago.

18         MR. BERNDT:  Objection, Your Honor.

19         THE COURT:  Sustained.

20         MR. BERNDT:  Thank you.  Move to strike his answer.

21         THE COURT:  Granted.

22         MR. BERNDT:  Thank you.

23     BY MR. KELLEY:

24   Q.    Is there anything else that helps you pin down the time

25   frame of when this occurred?

TRIAL ONE – VOL. 7 –  744

1    A.    Nothing comes to mind, no.

2    Q.    Ultimately, Rodriccos Williams is killed I think

3    November 3 of 2007.  Does that sound about right?

4    A.    Sounds right.  The only reason why I say that is my

5    birthday is November 8, and I remember it being kind of crappy.

6    Q.    Did you tell anyone about the conversation you had had

7    with Brandon Ledbetter when that happened?

8    A.    Yeah, I told Latonya Boyce.

9         MR. DURKIN:  I would object, Your Honor, as to who he

10   told the conversation to.

11        THE COURT:  Overruled.

12        THE WITNESS:  I told Latonya Boyce.

13     BY MR. KELLEY:

14   Q.    Did you tell any law enforcement officials?

15   A.    I don't think I told any law enforcement officials then.

16   I told them after the fact because I got questioned by

17   Pickerington.

18   Q.    How long after the fact did that take place?

19   A.    '09.

20   Q.    At least two years after the murder?

21   A.    Yeah.

22   Q.    Did they seek you out or did you go looking for them?

23   A.    Actually, they sought me out.

24   Q.    You mentioned having served some time in jail.  What

25   were you convicted of?

TRIAL ONE - VOL. 7 - 745

1    A.    No problem.  I was convicted of agg arson.

2    Q.    And when was the aggravated arson conviction?

3    A.    It was May 25, 2012.

4    Q.    What was your sentence?

5    A.    Four years.

6    Q.    How much of that time did you serve?

7    A.    30 months, 31 months.

8    Q.    Any other convictions?

9    A.    I think something when I was in college, false pretense.

10   Q.    Where was that?

11   A.    Virginia.

12   Q.    Can you give us a time frame?

13   A.    2000.

14   Q.    Did you ever reach out to the federal government

15   offering up this information?

16   A.    No.

17   Q.    How did you end up here?

18   A.    I ended up here because I reached out -- well, I guess I

19   spoke to the Pickerington police department, and they

20   interviewed me while I was locked up.

21   Q.    Do you want to be here testifying today?

22   A.    Not at all.

23   Q.    What are you getting out of testifying here today?

24   A.    More gray hair.

25   Q.    Anything positive from the government you're hoping to

TRIAL ONE – VOL. 7 – 746

1   get out of this?

2   A.   I'm hoping to get off probation, but that's not a

3   guarantee.

4   Q.   What has the government offered to do for you?

5   A.   Zero.

6   Q.   Have you asked us, though, to talk to anybody?

7   A.   Yes, I have.

8   Q.   Who do you want us to talk to?

9   A.   My prosecutor.

10  Q.   Have there been any promises made that we would do that?

11  A.   Not a single one.

12  Q.   And you're still on probation from the --

13  A.   2012 incident.

14          THE COURT:  That was in state court, Mr. Boyd?

15          THE WITNESS:  Yes, Your Honor.

16      BY MR. KELLEY:

17  Q.   Did you get any kind of prison time for the false

18  pretenses conviction?

19  A.   No.

20  Q.   Do you remember what the sentence was?

21  A.   Probation.

22  Q.   Do you remember how long?

23  A.   Six months.

24          MR. KELLEY:  If I may have a moment, Your Honor?

25          THE COURT:  Yes, you may.

TRIAL ONE – VOL. 7 –  747

1     BY MR. KELLEY:

2     Q.    In regards to what you want the government to do, have

3     you asked for anything else from the government, the federal

4     government, as it relates to you testifying today?

5     A.    I believe I would like my record expunged, but nothing

6     has been promised to me.

7     Q.    How about your safekeeping or protection?

8     A.    Yeah, I would actually like to be relocated, if

9     possible.

10    Q.    And have we indicated that we would at least consider

11    that?

12    A.    Yes, you have.

13    Q.    Has that been promised to you?

14    A.    No, it hasn't.

15         THE COURT:  Before you are done, could I see counsel?

16              – – –

17    Thereupon, the following proceeding was held at side bar

18    out of hearing of the jury:

19         THE COURT:  I have a little bit of confusion that

20    maybe you can clear up for me or maybe clear up through the

21    witness.  I was under the impression that he was on probation

22    for like five years; it might have been non-reporting

23    probation.  He says he was on probation for six months.

24         Do you have any information one way or the other as to

25    which is correct?

TRIAL ONE - VOL. 7 -  748

1          MR. KELLEY:  His record indicates, Your Honor, that he

2     had a suspended sentence but that he was given five years of

3     probation.  On a suspended sentence, I don't know how much of

4     that is actually --

5          THE COURT:  Was that in Virginia?

6          MR. KELLEY:  That's the old one in Virginia.

7          THE COURT:  That might have been non-reporting

8     probation so that's why he thinks the sentence is maybe six

9     months.  I'm trying to figure it out.

10          MR. BERNDT:  Your Honor, his record also indicates

11     that in -- his conviction for the taking money under false

12     pretenses was 2004.  In 2005 he had a fugitive from justice

13     charge.

14          MR. KELLEY:  Not a conviction.

15          MR. BERNDT:  No.  But a fugitive from justice charge

16     is usually, in my experience here in Central Ohio, an

17     out-of-state warrant.

18          THE COURT:  Okay.

19          MR. BERNDT:  Which when I go back to my office tonight

20     and I look that up, I'll bet my next fee that that's what

21     that's going to be, that he had a probationary problem in

22     Virginia because there's no other conviction connected to that

23     fugitive from justice charge.  His next charge is 2007 for

24     theft.  So I believe that we're going to find out that he just

25     said that it was six months probation, and it was five years.

TRIAL ONE - VOL. 7 -  749

1   And I also will get -- think that we will see that he should

2   know that because of this fugitive from justice charge.

3          THE COURT:  Is there any way that --

4          MR. BERNDT:  I have his record if you want to see

5   that.

6          THE COURT:  Because that will make -- I have had a

7   chance to have some quick research done which shows that in the

8   Sixth Circuit when you come off of limited disability -- hold

9   on a second.

10         MR. NOLDER:  And he probably wasn't reporting.

11         MR. BERNDT:  Or probably not doing restitution.

12         THE COURT:  Mr. Kelley, I have two unpublished cases

13  from the Sixth Circuit which state indicta that the 10-year

14  clock runs from, quote, when the witness was relieved from

15  confinement or the period of his parole or probation had

16  expired.  And so whether he was on six months or five years

17  makes a lot of difference, because if it was five years then

18  the period expired in '09, and so you have until '19 where you

19  can inquire about it under 609.

20         MR. BERNDT:  Your Honor, this is what I based it on,

21  what was provided to me by the government here this morning.

22         THE COURT:  Unsupervised release probation.

23         MR. BERNDT:  Which again, Your Honor, taking money by

24  false pretenses probably also involved restitution which could

25  be another reason for this fugitive from justice warrant.  Even

TRIAL ONE – VOL. 7 –  750

1   if it was unsupervised, if you don't pay –– and, again, I'm

2   guessing, but with this guy's background and the nature of his

3   responses and the type of information that he's giving, I –– I

4   think that he just perjured himself, to be honest with you.  So

5   I don't think that the 10-year rule is going to matter when we

6   come back tomorrow morning.

7          THE COURT:  If either of you finds anything that's

8   different or that will give me greater clarity, then we can

9   take it up at 8:30.

10          MR. BERNDT:  Judge, I will just Google it and do what

11   I can.  These guys may have better access.

12          THE COURT:  You can find out, too, Mr. Kelley.

13          MR. KELLEY:  The only thing I want to note,

14   Your Honor, is the theft is not a conviction by the records I'm

15   seeing.  Likewise ––

16          THE COURT:  Yeah, only the convictions is fair game.

17          MR. BERNDT:  Judge, that's why I had all this to do.

18          MR. KELLEY:  All right.  Thank you.

19      (The following proceedings were had in open court.)

20          MR. KELLEY:  I have no further questions, Your Honor.

21        Thank you.

22          THE COURT:  Ladies and gentlemen, that will conclude

23   our testimony for today.  In the morning we will resume with

24   Mr. Boyd with the cross-examination, first, of Mr. Berndt and

25   then any other counsel for the defense who wishes to

TRIAL ONE – VOL. 7 –  751

1    cross-examine Mr. Boyd.

2           Ladies and gentlemen, thank you, once again, for your

3    patience and attentiveness.  And as I always admonish you,

4    remember the rules of engagement regarding our overnight

5    adjournments and travel safely going home.  I look forward to

6    seeing everyone first thing in the morning.

7           Oh, and by the way, tomorrow we will work from 9:00

8    o'clock until 4:00.  We will adjourn tomorrow at 4:00 o'clock.

9       (Whereupon, the Jury exited the room.)

10          THE COURT:  Mr. Kelley, anything else from the

11   government before we adjourn this evening?

12          MR. KELLEY:  No, Your Honor.

13          THE COURT:  And you're going to -- Mr. Martinez or

14   Mr. DeVillers will supply defense counsel within the next half

15   hour -- within the next hour --

16          MR. KELLEY:  We did send an e-mail yesterday, and I

17   think that system worked.  And our goal is always to do it

18   within one hour of us finishing court each day.

19          THE COURT:  Mr. Berndt, anything on behalf of

20   Mr. Ledbetter?

21          MR. BERNDT:  No, Your Honor.

22          THE COURT:  Mr. Durkin?

23          MR. DURKIN:  No, Your Honor.

24          THE COURT:  Mr. Miller?

25          MR. MILLER:  No, Your Honor.

TRIAL ONE – VOL. 7 –   752

1          THE COURT:  Mr. Durden?

2          MR. DURDEN:  No, Your Honor.

3          THE COURT:  Mr. McVay?

4          MR. MCVAY:  No, Your Honor.

5          THE COURT:  Mr. Nolder?

6          MR. NOLDER:  No, Your Honor.

7          THE COURT:  All right.  Thank you very much, everyone.

8   I will see you in the morning.

9       (Proceedings concluded at 5:13 p.m..)

10                           – – –

1                          – – –

2                      WITNESS INDEX

3                          – – –

4     WITNESSES              DIRECT   CROSS   REDIRECT   RECROSS

5     PLAINTIFF'S:

6     Michael Robison          469    480       494       499
      James Haley              500    522       539
7     Steven Magaw             540    547
      Ken Linscott             550    555       571
8     Michael P. Higgins       556    566
      Anthony J. Garrison      572    616
9        By Mr. Durkin                617
         By Mr. Miller                619
10    David Dennison           620    624       631       631
         By Mr. Gatterdam             628                 717
11    Yvonne Taliaferro        632    675       713       715
         By Mr. Gatterdam             684
12       By Mr. Miller                699
         By Mr. McVay                 701
13    Michael Boyd             720

14

15

16

17

18

19

20

21

22

23

24

25

TRIAL ONE – VOL. 7 –  754

1                           – – –

2                     INDEX OF EXHIBITS

3                           – – –

4     PLAINTIFF'S:                              RECEIVED

5     1-2-026                                     508
      1-2-027                                     508
6     1-2-028                                     509
      1-2-029                                     509
7     1-2-030                                     509
      1-3-076                                     516
8     19-1-006                                    584
      19-8                                        591
9     19-4                                        593
      19-8                                        594
10    19-6                                        599
      19-5                                        599
11    19-7                                        600
      19-19                                       600
12    19-26                                       603
      19-23                                       603
13    19-20                                       604
      19-21                                       605
14    19-25                                       606
      19-27                                       607
15    19-24                                       607
      19-22                                       608
16    19-13                                       609
      19-14                                       611
17    19-18                                       612
      19-12                                       613
18    19-11                                       614
      19-17                                       614
19    19-10                                       615
      19-15                                       616
20    20-1                                        640
      20-2                                        645
21    20-2# THROUGH 20-2#-056                     648
      20-3                                        655
22    20-14                                       657
      20-16                                       659
23    20-17                                       660
      20-15                                       661
24    20-4                                        663
      36-3                                        479
25    113-1                                       665

TRIAL ONE – VOL. 7 –   755

1                            – – –

2                   INDEX OF EXHIBITS

3                            – – –

4      PLAINTIFF'S:                                 RECEIVED

5      113-2                                         668
       113-2# THROUGH 113-2#-022                     670
6      113-3                                         673
       113-8                                         674
7      113-9                                         674
       113-10                                        674
8      113-11                                        674
       128-2                                         546
9      130-2                                         554
       131-3                                         565
10     154-1-33                                      522

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

TRIAL ONE – VOL. 7 –   756

1                    C E R T I F I C A T E

2

3          We, Shawna J. Evans, Denise N. Errett, Lahana DuFour,

4    Darla J. Coulter, do hereby certify that the foregoing is a

5    true and correct transcript of the proceedings before the

6    Honorable Algenon L. Marbley, Judge, in the United States

7    District Court, Southern District of Ohio, Eastern Division, on

8    the date indicated, reported by us in shorthand and transcribed

9    by us or under our supervision.

10

11

12                         s/Shawna J. Evans
                           Shawna J. Evans, RMR
13                         Official Federal Court Reporter

14

15                         s/Denise N. Errett
                           Denise N. Errett, RMR CRR
16                         Official Federal Court Reporter

17

18                         s/Darla J. Coulter
                           Darla J. Coulter, RMR, CRR
19                         Former Official Federal Court Reporter

20

21                         s/Lahana DuFour
                           Lahana DuFour, RMR, CRR
22                         Official Federal Court Reporter

23                         April 13, 2016

24

25